IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JACQUELINE STEVENS,                    )
                                       )
        Plaintiff,                     )
                                       )
vs.                                    )        CIVIL ACTION NO.:
                                       )        1:12-CV-1352-ODE
ERIC H. HOLDER, Attorney               )
General of the United States;          )
JUAN OSUNA, Director, Executive        )
Office of Immigration Review;          )
FRAN MOONEY, Assistant Director        )
for the Office of Management           )
Programs, Executive Office of          )
Immigration Review in her              )
individual and official capacity;      )
MARYBETH KELLER,                       )
Assistant Chief Immigration Judge,     )
Executive Office of Immigration        )
Review, in her individual and official )
capacity; GARY SMITH, Assistant        )
Chief Immigration Judge, Executive     )
Office of Immigration Review;          )
WILLIAM ANTHONY CASSIDY,               )
Immigration Judge, Executive           )
Office of Immigration Review in        )
his individual and official capacity;  )
CYNTHIA LONG, Court                     )
Administrator, in her individual and   )
official capacity; DARREN EUGENE)
SUMMERS, Regional District             )
Supervisor, Federal Protective         )
Services, in his individual and official )
capacity; INSPECTOR DOE,               )

Federal Protective Services;      )
PARAGON SYSTEMS, INC., and        )
PARAGON SYSTEMS, INC.'S           )
GUARD DOES 1-3; PARAGON           )
SYSTEMS, INC. SUPERVISOR          )
DOE,                              )
                                  )
        Defendants.               )

---

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE FEDERAL DEFENDANTS' MOTION TO DISMISS

---

FEDERAL & HASSON, LLP
R. Keegan Federal, Jr.
Georgia Bar No. 257200
Anne S. Douds
Georgia Bar No. 691947
Kelley B. Simoneaux
Georgia Bar No. 504602

*Attorneys for Plaintiff*

Two Ravinia Drive
Suite 1776
Atlanta, Georgia 30346
Telephone: (678) 443-4044
Facsimile: (678) 443-4081
keegan@federalhasson.com
anne@federalhasson.com
kelley@federalhasson.com

## **Table of Contents**

I. Introduction

    A. The Facts to be Tested by the Motion to Dismiss: *Twombly, Iqbal*, and the Constitutional Right of Access to the Courts ................................. 5

    B. The Federal Defendants' Mischaracterizations of the Assumed Factual Record ....................................................................................... 7

II. Argument and Citation of Authority

    A. The Claimed Impotency of Federal Injunctive Relief ......................... 10

    B. The Plaintiff's Constitutional Standing ................................................ 11

    C. The "Clear Definition" of a First Amendment Right to Observe Deportation Hearings ................................................................................ 12

    D. The Constitutional Scope of the *Bivens* Doctrine ............................... 19

        1. First Amendment Violations ..................................................... 22

        2. Fourth Amendment Violations ................................................. 24

        3. Fifth Amendment Violations .................................................... 25

    E. The Facial Unconstitutionality of Regulations Permitting Closure of Immigration Hearings to the Press .............................................................. 26

    F. The Alleged Failure to Exhaust Administrative Remedies ................... 28

    G. Immigration Judges Have Neither "Absolute" Nor "Qualified" Judicial Immunity for Constitutional Wrongs Committed Against Third Party Members of the Public .................................................................... 29

III. Conclusion ................................................................................................ 33

## Table of Authorities

## <u>Cases</u>

*Accord Weissman v. NASD, Inc.,* 468 F.3d 1306 (11th Cir. 2006)...............................31

*Alyshah v. Hunter,* 2006 U.S. Dist. LEXIS 68921 ...............................................31

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) .....................................................4, 23

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007).......................................4

*Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971)...........................19

*Bradley v. Fisher,* 80 U.S. 335 (1872) .......................................................30

*Buckley v. Fitzsimmons,* 509 U.S. 259 (1993) ............................................30

*Burns v. Reed,* 500 U.S. 478 (1991)..........................................................30

*Burton v. City of Belle Glade,* 178 F.3d 1175 (11th Cir. 1999)......................11

*Bush v. Lucas,* 462 U.S. 367 (1983)......................................................23, 24

*Butz v. Economou,* 438 U.S. 478 (1978) ...............................................25, 29

*Caraballo-Sandoval v. Honsted,* 35 F.3d 521 (11th Cir. 1994), *reh'g denied,*
       48 F.3d 538 (11th Cir. 1995) ........................................................29

*Carlson v. Green,* 446 U.S. 14 (1980).........................................................28

*City of Los Angeles v. Lyons,* 461 U.S. 95 (1983) .......................................10

*Clearfield Trust Co. v. United States,* 318 U.S. 363 (1943) ...........................21

*Conley v. Gibson,* 355 U.S. 41 (1957) .........................................................4

*Crawford-El v. Britton,* 523 U.S. 574(1998) .............................................23

*Davis v. Passman,* 442 U.S. 228 (1979) .....................................................25

*Detroit Free Press v. Ashcroft,* 303 F.3d 681 (6th Cir. 2002)..........................9

*Forrester v. White*, 484 U.S. 219 (1984) ........................................................30

*Gannett Co., Inc. v. Depasquale,* 443 U.S. 368 (1979) ...............................26

*Globe Newspaper Co. v. Superior Court,* 457 U.S. 596 (1982)...................27

*Hartman v. Moore,* 547 U.S. 250 (2006) .....................................................23

*In the Matter of Continental Illinois Securities Litigation.  Appeal of Continental
   Illinois Corp. & Continental Illinois National Bank & Trust Co. of Chicago,*
   732 F.2d 1302 (7th Cir. 1984) ...............................................................27

*J. 1 Case Co.* v. *Borak,* 377 U.S. 426 (1964) .............................................22

*Kelly v. Serna*, 87 F.3d 1235 (11th Cir. 2003) ............................................4

*Kwock Jan Fat v. White,* 253 U.S. 454 (1920)..............................................6

*Lyttle v. United States,* 2012 U.S. Dist. LEXIS 46211 (M.D. Ga.) ...........31, 32

*M.H.D. v. Westminister Schools*, 172 F.3d 797 (11th Cir. 1999) ................4

*Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274 (1977) ...................23

*NAACP v. Button*, 371 U.S. 415 (1963)........................................................26

*North Jersey Media Group,Inc. v. Ashcroft,* 308 F.3d 198 (3d Cir. 2002)..............17

*Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895 (5th Cir. 1978) ...........11

*Perry v. Sindermann,* 408 U.S. 593 (1972)..................................................23

*Press-Enterprise Co. v. Superior Court,* 478 U.S. 1 (1986).........................15

*Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555 (1980)...................13

*Smith v. Shook*, 237 F3d 1322 (2001) .........................................................31

*Solymar Investments, Ltd. v. Banco Santander, S.A.,* 672 F.3d 981 (11th Cir.
   2012) .......................................................................................................4

*Textile Workers* v. *Lincoln Mills,* 353 U.S. 448 (1957)..............................................21

*United States* v. *Standard Oil Co.,* 332 U.S. 301 (1947)............................................21

*Warth v. Seldin,* 422 U.S. 490 (1975) ..........................................................................12

### **Statutes and Regulations**

8 C.F.R. §3.27 .................................................................................................................18

8 C.F.R. §1003.27 ...........................................................................................................15

8 U.S.C. §1229 ................................................................................................15, 16, 19

42 U.S.C. §1983 ..............................................................................................................21

Massachusetts General Laws Section 16A of Chapter 278 .......................................27

### **Treatises**

J.M Beattie, CRIME AND THE COURTS IN ENGLAND, 1660-1800 (Clarendon Press, 1986) quoting from an Act of the Privy Council (colonial), vol. 2, pp. 370-71, 389-90. .........................................................................................13

Paul Slack, Vagrants and Vagrancy in England, 1598-1664, *Journal of Economic History* 364 citing R. H. Tawney and E. Power, eds. Tudor Economic Documents (1924), I, 341.................................................................13

Hill, *The Bill of Rights and the Supervisory Power*, 69 COLUM. L. REV. 181, 182-185 n 8  (1969) ...........................................................................................22

Dr. Jacqueline Stevens, Plaintiff in the matter at bar, is a journalist[1] and academician[2] who has for years been deeply involved in the research of national immigration policy and practices. She has publicly expressed outrage at the wrongful deportation of United States citizens,[3] at the conduct of secret immigration "trials," and at the trial of deportees *en masse*.[4] Her work led her to

---

1 Plaintiff's journalistic contributions have appeared in the *New York Times* and *The Nation* magazine. *E.g.,* Stevens, "Political Scientists Are Lousy Forecasters," N.Y. TIMES (June 23, 2012; Dr. Stevens states on her blog, www.stateswithoutnatiions.com: "I teach political theory and write about law-breaking by ICE and the immigration courts for *The Nation* magazine."

2 Professor, Department of Political Science, Northwestern University. Ph.D. in political science from the University of California at Berkeley (1993) and B.A. from Smith College (Phi Beta Kappa and Highest Honors, 1984). Her scholarship "explores political theories of membership since antiquity, and she publishes empirical research on immigration law enforcement, including the practices resulting in the unlawful deportation of United States citizens from the United States." See J. STEVENS, STATES WITHOUT NATIONS: CITIZENSHIP FOR MORTALS (Columbia University Press (2009)) (paperback edition (2011)); RESHAPING JUSTICE: INTERNATIONAL LAW AND THE THIRD WORLD, THIRD WORLD QUARTERLY, Jacqueline Stevens, Richard Falk and Balakrishnan Rajagopal (editors)(2006); J. STEVENS, REPRODUCING THE STATE (PRINCETON UNIVERSITY (1999)). Other scholarly work has appeared in the *American Political Science Review, Political Theory,* the *Journal of Political Philosophy, Social Text, The Third World Quarterly, Virginia Journal of Social Policy and Law, Journal of Law, Culture, and the Humanities, New York Law Review, Journal of Health Policy, Politics and Law, and Theory & Event.* Dr. Stevens has held faculty positions at the University of Michigan, the University of Southern California, New York University, Pomona College, the New School for Social Research, the University of California Santa Barbara, and the Berkeley Law School.

3 Stevens, *"Deporting American Citizens: ICE's Mexican-izing of Mark Lyttle,"* HUFFINGTON POST, August 21, 2009.

4 Dr. Stevens' webpage describes her "current projects:" "Since 2007 I have been conducting research on the unlawful detention and deportation of United States citizens and other United States residents locked up in jails and prisons without legal authority. Immigration and Customs Enforcement (ICE) has no jurisdiction over United States citizens and no one can

Atlanta, Georgia, location of one of the nation's most active immigration facilities,[5] where she incurred the ire of Defendant William Anthony Cassidy, an "Immigration Judge," within the Department of Justice's Executive Office of Immigration Review ("EOIR").

During 2009 and 2010, Defendant Cassidy's discomfort with the Plaintiff's inquiries caused him to close his "courtroom" to the Plaintiff and other members of the public and, ultimately, to direct Plaintiff's physical removal. The Plaintiff, *pro se*, sought Constitutional protection for her journalistic and academic activities in an action for damages against Defendant Cassidy and for injunctive relief against Cassidy, as well as the Attorney General of the United States, the Director of the EOIR, the Assistant Director for the Office of Management Programs of EOIR,

---

hold someone 'for ICE' without a legal detainer. In these cases, occurring by the thousands, ICE agents are guilty of false imprisonment and kidnapping." See www.poliscinorthwestern.edu.

5 Research from Plaintiff's April, 2010 investigations in Georgia was subsequently published in *The Nation*. The Defendants grudgingly acknowledge that "[b]ased upon her research, Plaintiff has appeared on CNN, NPR, and published articles ... about the alleged immigration law enforcement conduct." Brief at 3. However, notwithstanding the undisputed evidence of Plaintiff's scholarship and journalistic work, the Federal Defendants appear skeptical. *E.g.*: "According to Plaintiff," she is conducting research. (Brief at 3.) Plaintiff is "ostensibly ... a member of the press media." (Brief at 12-13.) Such skepticism appears to be strategic, in response to the extraordinary nature of the Defendants' actions. In this regard, e-mail among senior EOIR officials, including those named in the Complaint, obtained under the Freedom of Information Act, expresses dismay, even derision, about Plaintiff's persistence in attempting to observe immigration hearings. Such email references meetings in April, 2010 to discuss "banning" Plaintiff from hearings. This email is among those same officials who did not adequately investigate Plaintiff's misconduct complaints of April 27, 2010, November 20, 2010, and December 6, 2010.

two Assistant Chief Immigration Judges of EOIR, the EOIR's Immigration Court Administrator in Atlanta; and the Regional District Supervisor and an Inspector for the Federal Protective Services. (These nine defendants will be referred to as the "Federal Defendants.")[6]

However discomforting Professor Stevens' commentary and activities may have been to the Federal Defendants, such activities are--patently, classically, and unequivocally—Constitutionally protected. Indeed, the conduct of the Federal Defendants is a Constitutional outrage.

## I.    **Introduction**

Counsel for the Plaintiff anticipates that the Complaint, as filed, will be amended. However, the operative facts will not change, and the broad legal issues raised by the Federal Defendants' Motion will not change. Therefore, Plaintiff wishes to join issue on the matters raised in the Federal Defendants' Motion and Brief.

The precise nature of the Motion is unclear. It is referenced, initially, as a generic Rule 12(b)(6) motion to dismiss for failure to state a claim (Brief at 2); however, it is a hybrid motion, alternately referred to as a motion to dismiss for lack of subject matter jurisdiction (Brief at 6) under Rule 12(b)(1), or as an attack

---

6 Additionally, Plaintiff sought relief from the private corporation and its four employees who physically removed her from the EOIR facilities in Atlanta.

on the Plaintiff's standing (Brief at 7), and, finally, the Brief implicitly acknowledges that it (at 6) refers to matters outside of the pleadings, which under Rule 12 (d) should convert the Motion to one for summary judgment under Rule 56, with the attendant requirements of Local Rule 56.1.[7] Absent further guidance from the Federal Defendants, Plaintiff will treat the Motion as one to dismiss for failure to state a claim.

Notwithstanding the Supreme Court's opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)("retiring" *Conley v. Gibson*, 355 U.S. 41 (1957) in favor of a "facial plausibility" test) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the traditional nature of Rule 12(b)(6) motions has been subsequently affirmed by the Eleventh Circuit.  As Judge Fay recently wrote in *Solymar Investments, Ltd. v. Banco Santander, S.A.*, 672 F.3d 981 (11th Cir. 2012), "[u]nder both *Twombly* and *Ashcroft [v. Iqbal]*, we are required to accept well-pleaded facts as true when considering a motion to dismiss."   Indeed, ***all*** well-pled, non-conclusory allegations of a federal complaint are to be assumed as true for purposes of testing their legal sufficiency under 12(b)(6), and the Plaintiff is entitled to ***all*** favorable

_____

7 The Federal Defendants also assert that a portion of the Plaintiff's *Bivens* claim, filed April 18, 2012, is barred by the applicable statute of limitations under *Kelly v. Serna*, 87 F.3d 1235 (11th Cir. 2003) and *M.H.D. v. Westminister Schools,* 172 F.3d 797 (11th Cir. 1999).  Brief at 4 n.2.  Plaintiff acknowledges that the cited decisions hold a two year statute to be applicable to *Bivens* claims in Georgia, but both decisions are clear that the accrual of the cause of the action, the time at which the statute begins to run, is a matter of federal law.  Therefore, it is not clear, as suggested, that any of Plaintiff's claims are time-barred.

inferences that might be drawn from those allegations.  In this light, a review of the detailed averments of the *pro se* Complaint reveal a train of Constitutional abuses that cry for a federal remedy.

### A.   <u>The Facts to be Tested by the Motion to Dismiss: *Twombly, Iqbal*, and the Constitutional Right of Access to the Courts.</u>

As *Twombly* and *Iqbal* teach, the plausibility of a federal claim is to be tested by measurement of the non-conclusory statement of facts in the Complaint against the legal contours of the right sought to be vindicated.  The Plaintiff claims that she is entitled to attend deportation hearings and to be free, when she does so, of physical restraint designed to restrict her access.  The factual allegations of her Complaint, which must be assumed as true, are neither conclusory nor improperly pled.  They are explicit as to the date, time, and manner of the Constitutional violations.  They more than satisfy Rule 8(a)(2)'s requirement of a "short and plain statement of the claim showing that the pleader is entitled to relief."

The Complaint, at paragraphs 17 through 109, painfully details the efforts of the Federal Defendants to deny access to Plaintiff.  It must be taken as true that "[o]n *multiple occasions* Plaintiff had been unlawfully prevented from observing hearings or removed from them after hearings were underway ... ." Complaint ¶ 18. [Emphasis supplied.]   Defendant Cassidy personally threatened Plaintiff directly with forced removal (Complaint ¶ 92).  Paragon Guard Doe #1 made

several contemporaneous statements that Defendant Cassidy "ordered" Plaintiff's removal from the building (Complaint ¶¶ 61, 65). Defendant Paragon DOE 1 told the "MegaCenter" Operator, in a recorded statement on the day of Plaintiff's removal, that "they're trying to ban her from the building" (Complaint ¶62). The unlawful directives of Defendant Cassidy were enforced by physical coercion, pursuant to which the Plaintiff was placed in immediate apprehension of an unlawful touching (assault) and was, in fact, unlawfully touched (battery). Complaint ¶¶ 58-60.

Most significantly, however, the sufficiency of the Plaintiff's allegations should be tested against the Constitutional values that she seeks to vindicate. Nearly a century ago, the Supreme Court observed:

> The acts of Congress give great power … over Chinese immigrants and persons of Chinese descent. *It is a power to be administered, not arbitrarily and secretly, but fairly and openly under the restraints of the tradition and principles of free government applicable where the fundamental rights of men are involved, regardless of their origin or race.* Kwock Jan Fat v. White, 253 U.S. 454, 464 (1920).) [Emphasis supplied.]

In determining whether this Plaintiff has stated "a claim," it should be borne in mind that the "claim" is for fair and open administration of the immigration laws, in accordance with "principles of free government" and "fundamental rights."

**B.**   **The Federal Defendants' Mischaracterizatons of the Assumed Factual Record.**

Prior to review of the Federal Defendants' legal analysis, Plaintiff wishes to point out certain critical mischaracterizations of the Plaintiff's Complaint and certain matters that are simply not consistent with the facts alleged in the Complaint, as substantiated by pre-filing discovery obtained under the Freedom of Information Act. For example, at the most fundamental level, the Brief seeks to limit this action to two discrete events, October 7, 2009 and April 19, 2010. To the contrary, Plaintiff's Complaint asserts that she was turned away from deportation hearings in Atlanta on "multiple" occasions (Complaint ¶ 18).

Additionally, the Federal Defendants claim that the Plaintiff "refused to leave" the EOIC hearing facility. In fact, Dr. Stevens never refused any demand made of her, but merely made inquiries as to the legal basis of the demand and for identification of the individuals responsible for such demands.

Perhaps the most extensive mischaracterizations of the Complaint arise from the Defendants' efforts to bring Defendant Cassidy's actions under the existing Regulations governing the closure of hearings. To this end, the Defendants claim: "There have been no factual findings that the Defendant Cassidy's docket on April 19, 2010 did not include abuse cases." (Brief at 15.) In fact, the

Complaint provides specific allegations, based on pre-filing discovery, contravening the Defendants' suggested motive for Mr. Cassidy's actions.[8]

In this regard, the Complaint quotes, in detail, specific information from the October 7, 2009 docket posted for Defendant Cassidy, together with information derived from Plaintiff's contemporaneous telephone calls to and from EOIR staff in Falls Church, Virginia, and derived from email obtained under the Freedom of Information Act. The Complaint also reports interviews with attorneys, who were on the docket that day, and who will provide, at trial, credible, verifiable, and, arguably, conclusive evidence that Defendant Cassidy (a) left the courtroom after ascertaining Plaintiff's presence; (b) did not speak to any respondent in Plaintiff's presence on that date; and (c) placed a telephone call to EOIR headquarters in which he falsely reported an exchange with two respondents in Plaintiff's presence. (Complaint at ¶¶ 25-44).

EOIR email to Plaintiff, from EOIR employee Elaine Komis, referenced in the Complaint, also refutes Defendant Cassidy's claim that *"in Jackie's [the*

---

8 A motive for closure, based on the Regulations, was never mentioned, prior to Plaintiff's removal from the building, but appeared months later in Defendant Gary Smith's June 3, 2010 memorandum responding to Plaintiff's administrative complaint of misconduct. (Moreover, even assuming, *arguendo*, that Defendant Cassidy closed the hearing because of spousal abuse issues, in accordance with EOIR procedures, such a reason does not reduce his accountability for preventing Plaintiff's access to subsequent hearings on that day by ordering her removal from the building.)

Plaintiff's] presence, he advised the respondents and their attorneys that a member of the media was present and asked if they wanted an open or closed hearing. Both respondents advised they wanted a closed hearing (sexual abuse case)." (Complaint ¶ 35.) [Emphasis supplied.]. The allegations of the Complaint demonstrate that this assertion is incorrect---*no such conversation with the respondents about closed hearings took place in Professor Stevens' presence on that date or any other date.*

## II.   <u>Argument and Citation of Authority</u>

The Plaintiff shows, as an initial matter, that her damage claims are cognizable under the *Bivens* doctrine, in that there is a "clearly defined" Constitutional right to observe deportation hearings.  Such access has been squarely approved by the Sixth Circuit in *Detroit Free Press v. Ashcroft*, 303 F. 3d 681 (6th Cir. 2002) and is acknowledged by the EOIC's administrative regulations. Alternatively, the Plaintiff shows that any administrative restriction on such access is unconstitutional.  Plaintiff first addresses the curious argument of the Federal Defendants that, even assuming the facts of the Complaint to be true, a remedial federal injunction could not be crafted.

A.     <u>**The Claimed Impotency of Federal Injunctive Relief.**</u>

Perhaps no judicial instrument has been more efficacious, during the past century, in the enforcement of the Bill of Rights, than injunctive relief, carefully and creatively crafted, drawn from the broadly remedial equitable powers of the federal courts.   The Federal Defendants' argument as to the weakness of the federal judicial power is as puzzling as it is remarkable, advanced as it is by the United States Department of Justice.

The Government's description of the "necessary prerequisites" for this "extraordinary relief" (Brief at 3) makes the traditional, oft-quoted requirements for preliminary injunctive relief appear as if this is somehow an alien form of relief, rather than a traditional adjunct to Constitutional litigation. In this regard, Plaintiff has filed a motion under Rule 65(a)(2) seeking to consolidate the hearing on the merits of the equitable issues with the hearing for a preliminary injunction.   This, presumably, resolves the concerns of the Defendants over the issuance of preliminary relief.

More substantively, however, the Defendants seek to use *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), to suggest that unconstitutional behavior cannot be enjoined unless it can be shown that such behavior will always occur in the future or that such behavior is official policy.   In *Lyons*, the Court found

-10-

that the plaintiff would have to show that the City "ordered or authorized police officers to act in such manner [use of chokeholds]." Of course, such an order is precisely what is at issue in the present case.  Judge Cassidy has ordered the Plaintiff "banned."  He has ordered her to be "removed."

The Federal Defendants argue that injunctive relief in the present case would be "drastic" and, thus, should not be issued. (Brief at 11.)  This argument seems to contradict their later assertion that the Plaintiff is seeking only an "obey the law" injunction, which the Supreme Court and the Eleventh Circuit have disapproved in a variety of contexts.  However, an order that Plaintiff be allowed access to Mr. Cassidy's courtroom, and that Plaintiff not be subjected again to physical removal, is far different from an order to a defendant to "stop discriminating."  *See Burton v. City of Belle Glade*, 178 F.3d 1175 (11th Cir. 1999); *Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895 (5th Cir. 1978).

### B.      The Plaintiff's Constitutional "Standing."

When a citizen of the United States suffers a Constitutional deprivation, such an aggrieved party has "standing."  Surely, this Plaintiff has demonstrated sufficient connection to, and harm from, the actions of the Federal Defendants in order to cross the threshold of Constitutional standing. This Plaintiff has been (and

will be) harmed by the actions of the Defendants in their official and individual capacities. As the Supreme Court has stated, "In essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Contrary to the assertions of the Federal Defendants, this Plaintiff has demonstrated that this Court has power to decide the merits of her dispute and that she, in fact, stands in the path of future Constitutional harm. She has a right to be heard. She has a right of access to the equitable powers of this Court and to the courtroom of Defendant Cassidy.

C.   **The "Clear Definition" of a First Amendment Right to Observe Deportation Hearings.**

The government's obligation to allow the public's access to deportation hearings[9] has been clearly established since the beginnings of English common

---

9 The phrase "deportation," and not "immigration hearings," is used because with few exceptions, EOIR, ostensibly an agency of the Department of Justice, has as its main responsibility the finalization of removal orders issued by the Department of Homeland Security (DHS) for those in removal proceedings, while it is the main responsibility of the DHS Citizenship and Immigration Services is to confer immigration benefits. Second, this function is analogous to the experience of courts under common law issuing orders for the "transportation" of defendants to the West Indies and English colonies; the proceedings that were called "deportation" proceedings in United States law until recently conveys the similarity in these functions. The exclusion of aliens intercepted at the border does not require a hearing. Deportation proceedings typically occur for immigrants who have lived in the United States for long periods of time, with and without legal authorization.

law[10] and affirmed by contemporary courts as one guaranteed by the First Amendment, there being no other way to ensure a knowledgeable public.  "Even though the political branches may have unfettered discretion to deport and exclude certain people, ***requiring the Government to account for their choices assures an informed public--a foundational principle of democracy***." *Detroit Free Press, supra* at 693. [Emphasis supplied.]

To test whether deportation hearings trigger a First Amendment right, to the end of protecting a democratic public, the court in *Detroit Free Press* applied the two-prong test of "experience" and "logic" developed in *Richmond Newspapers*, 448 U.S. 555 (1980):

---

10 The *Detroit Free Press* Court reviewed the early precedents of public hearings in which "transportation" to the West Indies and America was the punishment.  But an even closer association between the transportation hearings of past and deportation present exists.

> Transportation to America came to seem such an attractive solution to the problem of incorrigible minor offenders in general that the Middlesex magistrates were authorized in the mid-1660s to transport 'vagabonds, idle and disorderly persons [and] sturdy rogues and beggars,' to be 'disposed of in the usual way of servants for the space of seven years.

J.M Beattie, CRIME AND THE COURTS IN ENGLAND, 1660-1800  (Clarendon Press, 1986) quoting from an Act of the Privy Council (colonial), vol. 2, pp. 370-71, 389-90.

The "vagabonds" referenced above were those apprehended outside their parishes of birth without the appropriate passport, the parallels between the circumstances then and now extending even to the efforts to evade the law's enforcement: "There was a wholesale trade in counterfeit passports of the sort prescribed by the Statute of Artificers for those travelling in search of work." Paul Slack, Vagrants and Vagrancy in England, 1598-1664, *Journal of Economic History* 364 citing R. H. Tawney and E. Power, eds. Tudor Economic Documents (1924), I, 341.

> [D]eportation proceedings historically have been open. Although exceptions may have been allowed, the general policy has been one of openness. ... Since 1965, INS regulations have explicitly required deportation proceedings to be presumptively open. ... Since that time, Congress has revised the Immigration and Nationality Act at least 53 times without indicating that the INS had judged their intent incorrect. [Citations omitted.] *Detroit Free Press* at 701.

The controversy in *Detroit Free Press* was born from a directive of Chief Immigration Judge Michael Creppy requiring closure of all "special interest" cases, in which national security concerns were implicated. The Sixth Circuit's comprehensive opinion, authored by Judge Damon Keith, squarely addressed "whether the First Amendment to the United States Constitution confers a public right of access to deportation hearings." The court unanimously found the public right of access to exist, particularly for members of the press, who have been "deputiz[ed] … as the guardians of … liberty." *Id.* at 682.

After unanimously ascertaining the right of public access, the court in *Detroit Free Press* continued: "[W]e now determine whether the government has made a sufficient showing to overcome that right" and applied a strict scrutiny standard. (*id.* at 705). The court held: "Although the Government is able to demonstrate a compelling interest for closure, the immigration judge … failed to make specific findings before closing [the respondent's] deportation

proceedings. *Press-Enterprise [Co. v. Superior Court, 478 U.S. 1 (1986)]* instructs that in cases where partial or complete closure is warranted, there must be specific findings on the record so that a reviewing court can determine whether closure was proper and whether less restrictive alternatives exist. … Similarly, the Creppy directive fails this requirement." 303 F.3d at 707.

If the directive of Chief Judge Creppy to close hearings implicating national security does not survive strict scrutiny because it does not require individually articulated justifications for the closing of a hearing, then it is plainly illogical to infer from *Detroit Free Press* that Immigration Judges may close routine, non-national security hearings, much less that they may control the movement of court observers.

Defendant Cassidy's failure to state a reason violates the Constitutional objections to the Creppy memorandum and its implementation, as reviewed in *Detroit Free Press*. The Federal Defendants have not, and cannot, explain how their assertion of broad authority to close hearings without a reason can stand in light of *Detroit Free Press*.

Beyond judicial enforcement of public access, such access to deportation hearings is required by 8 C.F.R. § 1003.27, the administrative regulation specifying access to proceedings authorized by 8 U.S.C. § 1229. It states:

"All hearings, other than exclusion hearings, shall be open to the public except that:

> (a) Depending upon physical facilities, the Immigration Judge may place reasonable limitations upon the number in attendance at any one time with priority being given to the press over the general public; ... ."

This regulatory prioritization of the press' attendance echoes the comments of the Sixth Circuit concerning the First Amendment and underscores the Plaintiff's position that deportation proceedings are presumptively open to the press. Indeed, these administrative regulations echo the Founders' intentions and language with respect to the First Amendment's scope and purpose.

Finally, as set forth in Plaintiff's Complaint, in addition to the Constitutional and regulatory restraints on Immigration Judges, Defendant Cassidy simply lacked the legal authority to take the actions that he did toward the Plaintiff. As described in the Complaint, Immigration Judges lack legal authority over Homeland Security guards. (E.g., Complaint ¶132.)

More significantly, Congress has tightly circumscribed the extent of Immigration Judges' contempt authority: "The immigration judge shall have authority (under regulations prescribed by the Attorney General) to sanction by civil money penalty any action (or inaction) in contempt of the judge's proper exercise of authority under this chapter." 8 U.S.C. § 1229a(b)(1) (2006). The

-16-

Attorney General has failed to provide this civil fine contempt authorization to Immigration Judges directly. This statute differs radically from the broad contempt authority that Congress has authorized for Article III Judges, such as this Court. Moreover, the fact that this authority is restricted to civil fines, suggests that Congress sought to prevent exactly the scenario described in Plaintiff's Complaint: the use of official force by Defendant Cassidy and his co-defendants against the Plaintiff in her capacity as an immigration court observer.

Plaintiff submits that the clear holding of the Sixth Circuit in *Detroit Free Press* should be dispositive of the issues raised by the Motion, and, indeed, Plaintiff's equitable claims on the merits. The Federal Defendants claim otherwise, pointing to the Third Circuit's opinion in *North Jersey Media Group v. Ashcroft*, 308 F.3d 198 (3rd Cir. 2002). The Defendants also argue: "The ruling in *Detroit Free Press* was based on a blanket closure of deportation proceedings, which is not true of the present case. In contrast, the present case involves only one specific hearing being closed." (Brief at 18). Neither logic nor an understanding of the Constitutional values at issue here supports such a distinction, and, as set forth below, *North Jersey,* upon close examination, does not diminish the clarity of Plaintiff's First Amendment rights to attend

and observe deportation hearings.

The *North Jersey* court points, with scant authority, to the fact that "in practice, deportation hearings have frequently been closed to the general public." The Third Circuit provides just two lines of authority for this proposition.

First, it is said that deportation hearings have been held in spaces that are not typically accessible to the public.  Second, as this Court is aware, "hearings involving abused alien children are closed by regulation no matter where they are held, and those involving abused alien spouses are closed presumptively," citing 8 C.F.R. § 3.27. Both assertions, however, are factually, as well as legally, dubious.

With respect to the second point, *North Jersey Media* provides no specific information as to the extent of the alleged exceptions for abused spouses or children. If only a handful of hearings trigger a closure under a regulation and practice that is itself unconstitutional, this does not suggest the absence of a "clearly defined" Constitutional right.

In regard to the first point, the Third Circuit claims that deportation hearings have not historically been open to the public as a result of federal legislation in 1996 that has resulted in "thousands of deportation hearings each

year in federal and state prisons." Again, however, the facts and the law suggest otherwise.

The statute authorizing the "Institutional Hearing Program," and now the "Institutional Removal Program," to which the Court referred, explicitly requires that such hearings adhere to the standards provided in the statute underlying the Department of Justice regulations for *all* of its hearings. Thus, in authorizing hearings for persons serving jail or prison sentences, Congress did *not* authorize--much less require--closed hearings but stated that conformity was expected with proceedings for all other deportation hearings: "Such proceedings shall be conducted in conformity with section 1229a of this title (except as otherwise provided in this section)."   This confirms the *Detroit Free Press* inference that when making its changes to laws for deportation proceedings, Congress continued to adhere to the regulatory presumption of transparency.

**D.**   **The Constitutional Scope of the *Bivens* Doctrine.**

Plaintiff seeks redress, under the banner of the *Bivens* Doctrine, for the Constitutional wrongs suffered at the hands of the Federal Defendants.   In this landmark holding, *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), the Supreme Court found an implied cause of action to exist where a person's Fourth Amendment freedom from unreasonable search and seizure was violated by federal

agents.  It is helpful to look again at the facts and language of this well-known holding, particularly in light of subsequent judicial restrictions on its scope.

Agents of the former Federal Bureau of Narcotics searched Mr. Bivens' home and then executed a warrantless arrest.  Drug charges were filed, later dismissed, and Mr. Bivens brought suit.  The United States argued that the acknowledged violation allowed for only a state law claim for invasion of privacy but that the Fourth Amendment itself provided no cause of action.  The District Court dismissed under Rule 12(b)(6) and for lack of subject-matter jurisdiction, and the Second Circuit affirmed.

The Supreme Court held that a private right of action for monetary damages should be implied, where no other federal remedy is provided for the vindication of a Constitutional right,  based on the fundamental principle that for every wrong, there is a remedy. The Court further reasoned that where there is violation of a right, the plaintiff can recover in a civil action, unless Congress has expressly curtailed that right of recovery, or there exists some "special factor counseling hesitation."

Thus, under *Bivens*, victims of Constitutional deprivations, such as the Plaintiff, at the hands of federal authorities, such as the Federal Defendants, are allowed to sue for damages for the violation itself, despite the lack of any explicit

-20-

federal statutory authorization. Rather, the remedy is said to be implied from the significance of the violated right. *Bivens* has been construed to create, in effect, a federal cause of action similar to the one that 42 U.S.C. § 1983 provides against the States.

In light of subsequent judicial suggestions of a retreat from *Bivens,* it is helpful, Plaintiff submits, to look at the Constitutional theories that underlay the Court's opinion, as reflected in the concurrence of Mr. Justice Brennan:

> If it is not the nature of the remedy which is thought to render a judgment as to the appropriateness of damages inherently "legislative," then it must be the nature of the legal interest offered as an occasion for invoking otherwise appropriate judicial relief. But I do not think that the fact that the interest is protected by the Constitution rather than statute or common law justifies the assertion that federal courts are powerless to grant damages in the absence of explicit congressional action authorizing the remedy. Initially, I note that it would be at least anomalous to conclude that the federal judiciary -- while competent to choose among the range of traditional judicial remedies to implement statutory and common law policies, and even to generate substantive rules governing primary behavior in furtherance  of broadly formulated policies articulated by statute or Constitution, see *Textile Workers* v. *Lincoln Mills,* 353 U.S. 448 (1957); *United States* v. *Standard Oil Co.,* 332 U.S. 301, 304-311 (1947); *Clearfield Trust Co.* v. *United States,* 318 U.S. 363 (1943) --is powerless  to accord a damages remedy to vindicate social policies which, by virtue of their inclusion in the Constitution, are aimed predominantly at restraining the Government as an instrument of the popular will.

> The Court today simply recognizes what has long been implicit in our decisions concerning equitable relief and remedies implied from statutory schemes; *i.e.,* that a court of law vested with

-21-

jurisdiction over the subject matter of a suit has the power -- and therefore the duty -- to make principled choices among traditional judicial remedies. Whether special prophylactic measures -- which at least arguably the exclusionary rule exemplifies, see Hill, *The Bill of Rights and the Supervisory Power*, 69 COLUM. L. REV. 181, 182-185 n. 8 (1969). On the other hand, if-- as I believe is the case with respect, at least, to the most flagrant abuses of official power -- damages to some degree will be available when the option of litigation is chosen, then the question appears to be how Fourth Amendment interests rank on a scale of social values compared with, for example, the interests of stockholders defrauded by misleading proxies. See *J. 1 Case Co.* v. *Borak,* [377 U.S. 426 (1964)]. Judicial resources, I am well aware, are increasingly scarce these days. Nonetheless, when we automatically close the courthouse door solely on this basis, we implicitly express a value judgment on the comparative importance of classes of legally protected interests. And current limitations upon the effective functioning of the courts arising from budgetary inadequacies should not be permitted to stand in the way of the recognition of otherwise sound Constitutional principles. *Bivens* at 410.

The first requirement for a *Bivens* complaint is that Plaintiff must plead the violation of a clearly established Constitutional right. The Federal Defendants assert that Plaintiff lacks such a clearly established First Amendment right to attend deportation hearings (Brief at 22), and that no Fifth Amendment right thus ensues for her to exercise this right (Brief at 23-24).

1. First Amendment Violations.

The Federal Defendants argue that the First Amendment cannot, under any circumstances, trigger a *Bivens* claim:

To the extent Plaintiff has alleged a *Bivens* action based upon the First Amendment against Judge Cassidy in his individual capacity, that claim also fails because the Supreme Court has "declined to extend *Bivens* to a claim sounding in the First Amendment." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009) (citing *Bush v. Lucas*, 462 U.S. 367 (1983). Motion at 14.

Contrary to the categorical exclusion of First Amendment claims. Justice Kennedy broadly observed, for the Court, that "we have declined to extend *Bivens* to a claim sounding in the First Amendment," citing to Bush v. Lucas, 462 U.S. 367 (1983). While acknowledging a "reluctance" to extend *Bivens*, the Court also acknowledges that the availability of the implied *Bivens* remedies turns on the presence of alter nature means of securing the Constitutional values at issue. *Ashcroft v Iqbil*, *supra* at 675. Judge Land's recent opinion in *Lyttle v. United States*, 2012 U.S. Dist. Lexis 46211 (M.D. Ga. 2012), contains (pp. 32-40) and thoroughly developed example of the "adequate alternative remedy" analysis required by *Bush v. Lucas*.

The civil service retaliation action reviewed in *Bush* did not present a case appropriate for the implication of *Bivens* remedies, because of the complex statutory and regulatory protections that were otherwise available to the employee. The Court in Bush v Lucas made plain the fact that the unavailability of a *Bivens* remedy was driven by the other remedies available to the aggrieved employee:

"Petitioner asks us to authorize a new non-statutory damages remedy for federal employees whose First Amendment rights are violated by their superiors. ***Because such claims arise out of an employment relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States***, we conclude that it would be inappropriate for us to supplement that regulatory scheme with a new judicial remedy." [Emphasis supplied.] Given the history of the development of civil service remedies and the comprehensive nature of the remedies currently available, it is clear that the question we confront today is quite different from the typical remedial issue confronted by a common-law court. The question is not what remedy the court should provide for a wrong that would otherwise go un-redressed." *Bush v. Lucas, supra Id.* at 388.

In summary, the fact that a judicial remedy authorize claims against federal employees for violation of a citizens Fourth Amendment rights does not mean that other rights are "necessarily" denied *Bivens* protection and does not mean that Fourth Amendment rights have been singled out for special Constitutional protection. The acid test for *Bivens* protection is the availability of alternative protections for the injured Constitutional Right. Unlike *Bush v. Lucas,* there is no alternative remedy of the violation of Dr. Stevens' First Amendment rights, and she should be allowed to pursue *Bivens* remedies. *See generally, Hartmann v. Moore* 547 U.S. 250, 256 (2006), citing *Crawford-El v. Britton*, 523 U.S. 574, 588 n. 10 (1998), *Perry v. Sindermann,* 408 US 593, 597 (1972), and *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977).

-24-

2. <u>Fourth Amendment Violations</u>.

The Federal Defendants appear to concede, *sub silentio*, that the Fourth Amendment right not to be subjected to assault, battery, and false imprisonment by federal agents is actionable under *Bevins*.   Defendants, however, object to Plaintiff's pleading of the violation of her Fourth Amendment right on the ground that this portion of the Complaint is "conclusory."   To the contrary, Plaintiff's averments, in this regard, are copious, clear, and compelling. And as reviewed above, *Bivens* was, itself, a Fourth Amendment case.

3. <u>Fifth Amendment Violations</u>.

There can be no legitimate dispute that *Bivens* remedies are available to redress Fifth Amendment violations. *Davis v. Passman*, 442 U.S. 228 (1979), held that a United States Congressman did not have immunity from a *Bivens* complaint when his discriminatory employment practices violated his female employee's rights to due process and equal protection under the Fifth Amendment. The Court held: "Last Term, *Butz* v. *Economou*, ... reaffirmed this holding, stating that 'the decision in *Bivens* established that a citizen suffering a compensable injury to a Constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official.'"

Mr. Justice Kennedy referred in *Ashcroft v. Iqbal, supra* to "the limited settings where *Bivens* does apply …." The present case is one of those "settings." The importance of a remedy cannot be understated: "[I]t is important, in a civilized society, that the judicial branch of the Nation's government stand ready to afford a remedy in these circumstances." *Bivens* at 411.

E.    **The Facial Unconstitutionality of Regulations Permitting Closure of Deportation Hearings to the Press.**

Plaintiff challenges the Federal Defendants' claim of broad authority to close hearings, without providing a legal reason as, facially violative of the First Amendment.   But as the *Globe Newspaper Co.* Court observed, "The Court's recent decision [1980] in *Richmond Newspapers* firmly established for the first time that the press and general public have a Constitutional right of access to criminal trials." 457 U.S. at 596.  This "firm establishment" of access for the press in general public should be made equally clear for deportation hearings.  The analogous nature, and frequent relationship, of criminal processes and immigration proceedings suggests that First Amendment rights are implicated with equal vigor in both contexts.

Of course, this right of access to criminal trials is not explicitly mentioned in terms in the First Amendment. But we have long eschewed any "narrow, literal conception" of the Amendment's terms, *NAACP v. Button*, 371 U.S. 415, 430 (1963), for the Framers were concerned with broad principles, and wrote against a background of shared values and practices. The First Amendment is thus broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment rights. 457 U.S. at 596.

"Public scrutiny of the judicial process has been held vital to the functioning of the courts." *In the Matter of Continental Illinois Securities Litigation. Appeal of Continental Illinois Corp. & Continental Illinois National Bank & Trust Co. of Chicago,* 732 F.2d 1302 (7th Cir. 1984)

The Supreme Court has found that the First Amendment right to attend trials overcomes a Massachusetts law excluding the press. The Boston Globe successfully challenged a Massachusetts law requiring judges to close criminal trials that involve sexual abuse of children. According to Mr. Justice Brennan: "Section 16A of Chapter 278 of the Massachusetts General Laws, as construed by the Massachusetts Supreme Judicial Court, requires trial judges, at trials for specified sexual offenses involving a victim under the age of 18, to exclude the press and general public from the courtroom during the testimony" from *Globe Newspaper, Co. v. Superior Court, supra.* Such a limitation violated the First Amendment. This decision is instructive in the present case for two reasons: 1)

-27-

it is on point for the assertion that child abuse, even sexual abuse, hearings may not be automatically closed; and 2) it affirms the general guidance in *Richmond Newspapers* for First Amendment access to hearings.

Surely, the First Amendment secures the right of citizens and, hence the press, to access to hearings that affect not only the respondents in Defendant Cassidy's court but, more broadly and of equal importance, the democracy of which his removal decisions are a part.

### F.    The Alleged Failure to Exhaust Administrative Remedies.

Plaintiff has no further "mandatory administrative" (Brief at 3) remedies to exhaust.  She pursued at least three internal complaint procedures to no avail.  It is unclear what failure is claimed, in this regard, by the Federal Defendants. Plaintiff asserted her rights at the time they were being violated. In all the incidents referenced in the Complaint, Plaintiff voiced objections and asked for the legal reasons for Defendants' assertions and demands.   The Federal Defendants apparently view these actions negatively but such actions are a requisite for assertion of Plaintiff's Constitutional rights. (See, E.g., "Several factors lead to the conclusion that the actions of the trial judge here were consistent with any right of access the petitioner may have had under the First and Fourteenth Amendments. First, none of the spectators present in the courtroom, including

the reporter employed by the petitioner, objected when the defendants made the closure motion." *Gannett Co., Inc. v. Depasquale,* 443 U.S. 368, 392 (1979)).

The *judicial* remedies suggested by the Federal Defendants are not required. They merely represent alternative claims or forum choices.  The only such remedy mentioned is the Federal Tort Claims Act, but Congress has not required this as an alternative to *Bivens* (*Carlson v. Green,* 446 U.S. 14 (1980)) and the Federal Tort Claims Act does not accomplish the deterrent or punitive redress that Plaintiff seeks in the present action.

Plaintiff also alleges in her Complaint that the officials who were supposed to provide an administrative remedy were, in fact, obstructing justice and conspiring to violate her civil rights. For example, on June 3, 2010, Plaintiff received a response to her April 27, 2010 complaint about the events of April 19, 2010, containing information that was demonstrably inaccurate and did nothing to alleviate the harms perpetrated by Defendants Cassidy, Keller, Smith, Mooney, and Long.  (Complaint ¶ 142.)

## G.   Immigration Judges Have Neither "Absolute" Nor "Qualified" Judicial Immunity for Constitutional Wrongs Committed Against Third Party Members of the Public.

The Federal Defendants advance, apparently as a matter of first impression, the doctrine of "absolute judicial immunity" for Immigration Judges from claims

of third parties (rather than parties to proceedings).   Immunity is said to be appropriate, because such claims "are based on actions [Defendant Cassidy] took in his judicial capacity while performing his duties as a United State Immigration Judge." Brief at 3.

Alternatively, the Federal Defendants argue that if "absolute immunity" is not available, "Defendant Cassidy is entitled to qualified immunity,"[11] since there is said to be "no clearly established Constitutional right of public access to deportation hearings," a proposition hotly disputed by the Plaintiff and the Sixth Circuit.  Brief at 30 n. 7

The Defendants argue that, assuming the truth of the allegation that Defendant Cassidy "inappropriately closed an deportation hearing," such action is unreviewable and unaccountable.  *Butz v. Economou*, 438 U.S. 478, 514-515 (1978) does not hold that administrative law judges are immune from actions by third parties, such as Plaintiff.  Indeed, Mr. Justice White's opinion for the Court[12] suggests that there should be personal liability in the present case.

---

11 *Caraballo-Sandoval v. Honsted*, 35 F.3d 521,524 (11th Cir. 1994).

12 Because of the extraordinary scope and significance of judicial immunity, it is imperative that it be properly applied.  "For it is an general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself.  Liability to answer to every one who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of this freedom, and would

Judicial immunity is a principle of ancient origin in the common law, but it is limited to "acts done" by judges "in the exercise of their judicial functions." *Bradley v. Fisher*, 80 U.S. 335, 347 (1872)(Field, J.).   The closing of proceeding, the "banning" of the Plaintiff, and her physical removal are not "judicial functions."[13]

In *Lyttle v. United States,* 2012 U.S. Dist. Lexis 46211 (M.D. Ga. 2012) Judge Land observed, in dicta, that "[a]n immigration judge is protected by absolute immunity." *Id.* at 76.   However, *Lyttle* did not address the "non-judicial" nature of actions taken against non-parties, such as Plaintiff.   Similarly, in *Alyshah v. Hunter*, 2006 U.S. Dist. Lexis 68921. (N.D. Ga. 2006), Judge Thrash afforded absolute immunity to Mr. Cassidy arising from claims by a party.   However, the Court observed that "[a] plaintiff may overcome judicial immunity… by showing that the judge engaged in non-judicial actions or took action where he had no jurisdiction." *Id.* at 11.

---

destroy that independence without which no judiciary can be either respectable or useful. … It has been the settled doctrine of the English courts for many centuries, and has never been denied … in the courts of this country." *Bradley v. Fisher, supra.*

13 As a general matter, the "functional" approach suggested in *Burns v. Reed*, 500 U.S. 478 (1991), *Forrester v. White*, 484 U.S. 219 (1984), and *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993), supports the Plaintiff's view that such proceedings should be open to the public and press.

Government actors who seek absolute immunity "bear the burden of showing that public policy requires an exemption of that scope." *Id.* at 506. *Accord Weissman v. NASD, Inc.,* 468 F.3d 1306, 1322 (11th Cir. 2006). In *Smith v. Shook,* 237 F.3d 1322, 1325 (11th Cir. 2001), the Eleventh Circuit held that federal administrative law judges are entitled to absolute judicial immunity because their responsibilities are functionally comparable to those of trial judges, including issuing subpoenas, ruling on evidence, regulating hearings, and making or recommending decisions. But the burden clearly rests on the official claiming such immunity.

The Defendants also argue, contrary to the Complaint's allegations with respect to the multiplicity of efforts to exclude Plaintiff, that "only one time" did Defendant Cassidy "clearly and unambiguously" seek "to close the hearing unexpectedly" when the televideo failed. Brief at 33. And without citation to case authority or regulations, the Defendants baldly assert that "[a]t no point did Judge Cassidy act outside the scope of his employment as a U.S. immigration judge ... ." Brief at 32. It is unclear to Plaintiff how either assertion requires either "absolute" or "qualified" immunity for Immigration Judges.

The Federal Defendants' immunity claims rest uncomfortably on the horns of an internal logical dilemma. For purposes of the immunity blanket, the

Defendants seek to characterize the offending actions as "judicial" (Brief at 2), or taken in a "judicial capacity" (Brief at 3), or, more accurately, as arising from a "quasi judicial administrative proceedings" (Brief at 13), or "close intertwined with the judicial process" (*id.*).

However, each stretch of the immunity blanket to cover Mr. Cassidy lays bare the flaw in the Federal Defendants' basic Constitutional claim.   If the activities upon which the Plaintiff's claim is based are "judicial" or "quasi-judicial" or "closely intertwined" with judicial process, they must be open, to the public, the press, and to Plaintiff.   By claiming judicial immunity for the administrative personnel who conduct immigration proceedings, the Federal Defendants highlight the degree to which such procedures deviate from the most basic and ancient notions of fundamental fairness.   If the presiding officers in such "trials" are entitled to judicial immunity, the processes over which they preside should at least faintly resemble judicial proceedings.

The rationale for the ruling in *Butz, supra* is that to hold otherwise would subject judges and prosecutors to endless legal harassment because of the nature of their government responsibilities. The Federal Defendants have indicated no evidence that lawsuits on behalf of journalists seeking access would similarly encumber judges.

-33-

### III.   **Conclusion**

The matter *sub judice* tests the viability of equitable and legal remedies for Constitutional deprivations effected by federal agents, who seek to frustrate inquiry into public policy issues of extraordinary national significance—the enforcement of federal immigration policy through mass removal "hearings" conducted in secret. The traditional journalism, and the real-time information of the sort Plaintiff makes available in her articles, blog, and other media work, is crucial to an informed electorate on these issues.

For all of the foregoing reasons, the Motion of the Federal Defendants should be denied, and the Plaintiff should be allowed to present the merits of her claims of Constitutional violation.

This 4th day of September, 2012.

Respectfully submitted,

FEDERAL & HASSON, LLP

R. Keegan Federal, Jr.
Georgia Bar No. 257200

*Attorneys for Plaintiff*

Two Ravinia Drive
Suite 1776
Atlanta, Georgia 30346

-34-

Telephone: (678) 443-4044
Facsimile: (678) 443-4081
keegan@federalhasson.com
anne@federalhasson.com
kelley@federalhasson.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JACQUELINE STEVENS,              )
                                 )
        Plaintiff,               )
                                 )
v.                               )     CIVIL ACTION NO.:
                                 )     1:12-CV-1352-ODE
ERIC H. HOLDER, ATTORNEY         )
GENERAL OF THE UNITED            )
STATES et al.                    )
                                 )
        Defendants.              )
                                 )

## CERTIFICATION OF FONT

Counsel for Plaintiff certifies that this document has been prepared in a

Times New Roman, 14 point font and otherwise complies with Local Rule 5.1C.

This ___4___ day of September, 2012.


                          FEDERAL & HASSON, LLP


                          R. Keegan Federal, Jr.
                          Georgia Bar No. 257200

                          *Attorneys for Plaintiff*

Two Ravinia Drive
Suite 1776

Atlanta, Georgia 30346
Telephone: (678) 443-4044
Facsimile: (678) 443-4081
keegan@federalhasson.com
anne@federalhasson.com
kelley@federalhasson.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JACQUELINE STEVENS,          )
                             )
        Plaintiff,           )
                             )
v.                           )        CIVIL ACTION NO.:
                             )        1:12-CV-1352-ODE
ERIC H. HOLDER, ATTORNEY     )
GENERAL OF THE UNITED        )
STATES et al.                )
                             )
        Defendants.          )
                             )

## CERTIFICATE OF SERVICE

I hereby certify that I have, this date, filed electronically the foregoing Notice of Entry of Appearance with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to the following attorneys of record:

*Aileen Bell Hughes*
*Assistant U.S. Attorney*
*600 U.S. Courthouse*
*75 Spring Street, S.W.*
*Atlanta, GA 30335*

*Stuart F. Delery*
*Acting Assistant Attorney General*
*David J. Kline*
*Director, District Court Section*
*Office of Immigration Litigation*
*Victor M. Lawrence*
*Assistant Director*
*Christopher W. Hollis*
*Trial Attorney*
*Office of Immigration Litigation*
*District Court Section*
*U.S. Department of Justice*
*P.O. Box 868 Ben Franklin Station*
*Washington, DC 20044*

*Hall F. McKinley, III*
*Drew, Eckl & Farnham, LLP*
*P.O. Box 7600*
*Atlanta, GA 30357-0600*

This ___4___ day of September, 2012.

R. Keegan Federal, Jr.
Georgia Bar No. 257200

*Attorney for Plaintiff*

Two Ravinia Drive
Suite 1776
Atlanta, Georgia 30346
Telephone: (678) 443-4044
Facsimile: (678) 443-4081
keegan@federalhasson.com
anne@federalhasson.com
kelley@federalhasson.com