# Exhibit C

Defendant Smith's Deposition Transcript

Deposition of          Gary W. Smith          August 20, 2014

---

Page 1

```
IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF GEORGIA
              ATLANTA DIVISION

JACQUELINE STEVENS,

     Plaintiff,                    CIVIL ACTION FILE
vs.
                                   NO. 1:12-CV-1352-ODE
ERIC HOLDER, JR.,
Attorney General of the
United States, in his official
capacity, et al.,

     Defendants.



              DEPOSITION OF
              GARY W. SMITH
             August 20, 2014

                9:40 a.m.

     Richard B. Russell Federal Building

          75 Spring Street, SW

           Atlanta, Georgia



     Marsi Koehl, CCR, CCR-B-2424
```

---

Page 2

### CONTENTS
### EXAMINATION

                                  Page
Examination by Mr. Brown...........................7
Examination by Mr. Hollis......................121

### EXHIBITS

Defendants'

| Exhibit No. | Description | Page |
|---|---|---|
| Exhibit 1 | Federal Defendants' Response to Plaintiff's First Continuing Interrogatories | 56 |
| Exhibit 2 | Memorandum, 8/9/06 | 63 |
| Exhibit 3 | A Guide for Immigration Judges on Investigation by the OPR | 64 |
| Exhibit 4 | Article from The Nation | 66 |
| Exhibit 5 | E-mail String, 1/27/10 RE: Stewart Tour | 67 |
| Exhibit 6 | E-mail String, 1/27/10 RE: Visits to Detention Centers | 68 |
| Exhibit 7 | E-mail String, 1/27/10 RE: Visitors Feb ICE Tours | 70 |

---

Page 3

### EXHIBITS CONTINUED

Defendants'

| Exhibit No. | Description | Page |
|---|---|---|
| Exhibit 8 | MegaCenter Transcript | 78 |
| Exhibit 9 | E-mail String, 5/12/10 RE: Judge Cassidy | 80 |
| Exhibit 10 | E-mail String, 6/1/10 RE: Ms. Stevens | 83 |
| Exhibit 11 | E-mail String, 4/19/10 RE: Journalist | 88 |
| Exhibit 12 | E-mail from M. Crosby 4/19/10 | 89 |
| Exhibit 13 | E-mail String, 4/19/10 RE: Ms. Stevens-April 19, 2010 | 90 |
| Exhibit 14 | E-mail String, 4/19/10 RE: Jackie Stevens is at the Atlanta Immigration Court | 91 |
| Exhibit 15 | E-mail from M. Crosby 4/19/10 | 93 |
| Exhibit 16 | E-mail String, 4/27/10 RE: Judge Cassidy | 96 |
| Exhibit 17 | E-mail String, 4/27/10 RE: Jackie Stevens | 99 |
| Exhibit 18 | E-mail String, 4/28/10 RE: Jackie Stevens | 100 |

---

Page 4

### EXHIBITS CONTINUED

Defendants'

| Exhibit No. | Description | Page |
|---|---|---|
| Exhibit 19 | Single Complaint Detail | 105 |
| Exhibit 20 | E-mail String, 6/1/10 RE: Judge Cassidy | 106 |
| Exhibit 21 | E-mail String, 6/1/10 RE: Case #810004327 | 106 |
| Exhibit 22 | Letter to Ms. Stevens from Mr. Smith, 6/3/10 | 110 |
| Exhibit 23 | E-mail String, 4/13/10 RE: Journalist | 114 |
| Exhibit 24 | E-mail String, 4/21/10 RE: Disruptive Courtroom Behavior | 116 |
| Exhibit 25 | E-mail String, 5/11/10 RE: Federal Protective Service | 117 |

(Original exhibits attached to Original transcript.)

---

Deposition of          Gary W. Smith      August 20, 2014

---

Page 5

1  APPEARANCES OF COUNSEL
2  On behalf of the Plaintiff:
3      BRUCE P. BROWN
4      Attorney at Law
5      BRUCE P. BROWN LAW, LLC
6      309 North Highland Avenue
7      Suite A
8      Atlanta, Georgia  30307
9      (404) 548-0400
10     bbrown@brucepbrownlaw.com
11 On behalf of the Defendants:
12     CHRISTOPHER W. HOLLIS
13     PATRICIA ALLEN
14     Attorneys at Law
15     U.S. DEPARTMENT OF JUSTICE
16     OFFICE OF IMMIGRATION LITIGATION
17     Liberty Square
18     450 5th Street, NW
19     Washington, D.C.  20001
20     (202) 305-0899
21     christopher.hollis@usdoj.gov
22
23 -- and --
24
25

---

Page 6

1  APPEARANCES OF COUNSEL CONTINUED
2  On behalf of the Defendants:
3      AILEEN BELL HUGHES
4      Attorney at Law
5      U.S. DEPARTMENT OF JUSTICE
6      NORTHERN DISTRICT OF GEORGIA
7      75 Spring Street, SW
8      Suite 600
9      Atlanta, Georgia  30303
10     (404) 581-6133
11     aileen.bell.hughes@usdoj.gov
12 Also present:
13     Jacqueline Stevens
14
15
16
17     (Pursuant to OCGA 15-14-37 (a) and (b) a
18 written disclosure statement was submitted
19 by the court reporter to all counsel present
20 at the deposition and is attached hereto.)
21
22
23
24
25

---

Page 7

1              P R O C E E D I N G S
2              GARY W. SMITH,
3  having been first duly sworn, was examined and testified
4  as follows:
5              EXAMINATION
6  BY MR. BROWN:
7      Q.  Please state your full name for the record.
8      A.  It's Gary W. Smith.
9      Q.  Mr. Smith, my name is Bruce Brown and I
10 represent the plaintiff in this case.  I'm asking you
11 some questions.  If you have any -- if you don't
12 understand a question, if you want me to reframe it,
13 please feel free to do so.
14     Have you had your deposition taken before?
15     A.  Yes.
16     Q.  Well, then you know it's important for me to
17 allow you to finish your answer and it's important
18 for you to allow me to finish the question so that
19 we're not talking over each other.  The court
20 reporter knows that I never talk over witnesses, so
21 it probably will never happen.  But just in case,
22 stop me and make sure that I allow you to give a full
23 answer.
24     A.  Sure.
25     Q.  Are you currently employed?

---

Page 8

1      A.  I retired in May 2012.  I was in a graduate
2  program for 18 months and I just finished that.  I
3  got a masters of business administration degree.  So
4  for the last two weeks, I've been unemployed.
5      Q.  Congratulations.  Where did you study?
6      A.  Georgia Regents University.
7      Q.  Before you retired, by whom were you
8  employed?
9      A.  Well, I was in the Army as a judge advocate
10 for 30 years and I retired from the Army in February
11 2005.  And I began with the Executive Office for
12 Immigration Review as an immigration judge in San
13 Francisco.  And in late October of that year, I moved
14 to Falls Church, Virginia, to become an assistant
15 chief immigration judge; and then retired May 31st,
16 2012.
17     Q.  Where were you stationed after you became an
18 assistant chief immigration judge?
19     A.  At the headquarters in Falls Church,
20 Virginia.
21     Q.  Did you ever spend time in Atlanta?
22     A.  Yes.  I supervised the Atlanta Immigration
23 Court as one of the courts that I supervised over
24 time from the end of October 2005 until I -- until
25 about spring 2011.

Deposition of           Gary W. Smith        August 20, 2014

Page 9

1    Q.  Where were you, for lack of a better
2  expression, housed when you were performing these
3  obligations, both places or primarily in Falls
4  Church?
5    A.  Oh, in Falls Church at the headquarters of
6  the Executive Office for Immigration Review.  It's, I
7  believe, on Columbia Pike there in Falls Church.  And
8  so I was physically there.
9    Q.  Where do you live now?
10    A.  I live in the Augusta area.
11    Q.  So after you retired from EOIR, did you move
12  to Augusta?
13    A.  Yes.  My family was there, so I just moved
14  back there.
15    Q.  I see.  Describe for me just generally at a
16  high level what your responsibilities were as
17  assistant chief immigration judge in the 2008, 2012
18  time frame?
19    A.  Okay.  Most of that time I supervised
20  11 immigration courts.  For about four months I
21  supervised 13 immigration courts.  And then towards
22  the end, we got a few more assistant chief
23  immigration judges and so we were able -- the chief
24  immigration judge was able to divide the duties a
25  little bit more.  And so towards the end I had seven

Page 10

1  immigration courts that I supervised.
2        That included supervising all the people in
3  the immigration courts that I was in charge of:  the
4  judges, the law clerks, the staff, the court
5  administrator, students, volunteers, interns, as well
6  as, you know, the human resources aspects that the
7  supervisor deals with.
8        And I also was responsible for watching the
9  case load and making sure that we had enough people
10  to do our jobs and that people were trained properly
11  and that type of thing.
12    Q.  You mentioned 11 and then 13 and then
13  towards the end seven courts.
14        Were the Stewart and Atlanta courts always
15  within your domain?
16    A.  Up until spring 2011, yes.  We opened the
17  Stewart Immigration Court, I believe, in January of
18  2010.  But we didn't have any judges there until
19  later that year.
20    Q.  As a general matter, how would you
21  characterize the difference between your
22  responsibilities as the chief -- assistant chief
23  immigration judge on the one hand and the actual work
24  of adjudicating immigration cases on the other?
25    A.  Well, since I had served as an immigration

Page 11

1  judge, I was pretty familiar with that role.  And
2  that is pretty much -- you are either reading or on
3  the bench most of your day.  The only time is if
4  somebody doesn't appear for court or doesn't appear
5  for a hearing, you may have a little break and then
6  you go to reading your next case.
7        So you spend a lot more time focusing on the
8  law aspect.  You still have to do that as an
9  assistant chief immigration judge because, you know,
10  supervising a good number of judges, you have to be
11  familiar with what they are doing and also reviewing
12  their appellate decisions and things like that, which
13  we did regularly.
14    Q.  How much responsibility did you have, or did
15  the office of the assistant chief immigration judge
16  or judges, over the substantive correctness of actual
17  immigration decisions by immigration judges?
18    A.  The actual decisions of the judges were --
19  if the person were -- if either the government or the
20  respondent in the case was -- believed they had a
21  basis for appeal, would appeal that to the Board of
22  Immigration Appeals and then to the circuit courts.
23        So at that point, you know, as long as it
24  was within the realm of reason of what a judge does
25  every day with their duties -- the cases would go to

Page 12

1  the Board of Immigration Appeals if there was an
2  appeal.  So we didn't intercede in that process
3  because we let the due process take its course.
4    Q.  Did you also have a role in considering
5  complaints about immigration judges?
6    A.  Yes.
7    Q.  Can you describe that role, please?
8    A.  Yes.  Assistant Chief Immigration Judge
9  MaryBeth Keller was the assistant chief immigration
10  judge for conduct and professionalism.  She came to
11  us in 2006 from being a general counsel.  And she,
12  basically, began that program.  And if a person had a
13  complaint, there was a complaint procedure that's on
14  the website where they can download that.  And they
15  can complain either to her through a mailbox or
16  telephone or letter or to the assistant chief
17  immigration judge directly.
18    Q.  So in our situation, if something arose out
19  of Atlanta or Stewart, one of those judges, it could
20  go to you or it could go to Judge Keller?
21    A.  That's correct.  Or it possibly could go to
22  the chief immigration judge who would then refer it
23  to Judge Keller.  And it would work its way, if there
24  was an inquiry needed, to the assistant chief
25  immigration judge.

Deposition of          Gary W. Smith          August 20, 2014

---

Page 13

1    Q. I'm going to come back to that process in
2  just a little bit, but let me go back and just get
3  the basic reporting chain.
4        The court administrators reported to you for
5  the courts that were within your jurisdiction;
6  correct?
7    A. Yes.
8    Q. And so Ms. Long reported to you; is that
9  right?
10    A. That's correct.
11    Q. And then you reported -- did you report to
12  anybody?
13    A. We have -- we have a deputy chief
14  immigration judge and chief immigration judge. So I
15  would say I reported to both of those.
16    Q. Who was the deputy chief administrative
17  judge in 2008 through 2011?
18    A. The deputy chief immigration judge was -- it
19  changed over time. The chief immigration judge --
20  let me do that first --
21    Q. Sure.
22    A. -- was David Neal who's now Chairman of the
23  Board of Immigration Appeals. And after him Judge
24  Tom Snow who is now back as an immigration judge. He
25  was the acting director, so he was also the acting

---

Page 14

1  chief immigration judge for a while.
2        And then Judge Brian O'Leary became the
3  chief immigration judge and he's currently still the
4  chief immigration judge, I believe. And the
5  deputy -- I'm trying to remember exactly when he
6  retired. But we had -- Judge Thomas Pullen was the
7  deputy chief immigration judge.
8        And in the 2008 frame, I believe it was
9  Deputy Chief Immigration Judge Michael McGoings. For
10  a while he was an acting chief immigration judge.
11  There was a little hiatus period. And then he's
12  now -- towards the time I was leaving was deputy
13  chief immigration judge again.
14    Q. I'm not going to ask for names. But take me
15  one step higher from them. What position would they
16  report to?
17    A. They would report to the director of
18  Executive Office for Immigration Review.
19    Q. And then the director would report to the
20  attorney general?
21    A. The director, I believe, reported to a
22  deputy attorney general.
23    Q. Just for the record, the entire group is
24  within the United States Department of Justice?
25    A. That's correct.

---

Page 15

1    Q. During your tenure as assistant chief
2  immigration judge, you would then handle a number of
3  complaints about particular judges; correct?
4    A. Yes.
5    Q. Can you just tell me generally what your
6  process was in reviewing complaints?
7    A. Well, first of all, I would read the
8  complaint. And if it referred to a specific case, if
9  it was in-court conduct, then -- we had a system that
10  was in place in 2010, in that time frame, and in 2009
11  a digital audio recording where I could actually
12  listen to the hearing from my desk because our
13  hearings were recorded by computer. And that
14  recording went into a central system. So I could
15  listen to the hearings at my desk.
16        So if it referred to in-court conduct, I
17  could listen to the hearing. And then I would look
18  at the complaint to see who was involved. If there
19  was a complainant, I would look to see if I had
20  information from the complainant who the judge was.
21  If there was a person such as a counsel, for example,
22  who might have been a witness to something, then I
23  would look at who those witnesses were and try to
24  come up with basically a plan for looking into it.
25    Q. So you did sort of a basic investigation, is

---

Page 16

1  that correct, to the extent that it was necessary
2  given the particular facts of the complaint?
3    A. Given the circumstances -- because sometimes
4  a complaint would come in and someone would say, I'm
5  dissatisfied with the result of my case. And the
6  answer to that most of the time was, You have the
7  right to appeal. Those types of very limited
8  circumstances, really, the appellate process was the
9  correct approach.
10        If it was more involved than that or
11  involved conduct or that type of thing, then we had
12  to kind of gauge it by what the complaint was about
13  and what the incident was about.
14    Q. What governed your review of complaints that
15  involved judicial misconduct or alleged judicial
16  misconduct?
17    A. There's actually a kind of two-page
18  schematic that you may have seen that sets out the
19  process. The assistant chief immigration judge for
20  conduct and professionalism would review the
21  complaints and see if it was most appropriate to be
22  investigated within our offices or should be referred
23  to the Office of Professional Responsibility or the
24  Office of the Inspector General if it involved
25  criminal misconduct.

---

APG USA INC.

Deposition of          Gary W. Smith          August 20, 2014

Page 17

1     Q.  And the OPR and the OIG are other divisions
2  within the Justice Department; correct?
3     **A.  Yes.  They are.  They're not part of our**
4  **agency.**
5     Q.  You were speaking about the assistant chief
6  immigration judge for ethics and --
7     **A.  Conduct and professionalism.**
8     Q.  What's the conduct and professionalism -- at
9  least a portion of this time, that was MaryBeth
10  Keller; correct?
11     **A.  In fact, she started the program.**
12     Q.  It would likely go through her office at
13  some point --
14     **A.  Yes.**
15     Q.  -- if it was about judicial misconduct?
16     **A.  Absolutely.  And she would assign a number**
17  **to the case to look into it and that type of thing**
18  **for tracking.**
19     Q.  And then might she assign it to an assistant
20  chief immigration judge to actually review or
21  investigate?
22     **A.  Yes, to look into.  And we would coordinate**
23  **with her to find out what her thoughts on it was.**
24  **She was obviously in that position to be a resource**
25  **person for us.**

Page 18

1     Q.  How does the process keep records of these
2  complaints?
3     **A.  Some of it is done by E-mail.  If there are**
4  **letters involved, we keep a copy of the letters.  If**
5  **there's a -- you know, if there was an extract of a**
6  **transcript or something, that could be included.  You**
7  **know, really it depended on a particular complaint**
8  **and how it came in and that type of thing.**
9     Q.  I'll use you as an example because I'm sure
10  there's never been complaints about you as a judge.
11  If, for example, I wanted to see, as a member of the
12  public, what complaints had been lodged against then
13  Judge Smith, is there a place within the Justice
14  Department where I could go to and ask for those
15  records where they would be produced in some kind of
16  organized fashion?
17     **A.  I'm sure you'd have to put in a Freedom of**
18  **Information Act request.  She actually puts on the**
19  **website their complaints.  I don't think she puts names**
20  **on there.  I'm sure she does not.**
21     **But if you wanted specific records, you'd**
22  **have to, I'm sure, put in a Freedom of Information**
23  **Act request.**
24     Q.  Do you know whether those records are
25  available for the public if a Freedom of Information

Page 19

1  Act request is submitted?
2     **A.  I didn't have to address that.  I think**
3  **they -- somebody would -- we had a Freedom of**
4  **Information Act officer at EOIR who really handled**
5  **that aspect.  And so I would expect that they would,**
6  **you know, apply FOIA law and make a decision what**
7  **could be released and what couldn't.**
8     Q.  In your role as assistant chief immigration
9  judge, did you have the responsibility for evaluating
10  a judge's actual performance given all the initiate
11  of quality --
12     **A.  Yes.**
13     Q.  -- not just complaints but generally?
14     **A.  Yes.  We actually started a performance**
15  **appraisal system for immigration judges in -- I**
16  **believe it was -- July 1st, 2009 was the first time**
17  **that they had been evaluated.  Now, assistant chief**
18  **immigration judges were evaluated because we were in**
19  **management roles and all of our employees are**
20  **evaluated.  But there was an appraisal system set up**
21  **for judges on July 1st, 2009, for a two-year**
22  **appraisal period.**
23     Q.  So they would be reappraised every two
24  years; is that the --
25     **A.  Yes.  And they'd get an interim.**

Page 20

1     Q.  Is there a written policy that describes the
2  appraisal process that you're aware of?
3     **A.  There is.  And Judge Keller actually worked**
4  **on that process.  There is -- I don't have a copy of**
5  **it or anything.  But there is a process in place for**
6  **appraising them and, you know, when those are done**
7  **and that type of thing.**
8     Q.  Let me change gears just a little bit.
9     From your perspective of overseeing the
10  courts, what generally is the policy about closing
11  particular immigration proceedings to the public?
12     **A.  There's one section -- if you look at the 8,**
13  **Code of Federal Regulations, which is a pretty hefty**
14  **document, the second part of it deals with the**
15  **Executive Office for Immigration Review.  The first**
16  **part of it really is directed to the Department of**
17  **Homeland Security.**
18     **So you actually turn to about the last half**
19  **of it for Executive Office for Immigration Review.**
20  **And in the 1000 series, those were the procedural**
21  **rules.  And in Section 1003.27 it sets out the rights**
22  **of the public to attend hearings.  And it also sets**
23  **out some limitations on that where the judge can**
24  **close the proceedings.  And it sets out four**
25  **different categories.**

Deposition of            Gary W. Smith      August 20, 2014

---

Page 21

1    Q. Fair to say the judges are expected to
2 follow that regulation; correct?
3    **A. Yes. In fact, one -- the section does give**
4 **some discretion to the immigration judge to protect**
5 **witnesses, the public and respondents.**
6    Q. Let me back up a second. You mentioned your
7 ability to access the digital audio recordings if you
8 received a complaint about in-court conduct. Are you
9 with me?
10    **A. Yes.**
11    Q. I believe you said -- and I may have gotten
12 this wrong, but that that system was in place in
13 2009, 2010?
14    **A. Yes. Let me explain a little bit.**
15    Q. Sure.
16    **A. We had 59 immigration courts. And**
17 **we piloted the program in about three of our**
18 **immigration courts to make sure that it worked**
19 **properly. And then it was rolled out to the other**
20 **immigration courts on a schedule.**
21      **I don't remember exactly where Atlanta was**
22 **on the rollout. But it was -- most of that was done**
23 **and completed by 2010 for all 59 immigration courts.**
24    Q. So that's when it started, but it continued
25 after that and for all you know it continues to this

---

Page 22

1 day?
2    **A. As far as I know it's still used today. It**
3 **was a huge improvement over what we did before. We**
4 **were using cassette recorders, which was like 1970s**
5 **technology. And as an immigration judge myself, if**
6 **you just finished a six-hour hearing and you didn't**
7 **know whether it was recorded because of an old**
8 **cassette, it really worried you as well as everyone**
9 **else in the courtroom.**
10    Q. Where are those digital audio recordings
11 archived or kept for older cases?
12      MS. HUGHES: Objection to form. I mean,
13      how is he supposed to know that now? He's
14      no longer working with them.
15 BY MR. BROWN:
16    Q. Do you know? When you were there --
17    **A. I do know. The recordings were archived in**
18 **Maryland. They actually go into a central system**
19 **there in Maryland because, you know, individual**
20 **computers can't store all that much information.**
21    Q. Let's look at the specifics of this lawsuit
22 more later on. But do you know whether the occasions
23 in which the plaintiff, Stevens, claims she was
24 excluded or asked to be -- asked to leave -- it's a
25 factual issue on which is which -- whether those

---

Page 23

1 would have been recorded by the digital audio
2 recording system?
3      MR. HOLLIS: Objection. Ambiguous.
4      Leading. Can you specify the dates that
5      you're referring to?
6      MR. BROWN: We can get to that later.
7 BY MR. BROWN:
8    Q. Let me ask you this way: Were there some
9 proceedings that would be recorded or were all
10 proceedings in which the judge was present on the
11 bench -- should all those have been recorded?
12    **A. The actual proceedings where the judge is in**
13 **court on the record would be recorded.**
14      **If it's a -- you know, before you get**
15 **started on a case, for example, the judge might say,**
16 **Are both sides ready? Where is Mr. Jones today? You**
17 **know, what -- whatever the issue was to -- before**
18 **they get started. And sometimes they would ask for a**
19 **few minutes to talk with each other. So you're not**
20 **recording at that point. But you begin the**
21 **recording, Is everyone ready? Yes. We're on the**
22 **record in the case, in the matter of -- and then the**
23 **person's name.**
24      **So most of those are recorded. There are**
25 **some types of proceedings like bond hearings that are**

---

Page 24

1 **not always recorded. Those are not required to be**
2 **recorded.**
3    Q. When you say they are not required to be
4 recorded, what regulation or policy governs what is
5 and what is not supposed to be recorded?
6    **A. 8, Code of Federal Regulations.**
7    Q. That same code provision?
8    **A. Yes.**
9    Q. Does the judge him or herself have the
10 button to push or someone else in the courtroom?
11    **A. Yes. Unfortunately, we didn't have court**
12 **reporters, so the judge actually does the recording.**
13 **So we spent a lot of time training our judges how to**
14 **record hearings and making sure that they push the**
15 **button. If they didn't and they weren't being**
16 **recorded, then they had to do the case over again.**
17 **So they were pretty careful about recording.**
18      **We spent two different conferences training**
19 **them. And then we actually went out to each court,**
20 **the information management people, and trained --**
21 **trained the judges as well as staff, so they would**
22 **understand how the system worked.**
23    Q. I understand that there is a Freedom of
24 Information Act office that people who are in your
25 organization would refer Open Records Act requests

---

Deposition of          Gary W. Smith      August 20, 2014

---

Page 25

1  to; correct?
2      A. Yes.
3      Q. I understand that. But are you aware of any
4  regulation that would shield the digital audio
5  recordings from public inspection in response to a
6  Freedom of Information Act request?
7      A. Let me tell you what I am aware of in that
8  regard. If a respondent in a case wanted a copy of
9  the recording of his or her hearing that was done,
10 say, yesterday, they could come in to the court
11 administrator and ask for a copy of the recording.
12 And we actually provided them a CD. We would copy it
13 on a system called -- a software that would burn a CD
14 of that hearing. And we'd provide it to the
15 respondent or the respondent's counsel, if they were
16 the counsel of record.
17     Q. Would the public be able to do that also or
18 do you know?
19     A. If it were, let's say, an asylum case,
20 you've got very personal information involved in that
21 where a person might be describing some beatings or,
22 you know, behavior, that type, in another country,
23 that -- it would be given to the respondent or the
24 respondent's counsel. But just anyone walking in the
25 door that wouldn't -- they would have to put in a

---

Page 26

1  FOIA request because they're not the respondent or
2  respondent's counsel.
3      Q. So as matter of course, the respondent or
4  respondent's counsel would presumptively have access
5  to the --
6      A. Yes.
7          MS. HUGHES: Objection to form.
8  Foundation. And we're getting into FOIA --
9          MR. BROWN: Understand. Objection
10 noted.
11 BY MR. BROWN:
12     Q. In your perspective, based upon your
13 knowledge, a member of the public would probably need
14 to present a FOIA request and go through that system
15 to access the recording?
16     A. That's my belief because...
17     Q. What role did you have or did your office
18 have in managing the court docket itself? How --
19     A. Well, one of our -- we had a database. It
20 was called CASE, which was an acronym. And it -- we
21 could look at records within the database. We could
22 also use -- do Cognos reports. And they would tell
23 us how many pending cases there were for each judge
24 for a particular court.
25          And if you had a small court, for example,

---

Page 27

1  and you had one judge who had 5,000 cases and another
2  judge who had 500, then you probably want to even
3  that out a little bit so that the workload was a
4  little bit more even. And you'd also have to look at
5  the type of docket that person was doing, whether
6  they were doing a juvenile docket, a detained docket,
7  a non-detained docket.
8          So, yes, that was part of our role to look
9  at the docket and discuss that with our court
10 administrators and make sure that we were fairly
11 apportioning the workload so that the judges had the
12 same challenges.
13     Q. Was there a particular person on your staff
14 who was tasked with the responsibility of making sure
15 that the work was distributed as evenly as you could?
16     A. I didn't have a staff assistant. I had -- I
17 had an assistant who helped me more with the
18 administrative things. But I primarily did that
19 myself with the court administrators.
20     Q. For all the courts that were --
21     A. For the courts that I supervised. And I
22 was -- you know, I knew the database system and I
23 knew how to use -- do reports. And so I could -- I
24 could pull that up pretty quickly.
25     Q. If a member of the public was interested in

---

Page 28

1  a particular case for a particular detainee, let's
2  say, would the member of the public have access to
3  the docket such that they would know when that case
4  would be heard by a particular judge?
5          MR. HOLLIS: Objection. Complex. I
6  don't know what that question means.
7          You can answer if you understand the
8  question.
9      A. We had -- all of our courts had a docket
10 board where we put the calendar for that day. And it
11 usually was by -- in some form it would identify the
12 number or something. We were very careful about what
13 went up there because we didn't want to embarrass
14 anyone. But it was -- the calendar was posted for
15 that judge for that day.
16 BY MR. BROWN:
17     Q. Beyond the docket board -- the docket board
18 would be actually in the -- physically in the
19 courthouse?
20     A. In the waiting area.
21     Q. In the waiting area of the courthouse?
22     A. (Witness nods head affirmatively.)
23     Q. So the docket board would be just against
24 the wall, correct, in the waiting area?
25     A. Yes.

---

Deposition of          Gary W. Smith       August 20, 2014

---

Page 29

1    Q. It would be changed every day, roughly?
2    A. It would -- if you had -- if it was a weekly
3 calendar. It depends on if it's weekly or daily.
4 Usually, there were daily calendars.
5    Q. And they would have like Judge Cassidy and
6 his cases, Judge Pelletier and his cases, et cetera?
7    A. Yes.
8    Q. And that would be posted by the court
9 administrator for that court?
10    A. Or someone they designated to do it.
11    Q. And then they would or their designee would
12 know what was on that by looking at the case
13 database; correct?
14    A. Yes. They'd run the reports and -- we had
15 two major types of hearings. One is called master
16 calendar and that's -- if you were talking about a
17 criminal docket, it would be sort of like an
18 arraignment day.
19       So we had master calendars and that would be
20 where you might have -- and each judge had a number
21 of cases on the master calendar. And so they would
22 know what cases were coming up for that day and they
23 could review the files before they started the
24 hearings, so they were not completely out of the
25 touch. When the case came up, they would know where

Page 30

1 the case stood and that type of thing.
2    Q. I'm familiar with how it's done in some
3 civil courts. I know more about the state court
4 system than the federal court system on this
5 particular issue.
6       The computer doesn't decide -- obviously, it
7 doesn't decide on its own when a particular case is
8 going to come up and the schedule for a particular
9 matter. But that's going to be driven to some extent
10 by the judge handling the matter; correct?
11    MR. HOLLIS: Objection. Form.
12       Are you asking a question?
13 BY MR. BROWN:
14    Q. Go ahead.
15    MR. HOLLIS: You can answer if you
16 understand it.
17    A. The master calendars, they were set out so
18 that if you had a hundred new cases and you had five
19 judges, if they were all doing the same types of
20 cases, the same types of dockets -- we had what we
21 called a hard counting system where you evenly
22 apportioned those out so that each of the five judges
23 would get 20 cases on their master calendar.
24       We tried to keep the master calendars
25 manageable. It was different at different courts

Page 31

1 depending on the case load, the type of docket being
2 done and that type of thing.
3       The individual -- the judge, himself or
4 herself -- since I did this as an immigration judge,
5 if you have a master calendar and you set the case
6 over to a new date, you deal with your legal
7 assistant and say, Is this date open for 8:30? If it
8 is, then you set their case. And then the legal
9 assistant enters that into the database. And that's
10 the case that's going to be on that day at that time.
11 BY MR. BROWN:
12    Q. The cases stayed with a particular
13 immigration judge until they were fully adjudicated,
14 generally; correct?
15    A. Unless the judge had a reason to recuse
16 himself or herself for some reason to disqualify
17 them.
18    Q. Other than a disqualification, did the judge
19 have the discretion to assign the case that --
20    A. Not the individual judges. They'd have to
21 usually go to the assistant chief immigration judge.
22 And they would also be working with the court
23 administrator. For instance, if the judge was going
24 to have a medical issue or something like that where
25 he was going to be out for an extended period, we'd

Page 32

1 probably have to reassign his cases in fairness to
2 the respondents so that they don't sit around and
3 have anxiety because their hearing was postponed.
4    MR. BROWN: Let's switch gears a little
5 bit.
6    MS. HUGHES: I need to use the rest
7 room. Can we take a quick break?
8       (Recess from 10:15 a.m. to 10:25 a.m.)
9 BY MR. BROWN:
10    Q. Sir, when do you first recall hearing of the
11 plaintiff Jacqueline Stevens?
12    A. In 2009.
13    Q. And what was the occasion for that?
14    A. Either the court administrator or the Office
15 of Legislative and Public Affairs told me that we had
16 a person that would be coming to the immigration
17 courts to view some proceedings. So that was about
18 the extent of my knowledge at that point.
19    Q. It seems to me, at least, unusual for the
20 visit of a citizen to the courts to engender that
21 kind of attention. Was --
22    MR. HOLLIS: Objection to form.
23 BY MR. BROWN:
24    Q. -- there a particular --
25    MR. HOLLIS: May I object?

---

Deposition of          Gary W. Smith          August 20, 2014

Page 33

1      MR. BROWN:  No.  You object after I ask
2  the question.  If you would limit it to one
3  of you objecting, that would be fine.  So
4  let me finish, but I'll just withdraw it.
5      But if you would let me ask the
6  question, then you may object.
7      MR. HOLLIS:  I'll do that.
8      MR. BROWN:  And if you would decide with
9  your co-counsel who is doing the objecting,
10  that would be in accordance with Rules.
11      Let me ask it again.
12      MR. HOLLIS:  Okay.
13 BY MR. BROWN:
14      Q.  Do you or the court administrator get
15  involved when any member of the public is thinking
16  about visiting the court to view proceedings?
17      **A.  If it's a member of the press they often --**
18  **the Office of Legislative and Public Affairs wants to**
19  **know because they interface with the press.  So those**
20  **members of the public, the press, as a courtesy**
21  **usually contact the Public Affairs office to let them**
22  **know that they will be observing a hearing or in the**
23  **building or whatever.**
24      Q.  Do people other than members of the press
25  get singled out for particular attention?

Page 34

1      **A.  No.  People can come in and observe**
2  **hearings.**
3      Q.  If you know, what was it about Ms. Stevens
4  that triggered the attention of the court
5  administrator in 2009?
6      **A.  I don't know.  It was just -- I guess it was**
7  **because she was -- I don't know.  I don't know**
8  **specifically.  I mean, I -- we expect people from the**
9  **public to come in and observe hearings and they do.**
10      Q.  So you heard that Jacqueline Stevens, a
11  professor, is viewing proceedings.  That was it for
12  the most part?
13      **A.  In 2009.**
14      Q.  When was the next time that you heard of
15  Ms. Stevens?
16      **A.  I believe that when the Stewart Immigration**
17  **Court opened in 2010, she came down to observe some**
18  **hearings.  At that time, we didn't have any judges in**
19  **the Stewart Immigration Court.  So that was maybe**
20  **slightly different there because we didn't have**
21  **judges onsite most of the time.**
22      Q.  That was just at the detention center where
23  the hearings would actually be televised to Atlanta;
24  is that right?
25      **A.  Yes.  They were -- since we didn't have any**

Page 35

1  **judges onsite, we had to do those by video**
2  **conference.**
3      Q.  What was the occasion for learning that
4  Ms. Stevens was either at or interested in going to
5  the Stewart facilities?
6      **A.  I recall there was one message about a tour**
7  **and that involved someone else as well.**
8      Q.  Who else was it?
9      **A.  I don't remember the name.**
10      Q.  Was it a former detainee or another member
11  of the public or press?
12      **A.  I think it was another member of the public.**
13  **Department of Homeland Security said that they had a**
14  **tour set up and they wanted to make sure that we were**
15  **aware of it.**
16      Q.  To the best of your recollection, Ms.
17  Stevens was on that tour or wanted to be on that
18  tour?
19      **A.  I believe so.  Yes.**
20      Q.  After the tour or something related to the
21  tour of the Stewart facility, when was the next time
22  that you recall hearing of Ms. Stevens?
23      **A.  I knew that she had -- was attending**
24  **hearings at different times, but that's not something**
25  **that overly concerned me.  We have people who attend**

Page 36

1  **our hearings all over the country.**
2      Q.  Is it typical for the organization to track
3  people as they attend different hearings?
4      **A.  It depends, I suppose, on what hearing it**
5  **is.  If it -- what type of hearing it was.  If it**
6  **was an asylum case or something like that, I guess we**
7  **would have a greater concern about someone -- or if**
8  **it was someone from, say, console -- consulate or**
9  **something like that, we would want to be aware of**
10  **that.**
11      Q.  Were you aware of other members of the press
12  who were visiting different facilities or courtrooms
13  in the same time period?
14      **A.  That was outside my bailiwick, really.  That**
15  **was the Office of Legislative and Public Affairs that**
16  **monitored that.**
17      Q.  So apart from Ms. Stevens, do you know of
18  any other people who you -- do you recall being aware
19  of any other people who were doing what she was
20  doing, that is, going to different immigration
21  hearings?
22      **A.  Around the country we had immigration law**
23  **clinics with professors who would take their**
24  **clinics -- their students over to observe hearings.**
25  **So that wasn't unusual.**

Deposition of              Gary W. Smith        August 20, 2014

Page 37

1    Q.  Do you recall any names of university
2  professors or journalists in the 2009-2010 time frame
3  whose name came up with the court administrators or
4  your office as attending various court hearings?
5      **A.  There were immigration law clinics all over**
6  **the country where the professor would go over and**
7  **observe the student.  You know, that was something**
8  **actually that we encouraged because, you know, it's**
9  **training of new lawyers.  And so I would not say that**
10 **was unusual.**
11    Q.  Apart from professors involved in the
12 immigration law clinics, do you recall your office
13 being aware of any other individuals who were
14 attending and visiting court proceedings other than
15 Ms. Stevens?
16    **A.  There were, but I don't remember names.**
17    Q.  Let me pick up where we were in the
18 chronology.  You mentioned that Ms. Stevens had
19 possibly participated in a tour of the Stewart
20 proceedings.
21        When was the next time you became aware of
22 Ms. Stevens?
23    **A.  Well, the first concerns that my court**
24 **administrators were really concerned about was in**
25 **April, I guess, when she went down to visit the**

Page 38

1  **Stewart Immigration Court.  And I told my court**
2  **administrator there that she could observe hearings**
3  **if she's a member of the public.**
4    Q.  The court administrator was Mr. Bethune?
5    **A.  Yes.**
6    Q.  What was your understanding of why there was
7  a question of whether she could attend the
8  proceedings?
9    **A.  I don't think it was a question of whether**
10 **she could attend the proceedings but just a**
11 **notification you have someone coming there.  We**
12 **didn't have any judge there, which made it a little**
13 **bit different because the judge was actually up here.**
14    Q.  Were there any difficulties with Ms. Stevens
15 in connection with Mr. Bethune's request or question
16 to you about whether she should be allowed into the
17 facility?
18        MR. HOLLIS:  Objection.  Form.
19        Ambiguous.
20        You can answer the question.
21    **A.  He came to that court having been the**
22 **supervisor legal assistant in Atlanta.  So he**
23 **moved -- he was selected and became the court**
24 **administrator down there.  And he knew -- he knew**
25 **that people could come in and observe hearings and he**

Page 39

1  **knew the rules regarding that.**
2  BY MR. BROWN:
3    Q.  What was your understanding of what
4  triggered his question to you as to whether she
5  should be allowed in or not?
6    **A.  I think it was more just a notification that**
7  **we actually have someone coming down to observe the**
8  **hearings here which, we didn't have very often down**
9  **there because if you go down to the immigration**
10 **court, it's out in the countryside.**
11    Q.  This was in, I believe, early-ish April
12 2010; correct?
13    A.  Yes.
14    Q.  When was the next incidence in which you
15 heard of Ms. Stevens?
16    **A.  It was during that week.**
17    Q.  Later that week?
18    **A.  Yes.**
19    Q.  I mean after the Stewart -- just in
20 sequence, Stewart first and then what?
21    **A.  Atlanta.**
22    Q.  And what was that?
23    **A.  Around April 14th, the court administrator**
24 **told me that -- sent me a note, Ms. Long, that**
25 **Professor Stevens had gone into Judge Sease's**

Page 40

1  **courtroom during the middle of a hearing.  And Judge**
2  **Sease was concerned about that because she checked**
3  **with the counsel in the case and the counsel asked**
4  **that that hearing be closed.**
5    Q.  That was on the record in the digital audio
6  recording?
7    **A.  I don't remember.  I --**
8    Q.  Should --
9    **A.  It could have been.  I don't remember.**
10    Q.  Why wouldn't it have been?
11        MR. HOLLIS:  Objection.  Asked and
12    answered.
13        You can answer the question if you
14    understand it and if you know the answer.
15    **A.  It might not have been if it didn't pertain**
16 **to that respondent's proceedings itself; it involved**
17 **someone coming in.  The judge could have gone off the**
18 **record.  I mean, if they see, for example, someone**
19 **coming in that may need to talk to the judge or**
20 **something like that, the judge might go off the**
21 **record.**
22 BY MR. BROWN:
23    Q.  Is it your understanding that Ms. Stevens
24 was asked to leave or that the hearing was closed to
25 the public?

Deposition of          Gary W. Smith        August 20, 2014

---

Page 41

1    A. It was my understanding that the attorney in
2 the case asked that it be closed because of the
3 nature of the proceeding.
4    Q. And was it closed?
5    A. Yes. She did ask them to leave, I believe,
6 at that point because the attorney had asked that.
7    Q. Did the people in the courtroom leave at
8 that point, including Ms. Stevens?
9    A. I wasn't there. I don't know. I believe
10 so.
11    Q. What was the occasion for you being involved
12 in that incident?
13    A. The judge had notified the court
14 administrator that she was concerned about that,
15 about someone coming in during the middle of the
16 proceeding and it interrupted her train of thought.
17 And so she notified the court administrator who let
18 me know.
19    Q. Did you -- I don't mean this to sound
20 pejorative in any way. But were you asked to do
21 anything or did you do anything or were you just an
22 information loop?
23    A. I was -- I didn't know what type of case it
24 was initially, so I had to listen -- I wanted to find
25 out. And the judge notified me what type of case it

---

Page 43

1 episode? Did that have any subsequent history as it
2 were?
3    A. Well, I was aware of it. I mean, we didn't
4 take any action with regard to anyone with that,
5 other than I inquired of the judge why the proceeding
6 was closed.
7    Q. Did anyone tell you of any misconduct from
8 Ms. Stevens or anyone else in the courtroom?
9    A. What the court administrator told me by
10 E-mail was that it interrupted the proceedings and
11 the judge asked -- said -- determined that it was
12 going to be a closed proceeding after talking with
13 counsel. And it was my understanding Professor
14 Stevens addressed the judge directly and I guess
15 questioned her decision.
16    Q. Was questioning the judge's decision to
17 close the proceedings conduct that in your view was
18 inappropriate?
19    A. Probably not good timing to address that to
20 the judge in the middle of someone else's proceeding
21 because that's the respondent's day in court. That's
22 that person's opportunity to present their case.
23    Q. So it's the fact of the interruption as much
24 as anything --
25    A. Yes.

---

Page 42

1 was. And I said, Why is this particular case closed?
2 And she had a rational basis for doing it. It was
3 one of those matters that's within the discretion of
4 the judge.
5    Q. What did the judge tell you about what type
6 of case it was?
7    A. It was a cancellation of removal case that
8 involved some delicate issues as I recall. I don't
9 have the -- that was to the best of my recollection.
10    Q. Do you know the nature of the delicate
11 issues?
12    A. No.
13    Q. Was it an asylum case?
14    A. No. It was a different type of case, but
15 the judge, in her discretion as a judge, made that
16 determination.
17    Q. Is it your recollection that the
18 determination was made upon the sensitivity of
19 witnesses or parties of some sort?
20    A. That would be the basis the judge would
21 consider. Yes.
22    Q. And then the request for closure made by
23 counsel for the respondent?
24    A. That's my understanding.
25    Q. What, if anything, came of that particular

---

Page 44

1    Q. -- fair to say?
2    A. Yes.
3    Q. What was the next time that you heard of
4 Ms. Stevens?
5    A. I believe it was on April 20th when I
6 received an E-mail notification from the court
7 administrator that included a statement from the
8 supervisor legal assistant Ms. Crosby.
9    Q. What did that E-mail ask you to do or say?
10    A. Well, it recounted what had occurred the
11 previous day on April 19th about what had occurred
12 with Judge Cassidy addressing a respondent and
13 closing the proceeding and then the behavior that
14 occurred after that.
15    Q. So you were not in contact with the Atlanta
16 court about Ms. Stevens on the 19th, to the best of
17 your recollection?
18    A. I don't remember. You know it could have
19 been late that day or early the next day.
20    Q. But what you remember, sitting here today,
21 is that on April 20th you received an E-mail from the
22 court administrator?
23    A. Yes. I believe it was April 20th.
24    Q. And then what did you do, if anything, in
25 response to receiving that information in that

---

Deposition of          Gary W. Smith      August 20, 2014

---

Page 45

1  E-mail?
2      A. Well, the court administrator -- I talked
3  with her and I found out what she believed had
4  occurred. She wasn't directly involved, but she
5  tried to tell me what had occurred. And she also
6  told me what she had done thus far, including getting
7  the statement from Ms. Crosby on what had occurred.
8      Q. Did you speak with Judge Cassidy that day?
9      A. I don't remember. I talked with him
10  periodically.
11      Q. Other than speaking with the court
12  administrator on the 20th, what did you do in your
13  role as the assistant chief administrative judge
14  about the incident on the 20th -- incident on the
15  19th?
16      A. At that point I was monitoring what she had
17  provided me. I looked at very carefully at
18  Ms. Crosby's statement about what she said had
19  happened. And Ms. Long was following it up. She had
20  asked the Federal Protective Service for information.
21  And she told me what had occurred, what she believed
22  had occurred.
23      Q. Were you called upon to do anything in your
24  official capacity about that?
25      A. I wasn't called upon it at that time to do

Page 46

1  anything.
2      Q. Was there some kind of deliberative process
3  in which you and your staff were considering what
4  actions to take with respect to Ms. Stevens?
5      A. No. It appeared to me that I was aware of
6  what was -- had gone on and I was monitoring; I was
7  aware of it.
8      Q. But in a way it was an incident that
9  happened and that's it; right?
10      A. I supervised 11 immigration courts during
11  that time. We had other types of things that
12  happened from time to time that I had to be aware of
13  them and see what, if anything, needed to be done.
14      Q. But to the best of your recollection, as of
15  that time there wasn't any specific action that you
16  needed to take or not take with respect to that
17  incident; fair to say?
18      A. Monitoring it.
19      Q. Monitoring as -- and if she showed up
20  again --
21      A. Well, if something like that repeated
22  itself, I suppose. I just monitored -- was aware of
23  it.
24      Q. After the communications of the 19th and the
25  20th, what was the next time that you heard of or

Page 47

1  from Ms. Stevens?
2      A. Judge Keller at one point told me that --
3  and by E-mail, I believe, that Professor Stevens had
4  complained to her. And that was followed up on
5  May 3rd by a telephone call to Judge Keller. And
6  then Judge Keller referred the matter to me as the
7  ACIJ, I believe, on May the 11th.
8      Q. And then what did you do after you received
9  the complaint? Just for the record, this was a
10  complaint that was lodged by Ms. Stevens relating to
11  the incident on April 19th; correct?
12      A. Yes.
13      Q. What did you do in response to receiving or
14  being delegated, I suppose, that complaint from Judge
15  Keller?
16      A. I followed the procedure that I would in any
17  other case. I carefully read the complaint and I
18  read Ms. Crosby's account of what had occurred. I
19  talked with the court administrator about it. I
20  talked with Judge Cassidy. I told him I needed a
21  statement from him about what had occurred. And I
22  received that on May 12th. And I reviewed the
23  hearing record itself.
24      Q. When you say "hearing record," what are you
25  referring to?

Page 48

1      A. The DAR recording, digital audio recording.
2      Q. Did the DAR recording include a recording of
3  any communications to or from Ms. Stevens?
4      A. Not that I recall. It was a DAR recording
5  of the hearing of that respondent involved in that
6  afternoon hearing.
7      Q. What did you learn relative to the complaint
8  from that DAR recording?
9      A. That it was an asylum related claim and the
10  respondent did ask that the proceeding be private.
11  The respondent was pro se, so he wasn't represented
12  by counsel.
13      Q. Was he asked by the judge whether he wanted
14  it to be closed to the public or did he make that
15  request on his own?
16      A. With a pro se respondent the judge has to
17  exercise particular caution because the person
18  doesn't have an attorney. So they have to advise
19  them of various rights and they have to tell them
20  about things that they may have a right to ask for.
21  And he did tell him that this is this type of case.
22  You can -- if someone wants to watch, then you have
23  to let me know whether you want it to be -- I'm
24  paraphrasing. It's in that transcript -- whether you
25  want it to be private or to have people observe the

---

Deposition of        Gary W. Smith        August 20, 2014

Page 49

1  hearing.  He did that.  And the person asked that it
2  be private.
3      Q.  Was it your impression that that exchange
4  between the judge and the respondent happened before
5  or after Ms. Stevens had been asked -- had been
6  notified that she may have to leave the proceedings?
7      A.  Judge Cassidy told me that it occurred after
8  he asked her to step out because the respondent
9  didn't have counsel.  The only way he could do that
10  is by addressing the respondent directly.
11      Q.  So your recollection of the sequence of
12  events as reported to you from Judge Cassidy was that
13  Judge Cassidy first asked Ms. Stevens to step out and
14  she did; correct?
15      A.  Yes.
16      Q.  And then on the record there was a colloquy
17  between respondent and the judge in which the
18  respondent, in response to the judge's questions,
19  indicated that he, indeed, wanted the pleadings
20  closed; correct?
21      A.  Yes.
22      Q.  And then -- and that happened when Professor
23  Stevens was not in the courtroom; correct?
24      A.  That's my belief, yes, according to what
25  Judge Cassidy told me.

Page 50

1      Q.  She did not return to the courtroom that
2  day; correct?
3      A.  That's my understanding.
4      Q.  Were you aware that Ms. Stevens was in the
5  EOIR waiting area there down the hall from the
6  courtroom?
7      A.  Yes.  I wasn't aware at the time.  I am now.
8      Q.  What was reported to you about Ms. Stevens'
9  communications and the action of the federal
10  officials in the waiting area outside of Judge
11  Cassidy's courtroom after she had been asked by Judge
12  Cassidy to leave that courtroom?
13      A.  Piecing the various statements together of
14  the people who I've talked with and also who provided
15  statement -- Ms. Britney Luckey, Judge Cassidy,
16  Ms. Marion Crosby and Officer Jackson -- the judge
17  went out to the inner space of the court, which is
18  our administrative space.  And one of the clerical
19  staff, either Ms. Lucky or Ms. Crosby, learned from
20  him that it was a closed proceeding.  And Ms. Crosby,
21  I believe, notified -- Professor Stevens actually
22  came to the window and asked about it.
23          And Britney Luckey, who was a student
24  employee, went to get Ms. Crosby because she was a
25  supervisor.  And Ms. Crosby talked with Professor

Page 51

1  Stevens and explained to her that Judge Cassidy had
2  closed the proceeding and, you know, she couldn't
3  enter the Courtroom 5 for that hearing.
4          And she -- she disputed that with Ms.
5  Crosby.  And Ms. Crosby was concerned, as I read her
6  statement, and as she told me, that she was concerned
7  that Ms. -- she was concerned enough that she let the
8  security personnel know that Professor Stevens could
9  not observe that proceeding because Judge Cassidy was
10  conducting a closed hearing.
11      Q.  By she, Ms. Crosby, informed the security
12  people?
13      A.  That's my understanding.  Yes.
14      Q.  And then after Ms. Crosby informed the
15  security people that Ms. Stevens could not attend --
16  could not return to the courtroom, what happened next
17  based upon what you learned from your people?
18      A.  Ms. Crosby clearly told the officer that she
19  was -- she couldn't enter that hearing room that --
20  for that proceeding, not that she couldn't stay in
21  the building.  We have no control over the security
22  people as far as the building.
23          And the officer came in.  And she, according
24  to what Ms. Stevens said -- or excuse me -- what
25  Ms. Crosby said, she was ranting with the officer and

Page 52

1  he told her to leave the building.  And there were --
2  apparently, Ms. Jackson the lead security officer
3  came at that time.
4      Q.  So some other officer, other than
5  Ms. Jackson, told Ms. Stevens to leave after she was,
6  quote, ranting; fair to say?
7      A.  The language they used was "ranting and
8  raving."
9      Q.  And then Ms. Jackson as the supervisor of
10  some kind came to the scene; right?
11      A.  Yes.
12      Q.  And then they all went out with Ms. Stevens?
13      A.  Yes.  And what Ms. Crosby had told them was
14  she could not enter the Courtroom 5 for that
15  proceeding.
16      Q.  And so I'm not getting you to attribute
17  fault of any kind, but just so I can interpret what
18  you're saying, to the extent that the security
19  officers asked or advised or encouraged Ms. Stevens
20  to leave the building, that direction or that
21  decision was made by the security people, not as a
22  result of instructions they received from either
23  Judge Cassidy or Ms. Crosby; fair to say?
24      A.  Yes.
25      Q.  Have you had an opportunity to review the

Deposition of          Gary W. Smith      August 20, 2014

Page 53

1  MegaCenter transcripts of the conversations between
2  officers and the operator, the MegaCenter operator?
3      A.  Yes.
4      Q.  You recall that that -- at least when the
5  security officers indicated that the judge had
6  ordered Ms. Crosby out of the building, was that
7  simply miscommunication or how do you think that
8  happened?
9      **A.  I did not find that to be accurate.**
10     Q.  Did you consider that before issuing your
11 decision -- your response to the complaint that --
12     **A.  I talked with Ms. Jackson who was the lead**
13 **security person.  And she told me that Judge Cassidy**
14 **said she couldn't appear for that proceeding.  In**
15 **other words, that was a closed proceeding.  The**
16 **security people, if anyone, made that determination**
17 **that she had to leave the building.**
18     Q.  So based upon your telephone communication
19 with Jackson, she was clear as to the scope of Judge
20 Cassidy's directive; fair enough?
21     **A.  She was clear, as far as I understand, that**
22 **he was just -- he had just closed the proceedings to**
23 **the public.  And Ms. Jackson could not attend that**
24 **particular proceeding in Courtroom 5 [sic].**
25     Q.  My question was:  Based upon your discussion

Page 54

1  with Ms. Jackson, Ms. Jackson understood that that
2  was the case, understood the scope of Judge Cassidy's
3  directive --
4      **A.  I don't know what she understood.  You'd**
5  **have to ask her that.  I don't know whether she**
6  **understood or not.  I think she did.  That's what she**
7  **indicated; she knew that it was -- that proceeding**
8  **was closed and Ms. Crosby had told them.**
9      Q.  Thank you.  My question was -- I appreciate
10 your response.
11         We got into talking a little bit about the
12 work that you did reviewing the complaint that had
13 been lodged against Judge Cassidy.  You mentioned
14 that you spoke with Ms. -- you spoke with Ms. Crosby,
15 with Court Administrator Long --
16     **A.  Yes.**
17     Q.  -- with Judge Cassidy?
18     **A.  Yes.**
19     Q.  And you -- did you speak with Britney Lackey
20 [sic]?
21     **A.  I did not talk -- I don't recall talking**
22 **with her.  She had made a fairly detailed statement,**
23 **which I received on June 1st.  She was a student**
24 **employee and -- which meant she, I think, was a**
25 **junior in college at that time.  It was a detailed**

Page 55

1  **enough statement that I had her recollection of the**
2  **events.**
3      Q.  And then, I believe, you also spoke with
4  Officer Jackson?
5      **A.  Yes.**
6      Q.  Did you speak with any of the other
7  officers?
8      **A.  No.**
9      Q.  Other than the people we have just
10 mentioned, did you speak with anybody else about the
11 events of April 19th or 20th?
12     **A.  I spoke with Judge Keller.  We are required**
13 **to coordinate with her as the assistant chief**
14 **immigration judge for conduct and professionalism.**
15 **So I regularly coordinated with her to get her advice**
16 **and counsel.**
17     Q.  What did she add to your consideration?
18     **A.  Well, if she had additional things that she**
19 **saw that needed to be done or -- then I would ask**
20 **her.**
21     Q.  Specifically with respect to Ms. Stevens'
22 complaint about Judge Cassidy?
23     **A.  I don't recall specifically anything.  She**
24 **was just there as a resource person to help us if we**
25 **needed assistance.  If we seemed to be on the right**

Page 56

1  **track, she'd let us know that, if we were doing it**
2  **appropriately.**
3      Q.  At some point you issued a written decision;
4  correct?
5      **A.  I did.**
6      Q.  After issuing a written decision, what was
7  the next time that you recall hearing Ms. Stevens'
8  name or dealing with Ms. Stevens?
9      **A.  I believe -- you know, I was aware that --**
10 **after June 3rd, I was aware that she may have called**
11 **Ms. -- our assistant chief immigration judge, Judge**
12 **Keller, but I wasn't involved in that.**
13     Q.  Nothing else?
14     **A.  I don't believe so.**
15         MR. BROWN:  Let me mark for
16 identification as Exhibit 1, Federal
17 Defendants' Response to Plaintiff's First
18 Continuing Interrogatories to Federal
19 Defendant Smith.
20         (Plaintiff's Exhibit 1 was marked for
21 identification.)
22 BY MR. BROWN:
23     Q.  Mr. Smith, these are your verified responses
24 to interrogatories that were promulgated by the
25 plaintiff; correct?

Deposition of          Gary W. Smith          August 20, 2014

Page 57

1    A. Yes.
2    Q. That is your signature on the last page?
3    A. Yes.
4    Q. Let me direct your attention to page 8,
5  paragraph five.  The interrogatory says, Please
6  identify the dates of any meetings you attended
7  concerning plaintiff.
8       Do you see that?
9    A. Yes.
10    Q. A very specific request; right?  Right?
11    A. Yes.
12    Q. But your objection says it's overly broad.
13  Do you see that?
14    A. Why is it my objection?
15       MS. HUGHES:  Objection to the form.
16  BY MR. BROWN:
17    Q. I understand.  But the United States lawyer
18  said it was overly broad; correct?
19    A. Okay.
20    Q. I understand you, the distinction you're
21  making.
22       Can you identify the dates of meetings you
23  attended concerning Ms. Stevens?
24    A. If you're talking about a meeting with one
25  other person, I talked with Judge Keller.  If you're

Page 58

1  talking about a group meeting in a conference room
2  like this, I don't recall any.
3    Q. Apart from meeting with Judge Keller, did
4  you have any other meetings with anybody person to
5  person about the plaintiff?
6    A. The deputy general counsel occasionally
7  would come to my office about different things, but I
8  think one he mentioned was, I guess, his concern
9  about Ms. Stevens.  But it wasn't -- I wouldn't
10  describe it as a meeting as such.  It was just -- he
11  came by to talk with me and he possibly sent me an
12  E-mail or E-mails.
13    Q. What is the name of the deputy general
14  counsel that you're referring to?
15    A. At that time it was John Blum and I believe
16  that was his title.  He had -- he may have actually
17  at one point in the past had been acting general
18  counsel, but at that time he was the deputy general
19  counsel.
20    Q. Apart from the occasional meetings with
21  Judge Keller about the plaintiff and possibly meeting
22  with John Blum -- B-L-U-M; is that right?
23    A. Yes.
24    Q. -- do you recall any other meetings that you
25  attended concerning the plaintiff?

Page 59

1    A. If you're referring to like a group meeting
2  in a conference room, I do not.  I don't recall any
3  such meeting that I was a member of or a party to.
4    Q. Let me direct your attention to
5  Interrogatory 7, which is on the next page.  This
6  asked you to identify any individual who was tasked
7  with research or other additional follow-up
8  concerning the plaintiff's presence in the
9  immigration courts; do you see that?
10    A. (Witness nods head affirmatively.)
11    Q. After you rendered your decision on
12  Ms. Stevens' complaint, did you take any action with
13  respect to Ms. Stevens in any way that involved her?
14    A. No.
15    Q. In that question, I would include:  Did you
16  task anyone who worked for you to do anything with
17  respect to Ms. Stevens?
18    A. At one point Judge -- or John Blum had
19  asked -- either John Blum or one of his attorneys,
20  Mr. Baker, had asked for a timeline of things that
21  might have -- or times she had been to the courts
22  that might have been disruptive or something of that
23  nature.  And I just told the court administrators to
24  provide that.  And they did and I provided that to
25  him.

Page 60

1    Q. So you provided a timeline?
2    A. It was dates and things of that nature.  And
3  I just provided what they provided me.
4    Q. You provided to the attorneys what the court
5  administrators had provided to you?
6    A. Yes.
7    Q. And the court administrators would have been
8  who other than Mr. Bethune and Ms. Long?
9    A. That's all.
10    Q. Was that information collected before or
11  after this lawsuit was filed, best of your
12  recollection?
13    A. Before.
14    Q. Do you recall the occasion for doing that?
15    A. I recall Mr. Blum sending me a message
16  saying, Can you provide me a timeline of any
17  incidents that might have occurred.  And I just
18  tasked the court administrators.  I couldn't ignore
19  the deputy general counsel.
20    Q. I'm not suggesting you should have.
21    A. And I just basically did what he was asking.
22    Q. Do you recall the FPS considering an order
23  banning the plaintiff from the federal immigration
24  buildings?
25    A. He prefaced his little message to me with

APG USA INC.

Deposition of          Gary W. Smith       August 20, 2014

Page 61

1 that, but it wasn't anything that I was aware of
2 until he sent that to me.
3      Q.  What did you learn after he sent that to you
4 about the FPS considering an order banning Ms.
5 Stevens from --
6      A.  I didn't learn anything after that.
7      Q.  Nothing came of that?
8      A.  No.  I didn't follow up on that.  That was
9 something he was working on, not me.
10      Q.  Did you learn anything else about it at all?
11      A.  No.
12      Q.  Are you aware of FPS banning any individuals
13 from courthouses --
14      A.  No.
15      Q.  -- ever?
16      A.  You know, I wouldn't have known if they did.
17 I'm not FPS.
18      Q.  But you didn't know anyway?
19      A.  I didn't know.
20      Q.  Let me direct your attention to page 12 of
21 your answer to paragraph 10.  Here you list some of
22 the people that you communicated with as a part of
23 your investigation.  That included Judge Cassidy,
24 Court Administrator Long and Judge Keller.  Do you
25 see that?

Page 62

1      A.  Yes.
2      Q.  And today you would add to that the names
3 that we've gone over in your deposition; is that
4 correct?
5      A.  Yes.  I talked with Ms. Crosby and I also
6 talked with Officer Jackson.
7      Q.  And you received the E-mail from Britney
8 Lackey?
9      A.  Luckey.  Yes.  It was a detailed E-mail
10 about -- Britney Luckey was the student employee.
11      Q.  Right.
12      A.  As I recall I asked the court administrator
13 to have her sit down, reflect on what had occurred
14 and provide a statement on what had occurred.
15 Because oftentimes when you just talk with someone on
16 the phone, they may give you a shorthand answer.  So
17 I like to give people an opportunity to reflect on
18 it, give me the statement of what occurred so that I
19 can address the matter.
20      Q.  So you got statements then from Cassidy,
21 Long, Crosby and Luckey?
22      A.  Yes.  And I also talked with Judge -- or
23 with Officer Jackson.  She didn't work for me or I
24 didn't have any authority over her, so I couldn't
25 require her to do anything.

Page 63

1      Q.  Do you think Judge Cassidy handled this
2 correctly based on what you know?
3      A.  With pro se respondents, the judge has a
4 specific duty to guide that person with regard to
5 providing them information about the rights they have
6 with regard to counsel, with regard to
7 cross-examining people and with regard to whether the
8 hearing is open or closed depending on what type of
9 information comes out.
10           And based on what he found out from the
11 respondent and the nature of the claim, it was within
12 his discretion to make that determination.  So it was
13 within the realm of reason to make that determination
14 for a judge.
15           (Plaintiff's Exhibit 2 was marked for
16      identification.)
17 BY MR. BROWN:
18      Q.  Mr. Smith, can you identify Plaintiff's 2,
19 please?
20      A.  That was a 2006 memorandum from the attorney
21 general to improve the immigration courts and the
22 award of immigration appeals.
23      Q.  Let me direct your attention to page 3.  To
24 the best of your understanding, did the director of
25 EOIR establish regular procedures for the purposes

Page 64

1 outlined in paragraph 6?
2      A.  Improved on-bench reference materials and
3 decision templates?
4      Q.  I was actually looking at paragraph 7 at the
5 top?
6      A.  Oh, mechanisms to detect poor conduct and
7 quality.
8      Q.  Yes, sir.
9      A.  Yes.
10      Q.  Those are in place best you can recall?
11      A.  Yes.
12      Q.  And then about the code of conduct on
13 paragraph 10 --
14      A.  Yes.
15      Q.  -- there is a code of conduct; correct?
16      A.  There is.  That took -- I -- that took a
17 good while to ultimately promulgate.  But I was -- I
18 remember that being promulgated.  So, yes, it was
19 kind of separate from the first one, though.
20           (Plaintiff's Exhibit 3 was marked for
21      identification.)
22 BY MR. BROWN:
23      Q.  Mr. Smith, can you identify Exhibit 3,
24 please?
25      A.  I can tell you what it states it is.  It's a

Deposition of          Gary W. Smith          August 20, 2014

---

Page 65

1  **Guide for Immigration Judges on Investigations by the**
2  **Office of Professional Responsibility.**
3      Q. Did you ever refer any of the complaints
4  that you received to the Office of the Inspector
5  General?
6      **A. I didn't because that wasn't my role. The**
7  **assistant chief immigration judge for conduct and**
8  **professionalism would make that determination and**
9  **probably certainly let the chief immigration judge**
10 **know. And that wasn't my role.**
11     Q. Same question for the office of OPR, do you
12 recall referring any of the complaints that you
13 received -- did I get that acronym right? Is that
14 correct?
15     **A. Yes. Office of Professional Responsibility.**
16 **I didn't. That would be something that the**
17 **ACIJ for conduct and professionalism would be**
18 **involved.**
19     Q. Judge Keller?
20     **A. Yes. She was the interface with that**
21 **office.**
22     Q. And would she, for lack of a better
23 expression, sort of triage the complaints to
24 determine if one of them belonged, say, to Judge
25 Smith or another needed to go across the hall to the

---

Page 66

1  Justice Department, Office of Inspector General?
2      **A. She would -- she had the authority to**
3  **consult with them directly, so -- you know, to have**
4  **one person as the interface with that office. So she**
5  **would do that, yes.**
6      (Plaintiff's Exhibit 4 was marked for
7      identification.)
8  BY MR. BROWN:
9      Q. Judge Smith, when did you first become aware
10 that the plaintiff was the author of an article in
11 The Nation magazine that some viewed as being highly
12 critical of the Executive Office of Immigration
13 Review?
14     **A. You know, I didn't -- I didn't read those.**
15 **I really didn't -- the things that I read were things**
16 **that our Public Affairs Office would encourage us to**
17 **read daily if there were matters of interest. But I**
18 **don't recall specifically reading anything about**
19 **that.**
20     Q. Did you know in the 2009 time frame that
21 Professor Stevens had published such articles?
22     **A. I knew that she was writing and -- but the**
23 **immigration field -- the immigration law field has a**
24 **lot of people who are constantly writing articles.**
25 **There's just reams of articles that come out all the**

---

Page 67

1  **time. I couldn't even conceivably read those. They**
2  **would be too much.**
3      (Plaintiff's Exhibit 5 was marked for
4      identification.)
5  BY MR. BROWN:
6      Q. Judge Smith, let me show you what has been
7  marked as Exhibit 5. In particular, I'm going to
8  direct your attention to the second page of Exhibit
9  5.
10     Were you involved in the redaction of these
11 E-mails?
12     **A. No.**
13     Q. And just looking over, what you can read of
14 Exhibit 5. Do you recall what these communications
15 were about --
16     MR. HOLLIS: Objection.
17 BY MR. BROWN:
18     Q. -- in January of 2010?
19     MR. HOLLIS: Objection. The information
20 is privileged. Attorney-client deliberative
21 process. Don't answer that question,
22 please.
23     MR. BROWN: You're instructing him not
24 to answer?
25     MR. HOLLIS: Yes.

---

Page 68

1      MR. BROWN: And what in particular --
2  I'll just go on.
3      (Plaintiff's Exhibit 6 was marked for
4      identification.)
5  BY MR. BROWN:
6      Q. Let me hand you what's been marked as
7  Exhibit 6, which is EOIR-B-000048.
8      Do you see that, sir?
9      **A. Yes.**
10     Q. Do you see in this one your E-mail to Ray
11 Bethune is partially redacted, but in Exhibit 5 it's
12 fully redacted? Do you see that?
13     **A. I believe so. Yes. I see what you're**
14 **talking about.**
15     Q. Do you recall what is being communicated on
16 the nonredacted portion of that exhibit?
17     MR. HOLLIS: Which portion are you
18 referring to?
19     MR. BROWN: I'm sorry. Exhibit 6.
20     MS. HUGHES: Is this the portion that's
21 redacted on the other exhibit?
22     MR. BROWN: Well, I don't know. The
23 portion that's not redacted on this one,
24 Exhibit 6.
25 BY MR. BROWN:

---

Deposition of          Gary W. Smith          August 20, 2014

---

Page 69

1    Q. Ray, if she is a visitor, it should be in
2  the courtroom.
3       Do you know what that was about?
4       MS. HUGHES:  Is this the same -- are
5  you -- this isn't -- I'm just -- give us a
6  minute, okay, to look at the document.
7       Is this something that we inadvertently
8  disclosed?
9       MR. BROWN:  I don't know.  It is
10  disclosed -- hang on a second.  No, no.
11  I'll explain it to you.
12       This and several other -- well, many
13  documents in the record, but there's
14  several, the next several, I'll just tell
15  you, they're redacted on some and they are
16  not redacted on others.
17       MS. HUGHES:  So we need to probably go
18  off the record for a minute, Bruce --
19       MR. BROWN:  Sure.  Let me give you the
20  next ones.
21       MS. HUGHES:  Because if this is
22  something we inadvertently disclosed, then
23  we need to --
24       MR. BROWN:  Let's do this and stay --
25  let's stay on the record, so I can, for your

---

Page 70

1  purpose -- this will help you or we're going
2  to be doing this a while.  Let me also mark
3  7.
4       MR. HOLLIS:  That might have the same
5  issue?
6       MR. BROWN:  Yeah.
7       (Plaintiff's Exhibit 7 was marked for
8  identification.)
9       MS. HUGHES:  Anything else that you --
10       MR. BROWN:  There will be but not right
11  here.
12       MS. HUGHES:  "Here" you mean with this
13  witness or --
14       MR. BROWN:  No.  I had three in a row
15  that had that problem.  There may be more in
16  the stack.  Most of the documents are
17  redacted in some way, so I can't --
18       MR. HOLLIS:  But we can address them as
19  they come up; right?
20       MR. BROWN:  Yeah.
21       MS. HUGHES:  Can you give us a minute to
22  look at these documents?
23       MR. BROWN:  Absolutely.  Of course.
24       (Recess from 11:22 a.m. to 11:47 a.m.)
25       (Whereupon, the record was read by the

---

Page 71

1  reporter as follows:
2       Q. Do you recall what is being
3  communicated on the nonredacted portion of
4  that exhibit?)
5       MR. HOLLIS:  I'm going to object on the
6  basis of the deliberative process privilege
7  and the attorney-client privilege.
8       And before we go -- this is sort of in
9  the interest of efficiency.  Before we go
10  piecemeal through each of these what seem to
11  be inadvertently disclosed exhibits or
12  documents that we produced, it would
13  probably be best if we went ahead and
14  identified when you first learned about
15  these inadvertent disclosures.
16       MR. BROWN:  First when I did?
17       MR. HOLLIS:  Yeah.  When you first
18  learned that we potentially inadvertently
19  disclosed things.
20       MR. BROWN:  I haven't learned that yet.
21       MR. HOLLIS:  Let me rephrase it.  This
22  is important for the record.
23       Do you have any sense of when you first
24  noticed a discrepancy in the redactions?
25       MR. BROWN:  No.  I mean, on these

---

Page 72

1  particular documents -- if you would review
2  your production, you will find these just
3  like I can.  There are more than one.  And I
4  don't think any of these are inadvertently
5  disclosed because none of them are
6  privileged.
7       MR. HOLLIS:  There's no question --
8       MR. BROWN:  I think they are incorrectly
9  redacted is my view.
10       MR. HOLLIS:  Some of them are redacted
11  and some aren't; right?  So we have a
12  discrepancy in redactions?
13       MR. BROWN:  Yes.  Some are, in my view,
14  improperly redacted.  Others, in my view,
15  are properly not redacted.
16       MS. HUGHES:  That should be an issue,
17  Bruce, that you present to the Court in the
18  same way that you did --
19       MR. BROWN:  I understand --
20       MS. HUGHES:  That's not what you're --
21  it's not appropriate to sit and ask the
22  witness --
23       MR. HOLLIS:  We're going to have to work
24  it out under Rule 37 and the motion to
25  compel or motion to -- for protective order

---

Deposition of          Gary W. Smith          August 20, 2014

Page 73

1  process rather than here.
2      MR. BROWN:  I don't think I'm under a
3  duty if I'm looking at an unredacted
4  document to assume that that's produced to
5  me by mistake.  And I'm not going to do
6  that.  So if I need to be ordered by the
7  Court to look at every document with a view
8  towards considering whether or not it was
9  inadvertently produced, then we need to do
10 that.
11     MR. HOLLIS:  Maybe I wasn't clear.  I'm
12 saying that if you see document A that is
13 redacted and document B that is unredacted,
14 as seems to be the case here and with others
15 that you mentioned earlier are coming in
16 this examination, that would imply that
17 there was a privilege on one and that's why
18 they are -- the portion was redacted and
19 there was an inadvertent disclosure in not
20 redacting the second.
21     MR. BROWN:  I understand, if the
22 communication to a lawyer looks like it's
23 even facially susceptible to some sort of
24 privilege.
25     However, the comment, Re:  If she is a

Page 74

1  visitor, it should be in the courtroom,
2  that's not privileged, it's not work product
3  and it's not a part of any deliberative
4  process privilege.  What am I supposed to
5  say?
6      MR. HOLLIS:  I'll tell you what you're
7  supposed to say -- I'm not going to tell you
8  what you're supposed to say, but you asked.
9      MR. BROWN:  Yeah.
10     MR. HOLLIS:  To Aileen's point, the best
11 way to work out these sorts of disagreements
12 over whether something's privileged or not
13 is to brief this up and allow a neutral
14 party to decide this.
15     MS. HUGHES:  It's not just the best way;
16 I think it's the ethical way to do that.
17     MR. BROWN:  My ethical obligation to --
18 you think I have an ethical obligation if I
19 run across any unredacted statement, no
20 matter how tame, to determine whether or not
21 it has been redacted in another document?
22     MR. HOLLIS:  We're beginning to repeat
23 ourselves here.  I already addressed that
24 question.  And I let you know that if you
25 see document A as redacted and document B

Page 75

1  unredacted -- not a redacted document -- I'm
2  saying if you see two docs, one is redacted
3  and one is unredacted, that would imply that
4  there's a privilege asserted.  And we even
5  have a privilege log to help you understand
6  that.
7      To the extent that you see A and B and
8  variations in redactions, it would be upon
9  you ethically to let us know, Hey, you might
10 have failed to redact here in one.
11     I'm not saying every document because it
12 would take two documents -- two exact
13 documents, one redacted, unredacted.  Those
14 are the instances I'm referring to.
15     MR. BROWN:  I understand.  I do,
16 however, believe that when -- that if the
17 statement looks to me like there is no good
18 faith basis upon which to assert a
19 privilege, that I ought to be able to be a
20 little bit more aggressive in using that
21 information.
22     If there's something -- if I get
23 something -- hang on a second.
24     MS. HUGHES:  Bruce, in terms of you
25 being aggressive -- I mean, the ethical way

Page 76

1  to deal with that is with the Court or bring
2  it to our attention and say, Hey, counsel.
3  Before you start questioning a witness about
4  it, bring it to our attention and see if
5  there was a mistake one way or the other,
6  okay, when you have two documents that are
7  exactly the same, one is redacted and one
8  isn't.
9      Was this an inadvertent disclosure?  And
10 if we say that is was and you don't believe
11 it was based upon the content of the E-mail,
12 then the appropriate way to deal with this
13 is to go to the Court.
14     MR. BROWN:  Fine.  I'm with you.  I'm
15 not saying I agree with you, but I
16 understand your position.
17     Are you-all taking the position that
18 these -- the portions of these three
19 exhibits that are redacted in some of them
20 and not redacted in others were
21 inadvertently disclosed?
22     MR. HOLLIS:  We're taking the position
23 that any document what was redacted in one
24 form and not redacted in another that we
25 produced to you, we have a claim of

Deposition of          Gary W. Smith      August 20, 2014

Page 77

1      privilege to it and it was inadvertently
2      disclosed.
3          MR. BROWN: I understand. Are you going
4      to allow the witness to identify these
5      documents for the record just so we can get
6      them into the deposition?
7          MR. HOLLIS: Yes.
8   BY MR. BROWN:
9      Q. Mr. Smith, just for the record, I'm handing
10  to you Exhibit 5, which contains E-mail
11  communications between you and Mr. Bethune, correct,
12  on the second page?
13     A. Yes.
14     Q. Just for the record, the top of that first
15  page is dated January 27, 2010; correct?
16     A. Yes.
17     Q. Let's move on to the next one.
18         Exhibit 6 is Bates labeled EOIR-B-000048.
19  And the top E-mail is also January 27, 2010. Do you
20  see that?
21     A. Yes.
22     Q. And then the third is Exhibit 7, which is
23  EOIR-E-000131. Do you see that?
24     A. Yes.
25     Q. And that -- the top one is undated, but the

Page 78

1      next to the top one is also dated January 27th;
2      correct?
3      A. Yes.
4          MR. BROWN: I'm not going to ask any
5      questions about that. It just gets too
6      difficult.
7          But I will hand to you what's going to
8      be marked as Exhibit 8.
9          (Plaintiff's Exhibit 8 was marked for
10         identification.)
11         MS. HUGHES: Exhibit 8?
12         MR. BROWN: Yes.
13  BY MR. BROWN:
14     Q. And Exhibit 8 is page 2 of 3 and page 3 of 3
15  of Docket 74-5 in this case.
16         Have you seen that document before?
17     A. I have seen it.
18     Q. Did you have that available to you before
19  you wrote your response to the complaint Ms. Stevens
20  lodged with respect to the April 19th incident?
21     A. No.
22     Q. Did you ask for it?
23     A. I didn't know that it existed, so I did not
24  ask for it.
25     Q. When did you learn of its existence?

Page 79

1      A. During this litigation.
2      Q. Given that the officer there says that he
3      was instructed by the judge to remove Ms. Stevens
4      from the building, had you had that prior to issuing
5      your opinion, would you have changed your opinion in
6      any way?
7      A. No.
8      Q. Why is that?
9      A. Because I had considered the information
10  that I had been provided. I believed the witnesses
11  who I talked with and who provided me statements. I
12  knew those people. I had known them for, at that
13  point in time, five years for most of them with the
14  exception of Britney Luckey and Ms. Jackson --
15  Officer Jackson.
16         And I had also reviewed the record. And I
17  had the positions of these different people which
18  were -- which were consistent.
19     Q. So, in your view, what Judge Cassidy would
20  tell you presumptively would be true?
21     A. I would consider more than what Judge
22  Cassidy told me --
23     Q. I understand that. But to answer my
24  question, because you had known him for years, what
25  he told you -- and he's judge and you had the same

Page 80

1      position. What he told you carried --
2      A. I believe --
3      Q. -- some weight; correct?
4      A. Excuse me. I didn't mean to interrupt you.
5          I believed him to be truthful.
6          (Plaintiff's Exhibit 9 was marked for
7          identification.)
8   BY MR. BROWN:
9      Q. Let me a hand you what has been marked as
10  Exhibit 9. Can you identify that document for the
11  record, please?
12     A. Yes. That is the written document that
13  Judge Cassidy provided me after I had talked with him
14  about this.
15     Q. Did you receive any other written document
16  from Judge Cassidy or is this it, his written report
17  of the incident?
18     A. This was his written report back to me about
19  what he recalled having occurred.
20     Q. About the sequence, this shows that Judge
21  Cassidy asked Ms. Stevens to leave and said he needed
22  to speak to the respondent; correct?
23     A. Yes.
24     Q. It then says that he left the courtroom to
25  obtain the file for the next individual hearing. Do

Deposition of            Gary W. Smith        August 20, 2014

---

Page 81

1 you see that?
2    **A. Yes.**
3    Q. Do you know whether when he left the court,
4 he gave any instructions to any court officials in
5 the inner space of the courtroom?
6    **A. I don't know. He may have talked with them**
7 **about anything or he may have just gone directly to**
8 **his chambers and procured the file and returned to**
9 **the courtroom.**
10    Q. And then here he indicates that the DAR
11 record would confirm his colloquy with the
12 respondent; correct?
13    **A. Yes.**
14    Q. Did the DAR, in fact, confirm his colloquy
15 with the respondent?
16    **A. Yes.**
17    Q. He says, Please note -- in sort of his PS.
18 Please note, I did not identify that the matter
19 before me was an asylum hearing.
20    Do you see that?
21    **A. Yes.**
22    Q. Do you know what the basis for closure was
23 if it was not an asylum hearing?
24    **A. I do know.**
25    Q. What was that?

---

Page 82

1    MR. HOLLIS: Objection. That calls for
2 private information to be redacted in our
3 production on the basis of the Privacy Act
4 and on the basis of the regulations, as
5 well.
6 BY MR. BROWN:
7    Q. Just generally.
8    **A. It was asylum related relief. I can tell**
9 **you more specifically, but that's what it was.**
10    Q. Asylum related issues?
11    **A. Yes.**
12    MR. BROWN: I actually don't know the
13 proper protocol. But the E-mail from Judge
14 Keller to Judge Smith that's redacted, it
15 would seem to go to the heart of the matter
16 here and not be privileged and be highly
17 material. And I also don't see how it could
18 be prejudicial to the United States to have
19 that disclosed.
20    Do you have a nonredacted version of
21 that we could look at?
22    MR. HOLLIS: I don't know the answer to
23 your last question. As far as the first
24 question, it would probably be better
25 addressed not at the deposition.

---

Page 83

1    MR. BROWN: That's fair to say. Okay.
2 Just as --
3    MR. HOLLIS: And I'm willing to address
4 it, just not at the deposition.
5    MR. BROWN: We need to move on anyway.
6 BY MR. BROWN:
7    Q. For purposes of identification -- I'm not
8 going to ask you about the redacted provision. But I
9 will ask you, the May 11 E-mail is from Judge Keller
10 to you in connection with her assignment to you of
11 the plaintiff's complaint against Judge Cassidy; is
12 that correct?
13    **A. Yes.**
14    (Plaintiff's Exhibit 10 was marked for
15    identification.)
16 BY MR. BROWN:
17    Q. Mr. Smith, let me hand you what has been
18 marked as Exhibit 10, which, for the record, includes
19 a June 1, 2010 E-mail, from you to Judge Keller and
20 from Britney Luckey to Cynthia Long -- excuse me --
21 and Marion Crosby; do you see that?
22    **A. Yes.**
23    Q. Is this Ms. Luckey's statement?
24    **A. Yes. It is.**
25    Q. The first thing that Ms. Luckey says is

---

Page 84

1 she told the plaintiff that she needed to check with
2 her superior before she would be allowed into the
3 courtroom. Do you see that?
4    **A. I do see that.**
5    Q. That's not in accordance with the
6 regulations; is it?
7    **A. If the court administrator knew something**
8 **about a particular case, it might. Ordinarily, the**
9 **public can come in and observe hearings. We actually**
10 **encourage members of the public, as I mentioned, law**
11 **students and others family members to come in and**
12 **observe hearings. And, you know, sometimes you have**
13 **to limit it because of the number of people.**
14 **Literally, the courtrooms get full of people at**
15 **times.**
16    Q. But there's no indication here that
17 Ms. Luckey even knew what the case was about enough
18 to exclude her from the courtroom. Do you see that?
19    **A. Yeah. She was a student employee. And she**
20 **probably -- if someone asked her something, she's**
21 **going to check with a superior on just about**
22 **everything.**
23    Q. Do you know why Officer Jackson was with the
24 plaintiff before the plaintiff went into the
25 courtroom before the disputed hearing?

---

Deposition of          Gary W. Smith          August 20, 2014

---

Page 85

1      A. I don't.
2      Q. Did you ask Ms. Jackson -- Officer Jackson
3  about that?
4      A. When you go into the immigration court in
5  Atlanta, our court -- we're a tenant in that
6  building. It's on the first floor, so you have to go
7  through the security section. So she probably went
8  through the security section and Ms. Jackson was
9  there.
10     Q. But it seems like the plaintiff is sort of
11 being trailed here along with all the E-mail traffic.
12 I mean, just level with me on this. Was she being
13 watched?
14     MR. HOLLIS: Objection. Foundation.
15     You're testifying for the witness.
16     A. Not to my knowledge.
17 BY MR. BROWN:
18     Q. I mean, there's E-mails that I'm sure you've
19 reviewed that says, She's here, you know, she's in
20 the courtroom, before any of these incidents. Have
21 you seen those?
22     A. You know, I've seen them, but she's a member
23 of the public. She can come in and observe hearings.
24 And if you look back on April 12th, I told my court
25 administrator at Stewart, She can come in --

---

Page 86

1      Q. Don't tell me that. That's privileged.
2  That's deliberative process privilege. That was
3  inadvertently produced, so that statement to Bethune
4  is not supposed to be produced to the plaintiff in
5  this litigation because it's privileged. So don't go
6  there.
7      Can you, without divulging state secrets or
8  privileged communication, tell me the advice that you
9  gave Mr. Bethune on that day?
10     A. That she could observe hearings.
11     Q. Would it be odd from your perspective if the
12 evidence indicated that court administrators and
13 administrative people were, in fact, tracking the
14 plaintiff's movements in and out courtrooms?
15     MR. HOLLIS: Objection. Ambiguous.
16     You can answer the question if you
17 understand it.
18     A. Court administrators and our court personnel
19 get to know people that come into the courtroom,
20 attorneys and others. And they may know them more
21 than I know them as a superior.
22     And you know how they keep a watchful eye on
23 people coming in. We have reasons. Sometimes we've
24 got blind hallways and all kinds of other things.
25 They have to be aware of who's in this space. And,

---

Page 87

1  you know, I certainly was not, you know, observing
2  her in and out of court or anything like that.
3      Q. Ms. Luckey states that -- gives some
4  information that Judge Cassidy did not give you. In
5  particular that Judge Cassidy exited the courtroom
6  and told Ms. Crosby that the hearing was a closed
7  hearing and that Ms. Stevens couldn't sit in there
8  anymore.
9      Do you see that?
10     A. Yes.
11     Q. And that piece of information is not in
12 Judge Cassidy's report of this relatively simple
13 event; right?
14     A. Judge Cassidy had told Professor Stevens,
15 per his statement to me -- and what he told me was
16 that he had told her to step out of the courtroom,
17 which at that point it was closed. So if he told
18 this person that it was closed at that point, it was
19 closed because he had talked to the respondent who
20 was pro se about his rights in the proceedings.
21     And so at that point that was closed. He
22 asked her to step out of the courtroom.
23     Q. But he didn't tell you that he went out into
24 the reception area and spoke to Ms. Crosby about
25 Ms. Stevens; did he?

---

Page 88

1      A. He didn't put that in his statement.
2      Q. And he also didn't put in that statement
3  that he had spoken to the security officers and told
4  them that she needed to leave the building; did he?
5      A. No. He certainly didn't say that. I know
6  of nothing like that.
7      Q. Right. But that is what's indicated by the
8  MegaCenter transcript that we looked at which was a
9  part of the record, document 74-5.
10     A. Yeah. It says what it says, but that's not
11 what was consistent with the other --
12     Q. Not consistent with what Judge Cassidy told
13 you?
14     A. As well as the other people.
15     Q. What other people told you that that's not
16 the way it happened?
17     A. None of them indicated that Judge Cassidy
18 spoke with any security personnel. And it would not
19 appear to me to be very logical for him to have done
20 that. He went back to our inner court space and then
21 back to the courtroom. And he wasn't -- as I
22 understand it, he was still in the courtroom when she
23 left the building.
24     (Plaintiff's Exhibit 11 was marked for
25 identification.)

---

APG USA INC.

Deposition of        Gary W. Smith      August 20, 2014

Page 89

1  BY MR. BROWN:
2      Q.  Judge Smith, I hand you what has been marked
3  as No. 11.
4      A.  Yes.
5      Q.  This E-mail is -- this exhibit is heavily
6  redacted, but it would appear to reflect
7  communications between EOIR officials concerning the
8  plaintiff on Monday the 12th, Tuesday the 13th and
9  Monday the 19th of April 2010; correct?
10     A.  Yes.
11         (Plaintiff's Exhibit 12 was marked for
12     identification.)
13  BY MR. BROWN:
14     Q.  Mr. Smith, I hand you what's been marked as
15  Exhibit 12.  You're not copied on this, but this
16  would indicate that on the morning of the date in
17  which the April 19th incident occurred, there had
18  been another incident with Ms. Stevens; right?
19         MR. HOLLIS:  Objection.  Form.
20     A.  Could you repeat that?  I really didn't
21  quite understand --
22  BY MR. BROWN:
23     Q.  This goes back to whether a member of the
24  public needs permission.
25         I mean, have you seen this before, this

Page 90

1  document?
2      A.  I don't recall seeing it.  I don't remember
3  seeing it.  I didn't -- I wasn't a party to that.
4      Q.  Did you know that on the morning of
5  April 19th, that the supervisory legal assistant at
6  the Atlanta courthouse stated to Ms. Stevens that she
7  needed permission to get into EOIR proceedings?
8      A.  I didn't know she told her that.  But
9  members of the public can attend hearings.
10         (Plaintiff's Exhibit 13 was marked for
11     identification.)
12  BY MR. BROWN:
13     Q.  Let me hand you what has been marked as
14  Exhibit 13.  This E-mail actually is dated June 2nd,
15  but it recounts Ms. Stevens' episode of April 19th;
16  correct?
17     A.  Yes.
18     Q.  And in this episode -- I'm sorry.  In this
19  E-mail --
20         MS. HUGHES:  Do we have the E-mail?
21         MR. HOLLIS:  What exhibit is that?
22         MR. BROWN:  Oh, shoot.
23         MR. HOLLIS:  We can share that one.
24         MR. BROWN:  Yeah, if you could.  My
25  apologies.

Page 91

1         MS. HUGHES:  You don't have a copy?
2         MR. BROWN:  I only have two copies.
3         MR. HOLLIS:  Is it one page?
4         MR BROWN:  Yeah.  It's a one-page
5     document bearing the Bates label
6     EOIR-D-000058.
7  BY MR. BROWN:
8      Q.  Do you recall receiving this report from
9  Judge Long -- I mean Ms. Long?
10     A.  Yes.
11         (Plaintiff's Exhibit 14 was marked for
12     identification.)
13  BY MR. BROWN:
14     Q.  Plaintiff's 14 is EOIR-B-000046.
15         Did you, in connection with your
16  investigation of the complaint of Judge Cassidy,
17  figure out why on the morning of April 19th these
18  federal officials were concerned with Ms. Stevens
19  observing Judge Cassidy's televideo hearings?
20         MR. HOLLIS:  Objection.  I think that
21     mischaracterizes the witness' testimony.
22     I'm not sure that was his testimony.  Maybe
23     we can go back to the record to see what his
24     testimony was.
25         MR. BROWN:  I didn't mean to

Page 92

1  mischaracterize his testimony.
2      A.  I didn't receive this.  I wasn't -- no one
3  sent me this document, so I -- I don't know what the
4  motivation behind that was.
5  BY MR. BROWN:
6      Q.  Did you learn in connection with your
7  investigation that these federal officials -- and
8  there are a number of them -- were, in fact, tracking
9  plaintiff's movement on the morning of April 19th,
10  2010?
11         MR. HOLLIS:  Objection.  Form.
12     A.  I don't know whether they were or not.
13  They're -- the legislative and Public Affairs
14  section, that's kind of their responsibility to deal
15  with the public and deal with legislative affairs and
16  visitors and those types of things.
17  BY MR. BROWN:
18     Q.  And then you'll see the next page of
19  Exhibit 14 is further communications that afternoon
20  between the same group of federal officials
21  indicating that Judge Cassidy called to advise that
22  he had to ask Jackie to leave the courtroom while he
23  conferred with counsel.
24         Do you see that?  It's on the next page.
25     A.  I see that.

Deposition of                    Gary W. Smith          August 20, 2014

---

Page 93

1      Q.  In fact, that's not correct.  He never
2  conferred with counsel; did he?
3      A.  Of course, I didn't see this document.
4      Q.  I understand.  But you --
5      A.  My understanding of what he told me -- and
6  it would have been odd that he would be conferring
7  with any counsel because the respondent in that
8  afternoon case was pro se.
9      Q.  Right.
10     A.  The only counsel involved was a government
11  counsel that was down at Fort Stewart.
12     Q.  And the bottom --
13     A.  Or, excuse me, at Stewart Immigration.
14     Q.  Right.  The bottom E-mail -- it appears that
15  Judge Cassidy, I guess, in a break in the morning
16  proceedings called the Office of Legislative and
17  Public Affairs to let them know that Ms. Stevens was
18  observing his televideo hearings; correct?
19         MR. HOLLIS:  Do you see that, Judge
20      Smith, the last sentence on page 47?
21     A.  That's indicated on the second page at the
22  top by Ms. Eastwood.  But, again, I don't -- I can't
23  confirm that.  I wasn't -- didn't receive this.
24         (Plaintiff's Exhibit 15 was marked for
25      identification.)

---

Page 94

1  BY MR. BROWN:
2      Q.  Have you seen this E-mail before, No. 15,
3  which is the E-mail from Marion Crosby to Ray
4  Bethune?
5      A.  I don't recall seeing this.  This was
6  between those two people.
7      Q.  But it indicates that Judge Cassidy wanted
8  to make sure that the Stewart court administrator was
9  aware that the plaintiff was in the courtroom in
10  Atlanta watching the video proceedings?
11         MR. HOLLIS:  Objection.  Calls for
12      speculation.
13         MS. HUGHES:  And you're asking him about
14      documents he hasn't seen.  He said he didn't
15      see them, didn't know them.  Are you just
16      planning to tell us what are on the
17      documents?
18  BY MR. BROWN:
19      Q.  You can answer the question.
20     A.  The way video conferencing hearings are done
21  is -- in this case, is there are two courts involved.
22  You have one court in Atlanta that's doing the video
23  hearing from another court and that was because we
24  didn't have any judges located onsite.  They hadn't
25  entered on duty at that point.  So he was doing the

---

Page 95

1  hearings by video conference.  And it appears from
2  this, although I didn't receive it, he was just
3  passing that message.
4      Q.  What legitimate interest does Court
5  Administrator Bethune have in knowing that a citizen
6  was watching televised proceedings in Atlanta?
7         MR. HOLLIS:  Objection.  Calls for
8      speculation.
9         You can answer the question.
10     A.  These two courts worked together habitually
11  because we didn't have any judges at one.  So they
12  worked together all day long on everything, including
13  getting these video systems to work properly all the
14  time, which didn't always work properly.  And we had
15  technical difficulties at times.
16         So these two court administrators and the
17  clerks and the legal assistants were working together
18  all the time on literally just about everything they
19  had to do because they were -- they were doing all
20  the cases from this other court.  That's -- that's a
21  reason.
22  BY MR. BROWN:
23     Q.  With all respect, I understand that there
24  needs to be some coordination about the video and
25  everything else.  But why does Mr. Bethune need to

---

Page 96

1  know the identity of members of the public who are
2  watching the video in Atlanta?
3      A.  I don't know.
4         MR. BROWN:  I'm trying to find a
5      document that's not heavily redacted.
6         (Plaintiff's Exhibit 16 was marked for
7      identification.)
8         MR. BROWN:  Mr. Smith, I hand you what's
9      been marked as Exhibit 16.
10        MS. HUGHES:  Can you identify the Bates
11     number?
12        MR. BROWN:  EOIR-C-000038.
13        MS. HUGHES:  Thank you.
14  BY MR. BROWN:
15     Q.  Do you recall the series of incidences that
16  is referred by you in your E-mail to MaryBeth Keller
17  on or about April 27, 2010?
18     A.  I recall that on the -- April 12th when
19  Professor Stevens went down to Stewart, there was an
20  officer who had indicated to Mr. Bethune that the
21  respondent -- or, excuse me, that Professor Stevens
22  was talking to the respondents.  And he had provided
23  a statement about that.
24        On the following day Mr. Bethune was out
25  during the morning and that was April 13th.  And the

---

Deposition of          Gary W. Smith        August 20, 2014

Page 97

1 acting court administrator -- we had a very small
2 staff there at the time -- contacted me and let me
3 know that Professor Stevens had wanted an entire row
4 for herself and one other visitor.
5      That was an unusual request. We don't --
6 even if I go into a courtroom, I will try to squeeze
7 in next to everyone else. And so, ordinarily, the
8 people just find a place that's open in the courtroom
9 to sit down.
10     Q. So was it a big deal that she wanted her own
11 row?
12     A. Well, the other thing was the incident on
13 April 14th in Judge Sease's courtroom where she
14 walked in during the proceedings.
15     Q. This is -- I'm trying to just track what
16 this is. The bottom of this is an E-mail from
17 plaintiff to Judge Keller; correct?
18     A. Yes. And, of course, April 19th fell within
19 that period as well.
20     Q. And then Judge Keller flipped her message to
21 you and others in a privileged communication, do you
22 see that, or, otherwise, not discoverable
23 communications. Do you see that or, otherwise, not
24 discoverable communications? Do you see that, that
25 black bar?

Page 98

1      MR. HOLLIS: He's referring to the
2 second black bar on page C, dash, 38.
3      A. Yes.
4 BY MR. BROWN:
5      Q. Skipping up, do you know the situation that
6 they are referring to there?
7      MR. HOLLIS: Objection. Deliberative
8 process.
9      You can answer the question to the
10 extent that you answer the question that was
11 asked but not the substance of the
12 communication.
13     A. I believe it was about what I just mentioned
14 to you.
15     MR. BROWN: I would recommend that you
16 look at that to see if there is another
17 inadvertent disclosure.
18     MR. HOLLIS: Now or later?
19     MR. BROWN: Later.
20     MR. HOLLIS: We'll talk about that.
21     MR. BROWN: Let me just get that on the
22 record. Counsel for the plaintiff is
23 handing to the counsel for the United States
24 EOIR-O-000059, which may indicate the
25 documents or words that are in Exhibit 16

Page 99

1 were inadvertently produced -- yeah,
2 inadvertently disclosed.
3      MR. HOLLIS: Okay.
4      MS. HUGHES: Is this the document you
5 just asked him about?
6      MR. BROWN: No.
7      (Plaintiff's Exhibit 17 was marked for
8 identification.)
9      MR. BROWN: Let me hand you what's been
10 marked as No. 17. I don't think you're in
11 this loop, Judge Smith, but let me just
12 check to make sure.
13     MR. HOLLIS: This one is Bates number --
14     MR. BROWN: I'm sorry. EOIR-B-000035.
15     MR. HOLLIS: All right.
16 BY MR. BROWN:
17     Q. This indicates that Robin Stutman is
18 responding to a meeting request that is secret. Do
19 you recall what that meeting was about?
20     A. I don't --
21     Q. Do you recall --
22     A. -- because I wasn't there.
23     Q. Do you recall -- it was too secret for you
24 to attend.
25      Do you recall having a meeting with Alder

Page 100

1 Reid, Mooney, Blum, Stutman, Komis, Keller about
2 Ms. Stevens on or about the end of April 2010?
3      A. Those days I was in Hartford and -- Boston
4 and Hartford on a site visit to the immigration
5 courts there.
6      Q. And so there might have been a meeting, but
7 if there was, you did not attend?
8      A. I'd have to guess because I wasn't there.
9      I do want to add something, though. A
10 minute ago you asked me about incidents and I qualify
11 that by saying "it appears." I didn't -- that was
12 from the information I had received at that point.
13     Q. The E-mail that was heavily redacted, it
14 appears that you were talking about the earlier
15 incident in Stewart, but you're not certain?
16     A. I said it appears. I was providing them the
17 best information I had at that point.
18     (Plaintiff's Exhibit 18 was marked for
19 identification.)
20     MS. HUGHES: How much longer?
21     MR. BROWN: I do not know.
22     MS. HUGHES: I'm getting hungry.
23     (Recess from 12:30 p.m. to 12:38 p.m.)
24 BY MR. BROWN:
25     Q. Let me back up to a couple of things that I

Deposition of          Gary W. Smith          August 20, 2014

Page 101

1  meant to ask about.
2      At the start of the deposition, you
3  mentioned that in your capacity as the assistant
4  chief immigration judge you would on occasion review
5  an appellate cases?
6      A. Yes.
7      Q. What was the purpose of doing that?
8      A. It was as much training as anything else
9  because particularly with the new judges, you want to
10 review to make sure that they are using the proper
11 standards. And the Board very often -- the Board of
12 Immigration Appeal, if they reversed a case, for
13 example, might say that the judge didn't understand
14 the requirements of cancellation of removal or didn't
15 understand this.
16     And sometimes we would use that and talk
17 with the judge and say, Do you understand that? And
18 sometimes they would be candid and say, I really
19 didn't fully understand, so we could give them
20 additional training.
21     And, for example, judges who deal with
22 juveniles and things like that require special care.
23 So we would review the appellate decisions that would
24 be sent to us kind of like a dashboard of -- that
25 ACIJ judges' decisions that came from the Board of

Page 102

1  Immigration Appeals. And it was really to help the
2  judges more than anything else if they were doing
3  things correctly.
4      Q. So it was a general training in supervision
5  function rather than specific attention to the case
6  that's adjudicated. Fair to say?
7      A. That's fair to say. I mean, if we
8  identified something that was particularly way out in
9  left field, we'd certainly take note of that.
10     Q. Did you get a statement from Betsy Schuster,
11 Judge Cassidy's assistant, about the events on
12 April 19?
13     A. I did not. She was there with Judge Cassidy
14 when I got statement from him. And I didn't see that
15 she had anything additional to add. I didn't get one
16 from her.
17     Q. We saw and marked as an exhibit the E-mail
18 from Judge Cassidy to you in which he gave his side
19 of the story on the events of April 19th with the
20 plaintiff.
21     Did you receive any other communication that
22 you recall from Judge Cassidy about that incident?
23     A. He told me basically what was in there
24 orally and I told him to reduce that to writing.
25 It's always a good idea in my opinion to reduce

Page 103

1  things to writing when they occur so that years later
2  or months later you have some record of what -- what
3  you believe happened.
4      Q. But that -- just to make sure I got it
5  correctly. That E-mail was the only written piece of
6  information you recall receiving from Judge Cassidy?
7      A. To my recollection, it is.
8      Q. If you received a complaint -- well, you
9  mentioned -- let me back up. Strike that.
10     You mentioned that it's Judge Keller who
11 makes the decision on cases that would go to the OPR
12 or OIG; right?
13     A. She may consult with the ACIJ or someone
14 else, Office of General Counsel or others. But she
15 is the interface with those offices because you can't
16 have a huge organization and with multiple people
17 coordinating with one office down at main justice.
18 So she was the interface with them.
19     Q. If you got a particular complaint or a
20 complaint was assigned to you in the process to
21 review the conduct of a judge, you would be the
22 person that might be aware of facts indicating that
23 it ought to be referred to the OIG or OPR?
24     A. Yes.
25     Q. And if that's the case, you would kick it up

Page 104

1  to Judge Keller or kick it sideways to Judge Keller?
2      A. Kick it sideways to Judge Keller.
3      Q. Did you do that? Do you recall doing that?
4      A. I had no hesitance about going in and asking
5  her questioning or conferring with her. Her office
6  was near mine and I could go in and speak with her as
7  long as there wasn't someone in the room and, you
8  know, get her -- get her advice.
9      Q. Did you ever do that with respect to Judge
10 Cassidy's conduct?
11     A. With regard to this complaint, yes, I did.
12     Q. But, I mean, did you recommend -- did you
13 ever recommend or suggest or call into question
14 whether the matter should be referred to OPR or OIG
15 with respect to conduct by Judge Cassidy relating to
16 the plaintiff or to anyone else?
17     MR. HOLLIS: Objection. Complex.
18     You can answer that question if you can
19 make it out.
20     A. She was aware of what I was providing her.
21 If she believed that that was appropriate to refer,
22 that was something she should be telling me as
23 opposed to me telling her.
24 BY MR. BROWN:
25     Q. That is an explanation for an answer but not

Deposition of          Gary W. Smith        August 20, 2014

Page 105

1  an answer.
2       A. No. I didn't recommend that to her because
3  at that point I was looking into it. I investigated
4  it and coordinated with her about it.
5       Q. Did you have another occasion to review a
6  complaint of Judge Cassidy's conduct that ended up
7  being referred to the OPR or the OIG?
8       A. I don't recall any.
9       Q. Do you recall any complaints that you were
10 responsible for reviewing ending up with the OIG or
11 OPR?
12      A. I recall over the time I was there asking
13 her at different points, Is this the type of
14 complaint that you go -- because we had to -- she had
15 invited OPR and OIG to address our conference, I
16 believe, at one time. So, you know, we knew that she
17 was the person who should be our advisor on that.
18      (Plaintiff's Exhibit 19 was marked for
19      identification.)
20 BY MR. BROWN:
21      Q. Let me hand you what's been marked as
22 Exhibit 19. Can you identify that document, please?
23      A. That's a document that's prepared by Judge
24 Keller's assistant.
25      Q. And is that a screen shot of the database

Page 106

1  that collects and organizes the information on
2  particular complaints that are being handled by the
3  AICJs?
4       A. It appears to be. I don't prepare that, so
5  I don't know for certain.
6       (Plaintiff's Exhibit 20 was marked for
7       identification.)
8       MR. BROWN: This is going to be No. 20.
9  For the record No. 20 is EOIR-D-000054.
10 BY MR. BROWN:
11      Q. Without divulging any state secrets or other
12 privileged communications, can you recall what the
13 subject matter of this E-mail chain might have been?
14      A. I don't know. It says "Judge Cassidy" in
15 the subject box, but I don't remember.
16      (Plaintiff's Exhibit 21 was marked for
17      identification.)
18 BY MR. BROWN:
19      Q. Do you know who Mr. Feemster is?
20      A. I did after I received this.
21      Q. And this is Exhibit 21?
22      A. Well, I received something that had
23 Mr. Feemster's notice -- name on it. It wasn't this.
24 I had never heard the name "Mr. Feemster" before.
25 But apparently he is someone at Federal Protective

Page 107

1  Service.
2       MR. BROWN: And just for the record,
3  I've handed to the witness Exhibit 21, which
4  is EOIR-D-000029.
5  BY MR. BROWN:
6       Q. Do you recall receiving this version of
7  Marion Crosby's report to Cynthia Long about the
8  April 19th incident?
9       A. That's the same one that I've seen
10 previously.
11      Q. This looks like the same one.
12      A. It looks exactly --
13      Q. Okay. Could you describe from your
14 perspective the role of FPS compared to the role of
15 the court administrator under your supervision for
16 handling access to the building and access to various
17 courtrooms?
18      A. Within the court space, our court
19 administrator is responsible for ensuring that the
20 doors are open for people to go into the back of the
21 courtroom and for checking to make sure that
22 everything is working properly as far as locks and
23 things like that in the inner court space and as well
24 as at the doors to the court. And they notify space
25 and facilities if there's some problem with that.

Page 108

1       We are a tenant in that building on Spring
2  Street and a tenant -- and probably one of the
3  smaller tenants in that building. So we had no
4  control over the building itself and no control over
5  the Federal Protective Service at all.
6       Q. So the Federal Protective Service is
7  responsible for controlling access to that building.
8  But court personnel are responsible for controlling
9  access, to the extent there is control, to individual
10 courtrooms?
11      MR. HOLLIS: Objection. Complex. Calls
12      for speculation.
13      You can answer the question to the
14      extent that you think you know the answer.
15      A. Our legal assistant and court administrator
16 are not security personnel. So if we had a problem,
17 we'd have to notify the security or the FPS or our
18 own security department at EOIR.
19 BY MR. BROWN:
20      Q. Would Atlanta security have its own security
21 apart from FPS?
22      A. No. We don't have any security within our
23 spaces. I don't mean to say we don't have any
24 security. We don't have any security people. We
25 have locking devices and that type of thing to

Deposition of            Gary W. Smith      August 20, 2014

Page 109

1  protect people.
2      Q.  I've been there.  It's plenty secure.
3      I mean, just the physical layout actually is
4  important to these events.  The Courtroom 5 is right
5  there on the first floor; correct?
6      A.  The entire court -- we had a small court
7  facility there for up to five judges.  And it's all
8  on the first floor.
9      Q.  And the waiting area is right there maybe
10 within a hundred feet from Courtroom 5; correct?
11     A.  Yes.  It's right outside there.
12     Q.  It's a small room, maybe as big as three or
13 four of these conference rooms; right?
14     A.  It's not a large room.
15     Q.  It has a window for EOIR personnel?
16     A.  Yeah.  And we usually put the student at the
17 window because that's -- they are kind of the low
18 person on the totem pole, so they usually work the
19 window.
20     Q.  It has a bunch of plastic chairs like a DMV
21 does?
22     A.  Yes.
23     MR. BROWN:  Chris, that's the Department
24 of Motor Vehicles.
25     MR. HOLLIS:  Objection to integrating

Page 110

1  the DMV.
2      (Discussion ensued off the record.)
3      (Plaintiff's Exhibit 22 was marked for
4  identification.)
5  BY MR. BROWN:
6      Q.  Exhibit 22 is a copy of your -- Exhibit 22
7  is a copy of your formal response to Professor
8  Stevens' April 27th complaint; is that correct?
9      A.  Yes.  It is.
10     Q.  You haven't issued any revisions to that
11 opinion; correct?
12     A.  No.
13     Q.  Let me direct your attention to the one
14 issue we haven't addressed a whole lot and that's the
15 third matter.  And you address it in the last
16 paragraph on page 1 of Exhibit 22 and that is the
17 complaint that Judge Keller did not record hearings
18 or did not record -- I'm sorry -- Judge Cassidy did
19 not record hearings or did not record them in an
20 appropriate manner.
21     Do you recall that?
22     A.  Yes.
23     Q.  What did you do to determine that Judge
24 Cassidy regularly records all removal proceedings?
25     A.  Well, I asked him about that as well.  And

Page 111

1  he did tell me that he records his hearings.  I also
2  have listened to his hearings because in addition to
3  reviewing appellate records, we periodically listen
4  to recordings of hearings.
5      And I know at that time five years of
6  working with him that he did record hearings
7  regularly.
8      Q.  Can you have live look-ins?
9      A.  You mean, if I'm on a site visit or
10 something?
11     Q.  Yes.
12     A.  Yes.  I do walk into courtrooms sometimes
13 and I don't -- since I have limited travel funds, I'd
14 usually go in for a few minutes.  And also I don't
15 want to interfere with the proceedings in anyway.
16     Q.  Are you aware of other complaints of Judge
17 Cassidy not recording the proceedings?
18     A.  Well, one thing that has to be separated is
19 bond hearings because those are ordinarily not
20 recorded.
21     Q.  I understand.  Are you aware of other
22 complaints relating to Judge Cassidy of not recording
23 hearings that are supposed to be recorded?
24     A.  I don't recall any.  I can't say there
25 weren't any, but I can tell you that I don't remember

Page 112

1  any specific.  But I do know that he recorded
2  hearings.  And all judges don't record every single
3  thing because sometimes the parties might say, Judge,
4  could we go off the record, I want to discuss
5  scheduling with you.
6      And rather than have 15 minutes of
7  discussions with calendars, sometimes the judge
8  would -- if it's not a matter of substantive law
9  would talk about a matter off the record without
10 recording it.  And that's entirely appropriate as are
11 prehearing conferences where the parties are talking
12 about marking documents and things like that.  The
13 same as in any other type of court.
14     Q.  But public access to those would be
15 particularly important if there's no transcript of
16 what's going on between the judge and counsel; right?
17     MR. HOLLIS:  Objection.  Testifying for
18 the witness.
19     A.  Let me give you an example.  If you're doing
20 a master calendar hearing with 25 or 30 respondents
21 and you're calling the next case, probably before
22 you'd begin the recording you would ask the parties,
23 Is there anything that we need to address before we
24 go on the record?
25 BY MR. BROWN:

Deposition of          Gary W. Smith          August 20, 2014

---

Page 113

1    Q. I'm with you and I know. The same in
2 superior court or district court downstairs -- or
3 upstairs. There are communications with the
4 tribunal, which are taken down by the court reporter
5 or official of record. And there's other
6 communications with the judge which are not.
7        But my question is: In federal court, all
8 of those, unless there's a particular order sealing
9 the case, are open to the public; right?
10   **A. I don't know why they would not be.**
11   Q. Right. And the same thing in immigration
12 proceedings is that given that there could have been
13 in the situation that you described any judicial
14 finding that closure was necessary -- because as you
15 said, this is an informal sort of colloquy with
16 counsel -- all of that should be public; right?
17       MR. HOLLIS: Objection. Complex.
18   Narrative by counsel.
19   **A. I think that may be too broad a brush. I**
20 **can't say what every situation would be about. An**
21 **attorney might say, I want to talk with you Judge**
22 **because there's a sensitivity issue that you and**
23 **opposing counsel -- and they would have to both be**
24 **there, not ex parte, but need to know.**
25       **And that could happen. I, personally,**

---

Page 114

1 **whenever an attorney told me, We'd like to discuss**
2 **something off the record, I always thought about,**
3 **Well, this is what I really need to make sure is on**
4 **the record. Because sometimes someone will tell you**
5 **something that's important and you want to make sure**
6 **it's on the record.**
7        **So I guess the preference is to be on the**
8 **record. And one of the sayings in most courts is the**
9 **record is your friend because it keeps a permanent**
10 **record of what transpired.**
11       (Plaintiff's Exhibit 23 was marked for
12   identification.)
13 BY MR. BROWN:
14   Q. Do you recall receiving Exhibit 23?
15   **A. Yes.**
16   Q. Exhibit 23 concerns -- it's dated April
17 13th. And this is referring to Ms. Stevens allegedly
18 talking with detainees in the courtroom; do you see
19 that?
20   **A. Which page are you talking --**
21   Q. First page, two-thirds of the way down.
22   **A. Yes.**
23   Q. Let me ask you this. If you turn the page
24 to EOIR-Z-000098, you say in an E-mail to Judge
25 Cassidy, and this is on the 13th, I don't know

---

Page 115

1 whether this will surface again today, but this is
2 the advice rendered by the Deputy GC.
3        And then beneath that there's a partial
4 advice from the legal department. Do you see that?
5   **A. Yes.**
6   Q. Why was Judge Cassidy in that loop?
7   **A. At the time he was the --**
8       MR. HOLLIS: Objection. That
9   mischaracterizes the document. He's not in
10   the loop on that last E-mail.
11 BY MR. BROWN:
12   Q. Okay. Why was it written to Judge Cassidy?
13   **A. They was primary judge for the Stewart**
14 **cases. He did the Stewart docket, so he needed to be**
15 **aware of any advice that the general counsel or**
16 **deputy general counsel was giving about procedure.**
17   Q. Do you recall the suggestion that Plaintiff
18 Stevens had reserved an entire row for herself?
19   **A. That was what my acting court administrator**
20 **told me.**
21   Q. That was wrong; right? That was incorrect;
22 right?
23       MR. HOLLIS: Objection. Don't testify
24   for the witness.
25       MR. BROWN: It's called a leading

---

Page 116

1   question down here.
2   **A. I don't believe it was incorrect. That is**
3 **what the acting court administrator told me.**
4 **BY MR. BROWN:**
5   Q. But the Court Administrator Bethune wrote
6 you on April 12 saying, I had the guards clear the
7 front row seat to avoid any --
8   **A. That was on April 12th.**
9   Q. So that's about a different day?
10   **A. That was a different day. Yes.**
11   Q. So the guards did it one day and she did it
12 another day?
13   **A. Yes. That's -- that's correct. That was my**
14 **understanding of what happened.**
15       (Plaintiff's Exhibit 24 was marked for
16   identification.)
17 BY MR. BROWN:
18   Q. Have you seen Exhibit 24 before?
19   **A. Never.**
20   Q. Exhibit 24, for the record, is an April 21,
21 2010 E-mail from Glen Baker to David Neal.
22       And just for the record, who is Mr. Neal?
23   **A. Mr. Neal is the chairman of the board of**
24 **immigration appeal.**
25   Q. And who is Mr. Baker?

---

Deposition of            Gary W. Smith         August 20, 2014

Page 117

1      **A. He was an attorney in the Office of General**
2  **Counsel.**
3          MR. BROWN: I probably have copies here
4  somewhere, but I do not have them at my
5  fingertips. So I'm going to have the court
6  reporter mark for the record my only copy of
7  EOIR-REQ-20,54, dash, 00005.
8          And that's going to be marked as
9  Exhibit 25.
10         (Plaintiff's Exhibit 25 was marked for
11  identification.)
12         MR. BROWN: For the record, this
13  includes an E-mail from Glen Baker to Alex
14  Daman concerning the Federal Protective
15  Service.
16         MS. HUGHES: Is it redacted?
17         MR. BROWN: Let me see.
18         MS. HUGHES: Glen Baker, he's an
19  attorney; right?
20         MR. BROWN: This is all about --
21         MS. HUGHES: Is it not redacted, none of
22  it is?
23         MR. BROWN: It's about the FPS decision.
24         MR. HOLLIS: Are we able to see it?
25         MR. BROWN: I spoke to the FPS Atlanta.

Page 118

1  Here's what I learned. Please note what I
2  was told by FPS this morning as in contrast
3  to what I was told last week.
4      Last week FPS was ready to issue a
5  banning letter. This morning they have
6  softened their position. There are two
7  distinct actions: removal and banning.
8      And then it goes on to describe that.
9  That is not -- that's to the attorney not by
10  the attorney.
11     So take a look at it. This is the kind
12  of documents that we've been --
13         THE WITNESS: I can't identify this
14  because I've never seen this.
15         MR. BROWN: That is going to be all we
16  have for this witness.
17  BY MR. BROWN:
18     Q. Have you seen this Exhibit 25 before?
19         MR. HOLLIS: So the Bates
20  EOIR-REQ-20,54, dash, 00005.
21         MR. BROWN: (Witness nods head
22  affirmatively.)
23     **A. The only thing that I have seen at one point**
24  **in time and don't have a copy of was a note from**
25  **Ms. Antonini. With the exception of everything else**

Page 119

1  in here, I've never seen it.
2          **Ms. Antonini was reflecting on what the case**
3  **that she was doing with Judge Gray Sease on**
4  **April 14th. So I at some point I would have seen her**
5  **memo or note -- E-mail, but that was the only part of**
6  **all of this that I've seen of No. 25.**
7  BY MR. BROWN:
8      Q. As the supervisor of court administrators --
9  as the supervisor of courts in a number of different
10  states, wouldn't you be a part of any dialogue
11  relating to official government action that would ban
12  a citizen from your courtrooms or your courthouses?
13     **A. I would think so. But I -- I have never**
14  **seen this.**
15     Q. Were you familiar with the decisions by the
16  FPS concerning banning Ms. Stevens from the
17  courtrooms?
18     **A. No.**
19     Q. Did you know anything about that?
20     **A. No. Just the one thing I mentioned to you**
21  **earlier that I believe it was Mr. Blum had asked me**
22  **for a timeline. If you recall, I mentioned that**
23  **earlier and that is what I had received.**
24     Q. It's your hunch, nothing more, that that
25  might have related to an FPS decision to ban

Page 120

1  Ms. Stevens from courthouses?
2      **A. He referred to it -- he referred to DHS.**
3      Q. And is FPS under DHS?
4      **A. I believe so. DHS has a lot of different**
5  **organizations and I believe it falls under it. But**
6  **that's -- it has an immigration customs enforcement,**
7  **customs and border patrol, a number of agents.**
8      Q. Turn to Ms. Antonini's comments in
9  Exhibit 25. I think you referenced them.
10         Do you know who asked her to write that?
11     **A. I don't. It was either Ms. Long or Judge**
12  **Sease.**
13     Q. Are you aware of any complaints relating to
14  Ms. Stevens that was written by any attorney who was
15  not asked by the Federal Government to comment upon
16  Ms. Stevens' conduct?
17         MR. HOLLIS: Objection. Complex.
18     **A. I'm not aware of it.**
19  BY MR. BROWN:
20     Q. Just to finish off the timeline that you
21  described -- and that may be privileged information.
22  That's probably why we haven't gotten it.
23         But did you have any policy input about
24  whether to ban Ms. Stevens from federal courthouses?
25     **A. I don't remember any because I didn't have**

Deposition of          Gary W. Smith       August 20, 2014

Page 121

1 any reason to be doing that.  I mean, I was concerned
2 about conduct, of course, and that our proceedings
3 are -- go on properly and that people are allowed to
4 attend.  But my preference by all means is that the
5 public be able to observe hearings.
6        I've done this work for a long time.  I've
7 been a lawyer for a long time.  I think people should
8 be able to come in and see the system.  I think it --
9 the system works.  It gives them a feeling whether
10 this system is working properly.
11        MR. BROWN:  Okay.  Thank you.  That's
12 all we've got.
13        MR. HOLLIS:  I have a few follow-up
14 questions.
15             EXAMINATION
16 BY MR. HOLLIS:
17    Q.  Judge Smith, is security a concern in
18 immigration court?
19    A.  Security is a concern at every immigration
20 court proceeding because we don't ever know -- in any
21 court proceeding, honestly, because you never know
22 when someone is going to explode or threaten a judge
23 or threaten counsel.  You know there are just too
24 many things that can happen and security is certainly
25 a concern.

Page 122

1    Q.  Are there ever any vulnerable persons, for
2 example children, before the immigration judge?
3    A.  Yes.
4    Q.  Are there ever violent offenders that come
5 before the immigration judge?
6    A.  Yes.
7    Q.  Are there ever any gang members that come
8 before the immigration judge?
9    A.  Yes.
10    Q.  If a proceeding is ongoing, that is, the
11 immigration judge has already begun his pleadings and
12 a member of the public wants to enter the courtroom,
13 is there any reason why a court personnel would check
14 with the judge before allowing that person to enter?
15    A.  If the court personnel knew or suspected
16 that it was an asylum case or a case where it was
17 closed to the public, that would be a concern.
18        MR. HOLLIS:  I'm finished.
19        (Deposition concluded at 1:11 p.m.)
20        (Signature reserved.)
21
22
23
24
25

Page 123

1             CERTIFICATE
2
3 STATE OF GEORGIA:
4 COUNTY OF FULTON:
5
6        I hereby certify that the foregoing transcript
7 was taken down, as stated in the caption, and the
8 colloquies, questions, and answers were reduced to
9 typewriting under my direction; that the transcript is a
10 true and correct record of the evidence given upon said
11 proceeding.
12        I further certify that I am not a relative or
13 employee or attorney of any party, nor am I financially
14 interested in the outcome of this action.
15        This the 5th day of September, 2014.
16
17
18
19
20        Marsi Koehl, CCR, CCR-B-2424
21
22
23
24
25

Page 124

1             DISCLOSURE
2
3 STATE OF GEORGIA:
4 COUNTY OF DEKALB:
5        Deposition of GARY W. SMITH.
6        Pursuant to Article 8.B. of the Rules and
  Regulations of the Board of Court Reporting of the
7 Judicial Counsel of Georgia, I make the following
  disclosure:
8
       I am a Georgia Certified Court Reporter acting
9 as an agent of APG USA, Inc., who was contacted by the
  offices of BRUCE P. BROWN LAW, LLC, to provide court
10 reporting services for this deposition.  I will not be
  taking this deposition under any contract that is
11 prohibited by O.C.G.A. 15-14-37 (a) and (b).
12        APG USA, Inc., has no contract to provide
  reporting services with any party to the case, any
13 counsel in the case, or any reporter or reporting agency
  from whom a referral might have been made to report this
14 deposition.  APG USA, Inc., will charge its usual and
  customary rate to all parties in the case, and a
15 financial discount will not be given to any party to this
  litigation.
16
17
18
19
20      Marsi Koehl, CCR B-2424    Date: 9/5/14
21
22
23
24
25

Deposition of     Gary W. Smith     August 20, 2014

---

Page 125

```
1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION
3
JACQUELINE STEVENS,
4
      Plaintiff,
5                     CIVIL ACTION FILE
      vs.
6                     NO. 1:12-CV-1352-0DE
7  ERIC HOLDER, JR.,
      Attorney General of the
8  United States, in his official
   capacity, et al.,
9
      Defendants.
10
11
12
13
14
15      The preceding deposition taken in the matter, on
16  the date, and at the time and place set out on the title
17  page hereof.
18
19      It was requested that the deposition be taken by
20  the reporter and that same be reduced to typewritten
21  form.
22
23      It was agreed by and between counsel and the
24  parties that the Deponent will read and sign the
25  transcript of said deposition.
```

---

Page 126

```
1             CERTIFICATE
2  STATE OF
   COUNTY/CITY OF
3
4      Before me, this day, personally appeared, GARY W.
   SMITH, who, being duly sworn, states that the foregoing
5  transcript of his deposition, taken in the matter, on the
   date, and at the time and place set out on the title page
6  hereof, constitutes a true and accurate transcript of
   said deposition.
7
8
9             GARY W. SMITH
10
11
12
13  SUBSCRIBED and SWORN to before me this
14      day of          , 2014 in the
15  jurisdiction aforesaid.
16
17
18  My Commission Expires      Notary Public
19
20
21  [] No changes made to the Errata Sheet; therefore, I
22  am returning only this signed notarized certificate.
23
24  [] I am returning this signed, notarized certificate
25  and Errata Sheet with changes noted.
```

---

Page 127

```
1  DEPOSITION ERRATA SHEET
2  Deponent: GARY W. SMITH
3  Deposition Date: August 20, 2014
4  To Reporter:
5  I have read the entire transcript of my deposition taken
6  in the captioned matter or the same has been read to me.
7  I request that the following changes be entered upon the
8  record for the reasons indicated. I have signed my name
9  to the Errata Sheet and appropriate Certificate and
10  authorize you to attach both to the original transcript.
11
12  Page No.      Line No.
13  Change to:
14  Reason for Change:
15
16  Page No.      Line No.
17  Change to:
18  Reason for Change:
19
20  Page No.      Line No.
21  Change to:
22  Reason for Change:
23
24
25
```

---

Page 128

```
1        Deposition of GARY W. SMITH
2
3  Page No.      Line No.
4  Change to:
5  Reason for Change:
6
7  Page No.      Line No.
8  Change to:
9  Reason for Change:
10
11  Page No.      Line No.
12  Change to:
13  Reason for Change:
14
15  Page No.      Line No.
16  Change to:
17  Reason for Change:
18
19  Page No.      Line No.
20  Change to:
21  Reason for Change:
22
23
24  Signature:           Date:
25        GARY W. SMITH
```

---

Deposition of         Gary W. Smith      August 20, 2014

**A**

**ability** 21:7
**able** 9:23, 9:24
  25:17, 75:19
  117:24, 121:5
  121:8
**Absolutely**
  17:16, 70:23
**access** 21:7
  26:4, 26:15
  28:2, 107:16
  107:16, 108:7
  108:9, 112:14
**account** 47:18
**accurate** 53:9
  126:6
**ACIJ** 47:7
  65:17, 101:25
  103:13
**acronym** 26:20
  65:13
**Act** 18:18, 18:23
  19:1, 19:4
  24:24, 24:25
  25:6, 82:3
**acting** 13:25
  13:25, 14:10
  58:17, 97:1
  115:19, 116:3
  124:8
**action** 1:5, 43:4
  46:15, 50:9
  59:12, 119:11
  123:14, 125:5
**actions** 46:4
  118:7
**actual** 10:23
  11:16, 11:18
  19:10, 23:12
**add** 55:17, 62:2
  100:9, 102:15
**addition** 111:2
**additional** 55:18
  59:7, 101:20
  102:15

**address** 19:2
  43:19, 62:19
  70:18, 83:3
  105:15, 110:15
  112:23
**addressed** 43:14
  74:23, 82:25
  110:14
**addressing**
  44:12, 49:10
**adjudicated**
  31:13, 102:6
**adjudicating**
  10:24
**administration**
  8:3
**administrative**
  13:16, 27:18
  45:13, 50:18
  86:13
**administrator**
  10:5, 25:11
  29:9, 31:23
  32:14, 33:14
  34:5, 38:2, 38:4
  38:24, 39:23
  41:14, 41:17
  43:9, 44:7
  44:22, 45:2
  45:12, 47:19
  54:15, 61:24
  62:12, 84:7
  85:25, 94:8
  95:5, 97:1
  107:15, 107:19
  108:15, 115:19
  116:3, 116:5
**administrators**
  13:4, 27:10
  27:19, 37:3
  37:24, 59:23
  60:5, 60:7
  60:18, 86:12
  86:18, 95:16
  119:8
**advice** 55:15

**address** 86:8, 104:8
  115:2, 115:4
  115:15
**advise** 48:18
  92:21
**advised** 52:19
**advisor** 105:17
**advocate** 8:9
**affairs** 32:15
  33:18, 33:21
  36:15, 66:16
  92:13, 92:15
  93:17
**affirmatively**
  28:22, 59:10
  118:22
**aforesaid**
  126:15
**afternoon** 48:6
  92:19, 93:8
**agency** 17:4
  124:13
**agent** 124:9
**agents** 120:7
**aggressive**
  75:20, 75:25
**ago** 100:10
**agree** 76:15
**agreed** 125:23
**ahead** 30:14
  71:13
**AICJs** 106:3
**AILEEN** 6:3
**Aileen's** 74:10
**aileen.bell.hug...**
  6:11
**al** 1:8, 125:8
**Alder** 99:25
**Alex** 117:13
**alleged** 16:15
**allegedly** 114:17
**ALLEN** 5:13
**allow** 7:17, 7:18
  7:22, 74:13
  77:4
**allowed** 38:16

**address** 39:5, 84:2
  121:3
**allowing** 122:14
**Ambiguous**
  23:3, 38:19
  86:15
**answer** 7:17
  7:23, 16:6, 28:7
  30:15, 38:20
  40:13, 40:14
  61:21, 62:16
  67:21, 67:24
  79:23, 82:22
  86:16, 94:19
  95:9, 98:9
  98:10, 104:18
  104:25, 105:1
  108:13, 108:14
**answered** 40:12
**answers** 123:8
**Antonini** 118:25
  119:2
**Antonini's**
  120:8
**anxiety** 32:3
**anybody** 13:12
  55:10, 58:4
**anymore** 87:8
**anyway** 61:18
  83:5, 111:15
**apart** 36:17
  37:11, 58:3
  58:20, 108:21
**APG** 124:9
  124:12, 124:14
**apologies** 90:25
**apparently** 52:2
  106:25
**appeal** 11:21
  11:21, 12:2
  16:7, 101:12
  116:24
**appeals** 11:22
  12:1, 13:23
  63:22, 102:1
**appear** 11:4

**address** 11:4, 53:14
  88:19, 89:6
**APPEARANC...**
  5:1, 6:1
**appeared** 46:5
  126:4
**appears** 93:14
  95:1, 100:11
  100:14, 100:16
  106:4
**appellate** 11:12
  16:8, 101:5
  101:23, 111:3
**apply** 19:6
**apportioned**
  30:22
**apportioning**
  27:11
**appraisal** 19:15
  19:20, 19:22
  20:2
**appraising** 20:6
**appreciate** 54:9
**approach** 16:9
**appropriate**
  16:21, 72:21
  76:12, 104:21
  110:20, 112:10
  127:9
**appropriately**
  56:2
**April** 37:25
  39:11, 39:23
  44:5, 44:11
  44:21, 44:23
  47:11, 55:11
  78:20, 85:24
  89:9, 89:17
  90:5, 90:15
  91:17, 92:9
  96:17, 96:18
  96:25, 97:13
  97:18, 100:2
  102:12, 102:19
  107:8, 110:8
  114:16, 116:6

Deposition of                Gary W. Smith        August 20, 2014

116:8, 116:20
119:4
**archived** 22:11
22:17
**area** 9:10, 28:20
28:21, 28:24
50:5, 50:10
87:24, 109:9
**Army** 8:9, 8:10
**arose** 12:18
**arraignment**
29:18
**article** 2:19
66:10, 124:6
**articles** 66:21
66:24, 66:25
**asked** 22:24
22:24, 40:3
40:11, 40:24
41:2, 41:6
41:20, 43:11
45:20, 48:13
49:1, 49:5, 49:8
49:13, 50:11
50:22, 52:19
59:6, 59:19
59:20, 62:12
74:8, 80:21
84:20, 87:22
98:11, 99:5
100:10, 110:25
119:21, 120:10
120:15
**asking** 7:10
30:12, 60:21
94:13, 104:4
105:12
**aspect** 11:8
19:5
**aspects** 10:6
**assert** 75:18
**asserted** 75:4
**assign** 17:16
17:19, 31:19
**assigned** 103:20
**assignment**

83:10
**assistance** 55:25
**assistant** 8:14
8:18, 9:17, 9:22
10:22, 11:9
11:15, 12:8
12:9, 12:16
12:24, 15:1
16:19, 17:5
17:19, 19:8
19:17, 27:16
27:17, 31:7
31:9, 31:21
38:22, 44:8
45:13, 55:13
56:11, 65:7
90:5, 101:3
102:11, 105:24
108:15
**assistants** 95:17
**assume** 73:4
**asylum** 25:19
36:6, 42:13
48:9, 81:19
81:23, 82:8
82:10, 122:16
**Atlanta** 1:2
1:21, 3:17, 5:8
6:9, 8:21, 8:22
10:14, 12:19
21:21, 34:23
38:22, 39:21
44:15, 85:5
90:6, 94:10
94:22, 95:6
96:2, 108:20
117:25, 125:2
**attach** 127:10
**attached** 4:20
6:20
**attend** 20:22
35:25, 36:3
38:7, 38:10
51:15, 53:23
90:9, 99:24
100:7, 121:4

**attended** 57:6
57:23, 58:25
**attending** 35:23
37:4, 37:14
**attention** 32:21
33:25, 34:4
57:4, 59:4
61:20, 63:23
67:8, 76:2, 76:4
102:5, 110:13
**attorney** 1:7
5:4, 6:4, 14:20
14:22, 41:1
41:6, 48:18
63:20, 113:21
114:1, 117:1
117:19, 118:9
118:10, 120:14
123:13, 125:7
**attorney-client**
67:20, 71:7
**attorneys** 5:14
59:19, 60:4
86:20
**attribute** 52:16
**audio** 15:11
21:7, 22:10
23:1, 25:4, 40:5
48:1
**August** 1:14
127:3
**Augusta** 9:10
9:12
**author** 66:10
**authority** 62:24
66:2
**authorize**
127:10
**available** 18:25
78:18
**Avenue** 5:6
**avoid** 116:7
**award** 63:22
**aware** 20:2
25:3, 25:7
35:15, 36:9

36:11, 36:18
37:13, 37:21
43:3, 46:5, 46:7
46:12, 46:22
50:4, 50:7, 56:9
56:10, 61:1
61:12, 66:9
86:25, 94:9
103:22, 104:20
111:16, 111:21
115:15, 120:13
120:18

**B**

**B-2424** 124:20
**B-L-U-M** 58:22
**back** 9:14, 13:1
13:2, 13:24
21:6, 80:18
85:24, 88:20
88:21, 89:23
91:23, 100:25
103:9, 107:20
**bailiwick** 36:14
**Baker** 59:20
116:21, 116:25
117:13, 117:18
**ban** 119:11
119:25, 120:24
**banning** 60:23
61:4, 61:12
118:5, 118:7
119:16
**bar** 97:25, 98:2
**based** 26:12
51:17, 53:18
53:25, 63:2
63:10, 76:11
**basic** 13:3
15:25
**basically** 12:12
15:24, 60:21
102:23
**basis** 11:21
42:2, 42:20

71:6, 75:18
81:22, 82:3
82:4
**Bates** 77:18
91:5, 96:10
99:13, 118:19
**bbrown@bruc...**
5:10
**bearing** 91:5
**beatings** 25:21
**began** 8:11
12:12
**beginning** 74:22
**begun** 122:11
**behalf** 5:2, 5:11
6:2
**behavior** 4:15
25:22, 44:13
**belief** 26:16
49:24
**believe** 9:7
10:17, 14:4
14:8, 14:21
19:16, 21:11
34:16, 35:19
39:11, 41:5
41:9, 44:5
44:23, 47:3
47:7, 50:21
55:3, 56:9
56:14, 58:15
68:13, 75:16
76:10, 80:2
98:13, 103:3
105:16, 116:2
119:21, 120:4
120:5
**believed** 11:20
45:3, 45:21
79:10, 80:5
104:21
**BELL** 6:3
**belonged** 65:24
**bench** 11:3
23:11
**beneath** 115:3

Deposition of          Gary W. Smith        August 20, 2014

**best** 35:16, 42:9
  44:16, 46:14
  60:11, 63:24
  64:10, 71:13
  74:10, 74:15
  100:17
**Bethune** 38:4
  60:8, 68:11
  77:11, 86:3
  86:9, 94:4, 95:5
  95:25, 96:20
  96:24, 116:5
**Bethune's** 38:15
**Betsy** 102:10
**better** 9:1, 65:22
  82:24
**Beyond** 28:17
**big** 97:10
  109:12
**bit** 9:25, 13:2
  20:8, 21:14
  27:3, 27:4, 32:5
  38:13, 54:11
  75:20
**black** 97:25
  98:2
**blind** 86:24
**Blum** 58:15
  58:22, 59:18
  59:19, 60:15
  100:1, 119:21
**board** 11:21
  12:1, 13:23
  28:10, 28:17
  28:17, 28:23
  101:11, 101:11
  101:25, 116:23
  124:6
**bond** 23:25
  111:19
**border** 120:7
**Boston** 100:3
**bottom** 93:12
  93:14, 97:16
**box** 106:15
**break** 11:5, 32:7

93:15
**Brian** 14:2
**brief** 74:13
**bring** 76:1, 76:4
**Britney** 50:15
  50:23, 54:19
  62:7, 62:10
  79:14, 83:20
**broad** 57:12
  57:18, 113:19
**Brown** 5:3, 5:5
  7:6, 7:9, 22:15
  23:6, 23:7, 26:9
  26:11, 28:16
  30:13, 31:11
  32:4, 32:9
  32:23, 33:1
  33:8, 33:13
  39:2, 40:22
  56:15, 56:22
  57:16, 63:17
  64:22, 66:8
  67:5, 67:17
  67:23, 68:1
  68:5, 68:19
  68:22, 68:25
  69:9, 69:19
  69:24, 70:6
  70:10, 70:14
  70:20, 70:23
  71:16, 71:20
  71:25, 72:8
  72:13, 72:19
  73:2, 73:21
  74:9, 74:17
  75:15, 76:14
  77:3, 77:8, 78:4
  78:12, 78:13
  80:8, 82:6
  82:12, 83:1
  83:5, 83:6
  83:16, 85:17
  89:1, 89:13
  89:22, 90:12
  90:22, 90:24
  91:2, 91:4, 91:7

91:13, 91:25
  92:5, 92:17
  94:1, 94:18
  95:22, 96:4
  96:8, 96:12
  96:14, 98:4
  98:15, 98:19
  98:21, 99:6
  99:9, 99:14
  99:16, 100:21
  100:24, 104:24
  105:20, 106:8
  106:10, 106:18
  107:2, 107:5
  108:19, 109:23
  110:5, 112:25
  114:13, 115:11
  115:25, 116:4
  116:17, 117:3
  117:12, 117:17
  117:20, 117:23
  117:25, 118:15
  118:17, 118:21
  119:7, 120:19
  121:11, 124:9
**Brown**................
  2:4
**Bruce** 5:3, 5:5
  7:9, 69:18
  72:17, 75:24
  124:9
**brush** 113:19
**building** 1:17
  33:23, 51:21
  51:22, 52:1
  52:20, 53:6
  53:17, 79:4
  85:6, 88:4
  88:23, 107:16
  108:1, 108:3
  108:4, 108:7
**buildings** 60:24
**bunch** 109:20
**burn** 25:13
**business** 8:3
**button** 24:10

24:15

**C**

**calendar** 28:10
  28:14, 29:3
  29:16, 29:21
  30:23, 31:5
  112:20
**calendars** 29:4
  29:19, 30:17
  30:24, 112:7
**call** 47:5, 104:13
**called** 25:13
  26:20, 29:15
  30:21, 45:23
  45:25, 56:10
  92:21, 93:16
  115:25
**calling** 112:21
**calls** 82:1, 94:11
  95:7, 108:11
**cancellation**
  42:7, 101:14
**candid** 101:18
**capacity** 1:8
  45:24, 101:3
  125:8
**caption** 123:7
**captioned** 127:6
**care** 101:22
**careful** 24:17
  28:12
**carefully** 45:17
  47:17
**carried** 80:1
**case** 4:8, 7:10
  7:21, 10:9, 11:6
  11:20, 15:8
  16:5, 17:17
  23:15, 23:22
  24:16, 25:8
  25:19, 26:20
  28:1, 28:3
  29:12, 29:25
  30:1, 30:7, 31:1

31:5, 31:8
  31:10, 31:19
  36:6, 40:3, 41:2
  41:23, 41:25
  42:1, 42:6, 42:7
  42:13, 42:14
  43:22, 47:17
  48:21, 54:2
  73:14, 78:15
  84:8, 84:17
  93:8, 94:21
  101:12, 102:5
  103:25, 112:21
  113:9, 119:2
  122:16, 122:16
  124:12, 124:13
  124:14
**cases** 10:24
  11:25, 22:11
  26:23, 27:1
  29:6, 29:6
  29:21, 29:22
  30:18, 30:20
  30:23, 31:12
  32:1, 95:20
  101:5, 103:11
  115:14
**cassette** 22:4
  22:8
**Cassidy** 3:6
  3:21, 4:6, 29:5
  44:12, 45:8
  47:20, 49:7
  49:12, 49:13
  49:25, 50:12
  50:15, 51:1
  51:9, 52:23
  53:13, 54:13
  54:17, 55:22
  61:23, 62:20
  63:1, 79:19
  79:22, 80:13
  80:16, 80:21
  83:11, 87:4
  87:5, 87:14
  88:12, 88:17

Deposition of          Gary W. Smith      August 20, 2014

91:16, 92:21
93:15, 94:7
102:13, 102:18
102:22, 103:6
104:15, 106:14
110:18, 110:24
111:17, 111:22
114:25, 115:6
115:12
**Cassidy's** 50:11
53:20, 54:2
87:12, 91:19
102:11, 104:10
105:6
**categories** 20:25
**caution** 48:17
**CCR** 1:25
123:20, 124:20
**CCR-B-2424**
1:25, 123:20
**CD** 25:12, 25:13
**center** 34:22
**Centers** 2:23
**central** 15:14
22:18
**certain** 100:15
106:5
**certainly** 65:9
87:1, 88:5
102:9, 121:24
**certificate** 123:1
126:1, 126:22
126:24, 127:9
**Certified** 124:8
**certify** 123:6
123:12
**cetera** 29:6
**chain** 13:3
106:13
**chairman** 13:22
116:23
**chairs** 109:20
**challenges**
27:12
**chambers** 81:8
**change** 20:8

127:13, 127:14
127:17, 127:18
127:21, 127:22
128:4, 128:5
128:8, 128:9
128:12, 128:13
128:16, 128:17
128:20, 128:21
**changed** 13:19
29:1, 79:5
**changes** 126:21
126:25, 127:7
**characterize**
10:21
**charge** 10:3
124:14
**check** 84:1
84:21, 99:12
122:13
**checked** 40:2
**checking** 107:21
**chief** 8:15, 8:18
9:17, 9:22, 9:23
10:22, 10:22
11:9, 11:15
12:8, 12:9
12:16, 12:22
12:24, 13:13
13:14, 13:16
13:18, 13:19
14:1, 14:3, 14:4
14:7, 14:9
14:10, 14:13
15:1, 16:19
17:5, 17:20
19:8, 19:17
31:21, 45:13
55:13, 56:11
65:7, 65:9
101:4
**children** 122:2
**Chris** 109:23
**CHRISTOPH...**
5:12
**christopher.hol...**
5:21

**chronology**
37:18
**Church** 8:14
8:19, 9:4, 9:5
9:7
**circuit** 11:22
**circumstances**
16:3, 16:8
**citizen** 32:20
95:5, 119:12
**civil** 1:5, 30:3
125:5
**claim** 48:9
63:11, 76:25
**claims** 22:23
**clear** 53:19
53:21, 73:11
116:6
**clearly** 51:18
**clerical** 50:18
**clerks** 10:4
95:17
**clinics** 36:23
36:24, 37:5
37:12
**close** 20:24
43:17
**closed** 40:4
40:24, 41:2
41:4, 42:1, 43:6
43:12, 48:14
49:20, 50:20
51:2, 51:10
53:15, 53:22
54:8, 63:8, 87:6
87:17, 87:18
87:19, 87:21
122:17
**closing** 20:10
44:13
**closure** 42:22
81:22, 113:14
**co-counsel** 33:9
**code** 20:13, 24:6
24:7, 64:12
64:15

**Cognos** 26:22
**collected** 60:10
**collects** 106:1
**college** 54:25
**colloquies** 123:8
**colloquy** 49:16
81:11, 81:14
113:15
**Columbia** 9:7
**come** 13:1
15:24, 16:4
25:10, 30:8
34:1, 34:9
38:25, 58:7
66:25, 70:19
84:9, 84:11
85:23, 85:25
86:19, 121:8
122:4, 122:7
**comes** 63:9
**coming** 29:22
32:16, 38:11
39:7, 40:17
40:19, 41:15
73:15, 86:23
**comment** 73:25
120:15
**comments** 120:8
**Commission**
126:18
**communicated**
61:22, 68:15
71:3
**communication**
53:18, 73:22
86:8, 97:21
98:12, 102:21
**communications**
46:24, 48:3
50:9, 67:14
77:11, 89:7
92:19, 97:23
97:24, 106:12
113:3, 113:6
**compared**
107:14

**compel** 72:25
**complain** 12:15
**complainant**
15:19, 15:20
**complained**
47:4
**complaint** 4:4
12:13, 12:13
15:8, 15:18
16:2, 16:4
16:12, 18:7
21:8, 47:9
47:10, 47:14
47:17, 48:7
53:11, 54:12
55:22, 59:12
78:19, 83:11
91:16, 103:8
103:19, 103:20
104:11, 105:6
105:14, 110:8
110:17
**complaints** 12:5
15:3, 15:6
16:14, 16:21
18:2, 18:10
18:12, 19:13
65:3, 65:12
65:23, 105:9
106:2, 111:16
111:22, 120:13
**completed**
21:23
**completely**
29:24
**Complex** 28:5
104:17, 108:11
113:17, 120:17
**computer** 15:13
30:6
**computers**
22:20
**conceivably**
67:1
**concern** 36:7
58:8, 121:17

Deposition of               Gary W. Smith          August 20, 2014

121:19, 121:25
122:17
**concerned**
35:25, 37:24
40:2, 41:14
51:5, 51:6, 51:7
91:18, 121:1
**concerning** 57:7
57:23, 58:25
59:8, 89:7
117:14, 119:16
**concerns** 37:23
114:16
**concluded**
122:19
**conduct** 12:10
15:9, 15:16
16:11, 16:20
17:7, 17:8, 21:8
43:17, 55:14
64:6, 64:12
64:15, 65:7
65:17, 103:21
104:10, 104:15
105:6, 120:16
121:2
**conducting**
51:10
**conference** 35:2
58:1, 59:2, 95:1
105:15, 109:13
**conferences**
24:18, 112:11
**conferencing**
94:20
**conferred** 92:23
93:2
**conferring** 93:6
104:5
**confirm** 81:11
81:14, 93:23
**Congratulations**
8:5
**connection**
38:15, 83:10
91:15, 92:6

**consider** 42:21
53:10, 79:21
**consideration**
55:17
**considered** 79:9
**considering**
12:4, 46:3
60:22, 61:4
73:8
**consistent** 79:18
88:11, 88:12
**console** 36:8
**constantly**
66:24
**constitutes**
126:6
**consulate** 36:8
**consult** 66:3
103:13
**contact** 33:21
44:15
**contacted** 97:2
124:9
**contains** 77:10
**content** 76:11
**continued** 6:1
21:24
**continues** 21:25
**Continuing** 2:14
56:18
**contract** 124:10
124:12
**contrast** 118:2
**control** 51:21
108:4, 108:4
108:9
**controlling**
108:7, 108:8
**conversations**
53:1
**coordinate**
17:22, 55:13
**coordinated**
55:15, 105:4
**coordinating**
103:17

**coordination**
95:24
**copied** 89:15
**copies** 91:2
117:3
**copy** 18:4, 20:4
25:8, 25:11
25:12, 91:1
110:6, 110:7
117:6, 118:24
**correct** 12:21
13:6, 13:10
14:25, 15:3
16:1, 16:9, 17:2
17:10, 21:2
25:1, 28:24
29:13, 30:10
31:14, 39:12
47:11, 49:14
49:20, 49:23
50:2, 56:4
56:25, 57:18
62:4, 64:15
65:14, 77:11
77:15, 78:2
80:3, 80:22
81:12, 83:12
89:9, 90:16
93:1, 93:18
97:17, 109:5
109:10, 110:8
110:11, 116:13
123:10
**correctly** 63:2
102:3, 103:5
**correctness**
11:16
**counsel** 5:1, 6:1
6:19, 12:11
15:21, 25:15
25:16, 25:24
26:2, 26:4, 40:3
40:3, 42:23
43:13, 48:12
49:9, 55:16
58:6, 58:14

58:18, 58:19
60:19, 63:6
76:2, 92:23
93:2, 93:7
93:10, 93:11
98:22, 98:23
103:14, 112:16
113:16, 113:18
113:23, 115:15
115:16, 117:2
121:23, 124:7
124:13, 125:23
**counting** 30:21
**country** 25:22
36:1, 36:22
37:6
**countryside**
39:10
**COUNTY** 123:4
124:4
**COUNTY/CITY**
126:2
**couple** 100:25
**course** 12:3
26:3, 70:23
93:3, 97:18
121:2
**court** 1:1, 3:17
6:19, 7:19, 8:23
10:4, 10:17
11:4, 13:4
23:13, 24:11
24:19, 25:10
26:18, 26:24
26:25, 27:9
27:19, 29:8
29:9, 30:3, 30:4
31:22, 32:14
33:14, 33:16
34:4, 34:17
34:19, 37:3
37:4, 37:14
37:23, 38:1
38:1, 38:4
38:21, 38:23
39:10, 39:23

41:13, 41:17
43:9, 43:21
44:6, 44:16
44:22, 45:2
45:11, 47:19
50:17, 54:15
59:23, 60:4
60:7, 60:18
61:24, 62:12
72:17, 73:7
76:1, 76:13
81:3, 81:4, 84:7
85:4, 85:5
85:24, 86:12
86:18, 86:18
87:2, 88:20
94:8, 94:22
94:23, 95:4
95:16, 95:20
97:1, 107:15
107:18, 107:18
107:23, 107:24
108:8, 108:15
109:6, 109:6
112:13, 113:2
113:2, 113:4
113:7, 115:19
116:3, 116:5
117:5, 119:8
121:18, 121:20
121:21, 122:13
122:15, 124:6
124:8, 124:9
125:1
**courtesy** 33:20
**courthouse**
28:19, 28:21
90:6
**courthouses**
61:13, 119:12
120:1, 120:24
**courtroom** 4:14
22:9, 24:10
40:1, 41:7, 43:8
49:23, 50:1
50:6, 50:11

Deposition of            Gary W. Smith       August 20, 2014

50:12, 51:3
51:16, 52:14
53:24, 69:2
74:1, 80:24
81:5, 81:9, 84:3
84:18, 84:25
85:20, 86:19
87:5, 87:16
87:22, 88:21
88:22, 92:22
94:9, 97:6, 97:8
97:13, 107:21
109:4, 109:10
114:18, 122:12
**courtrooms**
36:12, 84:14
86:14, 107:17
108:10, 111:12
119:12, 119:17
**courts** 8:23
9:20, 9:21, 10:1
10:3, 10:13
10:14, 11:22
13:5, 20:10
21:16, 21:18
21:20, 21:23
28:9, 30:3
30:25, 32:17
32:20, 46:10
59:9, 59:21
63:21, 94:21
95:10, 100:5
114:8, 119:9
**criminal** 16:25
29:17
**critical** 66:12
**Crosby** 3:11
3:18, 44:8, 45:7
50:16, 50:19
50:20, 50:24
50:25, 51:5
51:5, 51:11
51:14, 51:18
51:25, 52:13
52:23, 53:6

54:8, 54:14
62:5, 62:21
83:21, 87:6
87:24, 94:3
**Crosby's** 45:18
47:18, 107:7
**cross-examining**
63:7
**currently** 7:25
14:3
**customary**
124:14
**customs** 120:6
120:7
**Cynthia** 83:20
107:7

**D**

**D.C** 5:19
**daily** 29:3, 29:4
66:17
**Daman** 117:14
**DAR** 48:1, 48:2
48:4, 48:8
81:10, 81:14
**dash** 98:2, 117:7
118:20
**dashboard**
101:24
**database** 26:19
26:21, 27:22
29:13, 31:9
105:25
**date** 31:6, 31:7
89:16, 124:20
125:16, 126:5
127:3, 128:24
**dated** 77:15
78:1, 90:14
114:16
**dates** 23:4, 57:6
57:22, 60:2
**David** 13:22
116:21
**day** 11:3, 11:25

22:1, 28:10
28:15, 29:1
29:18, 29:22
31:10, 43:21
44:11, 44:19
44:19, 45:8
50:2, 86:9
95:12, 96:24
116:9, 116:10
116:11, 116:12
123:15, 126:4
126:14
**days** 100:3
**deal** 31:6, 76:1
76:12, 92:14
92:15, 97:10
101:21
**dealing** 56:8
**deals** 10:7
20:14
**decide** 30:6
30:7, 33:8
74:14
**decision** 19:6
43:15, 43:16
52:21, 53:11
56:3, 56:6
59:11, 64:3
103:11, 117:23
119:25
**decisions** 11:12
11:17, 11:18
101:23, 101:25
119:15
**Defendant**
56:19
**Defendants** 1:9
2:11, 2:13, 3:2
4:2, 5:11, 6:2
56:17, 125:9
**degree** 8:3
**DEKALB** 124:4
**delegated** 47:14
**deliberative**
46:2, 67:20
71:6, 74:3, 86:2

98:7
**delicate** 42:8
42:10
**department**
5:15, 6:5, 14:24
17:2, 18:14
20:16, 35:13
66:1, 108:18
109:23, 115:4
**depended** 18:7
**depending** 31:1
63:8
**depends** 29:3
36:4
**Deponent**
125:24, 127:2
**deposition** 1:12
6:20, 7:14, 62:3
77:6, 82:25
83:4, 101:2
122:19, 124:5
124:10, 124:10
124:14, 125:15
125:19, 125:25
126:5, 126:6
127:1, 127:3
127:5, 128:1
**deputy** 13:13
13:16, 13:18
14:5, 14:7, 14:9
14:12, 14:22
58:6, 58:13
58:18, 60:19
115:2, 115:16
**describe** 9:15
12:7, 58:10
107:13, 118:8
**described**
113:13, 120:21
**describes** 20:1
**describing**
25:21
**Description**
2:11, 3:2, 4:2
**designated**
29:10

**designee** 29:11
**desk** 15:12
15:15
**Detail** 4:4
**detailed** 54:22
54:25, 62:9
**detained** 27:6
**detainee** 28:1
35:10
**detainees**
114:18
**detect** 64:6
**detention** 2:23
34:22
**determination**
42:16, 42:18
53:16, 63:12
63:13, 65:8
**determine** 65:24
74:20, 110:23
**determined**
43:11
**devices** 108:25
**DHS** 120:2
120:3, 120:4
**dialogue** 119:10
**difference** 10:21
**different** 20:25
24:18, 30:25
30:25, 34:20
35:24, 36:3
36:12, 36:20
38:13, 42:14
58:7, 79:17
105:13, 116:9
116:10, 119:9
120:4
**difficult** 78:6
**difficulties**
38:14, 95:15
**digital** 15:11
21:7, 22:10
23:1, 25:4, 40:5
48:1
**direct** 57:4, 59:4
61:20, 63:23

Deposition of          Gary W. Smith          August 20, 2014

67:8, 110:13
**directed** 20:16
**direction** 52:20
123:9
**directive** 53:20
54:3
**directly** 12:17
43:14, 45:4
49:10, 66:3
81:7
**director** 13:25
14:17, 14:19
14:21, 63:24
**disagreements**
74:11
**disclosed** 69:8
69:10, 69:22
71:11, 71:19
72:5, 76:21
77:2, 82:19
99:2
**disclosure** 6:18
73:19, 76:9
98:17, 124:1
124:7
**disclosures**
71:15
**discount** 124:15
**discoverable**
97:22, 97:24
**discrepancy**
71:24, 72:12
**discretion** 21:4
31:19, 42:3
42:15, 63:12
**discuss** 27:9
112:4, 114:1
**discussion** 53:25
110:2
**discussions**
112:7
**disputed** 51:4
84:25
**disqualification**
31:18
**disqualify** 31:16

**disruptive** 4:14
59:22
**dissatisfied** 16:5
**distinct** 118:7
**distinction**
57:20
**distributed**
27:15
**district** 1:1, 1:1
6:6, 113:2
125:1, 125:1
**divide** 9:24
**DIVISION** 1:2
125:2
**divisions** 17:1
**divulging** 86:7
106:11
**DMV** 109:20
110:1
**docket** 26:18
27:5, 27:6, 27:6
27:7, 27:9, 28:3
28:9, 28:17
28:17, 28:23
29:17, 31:1
78:15, 115:14
**dockets** 30:20
**docs** 75:2
**document** 20:14
69:6, 73:4, 73:7
73:12, 73:13
74:21, 74:25
74:25, 75:1
75:11, 76:23
78:16, 80:10
80:12, 80:15
88:9, 90:1, 91:5
92:3, 93:3, 96:5
99:4, 105:22
105:23, 115:9
**documents**
69:13, 70:16
70:22, 71:12
72:1, 75:12
75:13, 76:6
77:5, 94:14

94:17, 98:25
112:12, 118:12
**doing** 11:11
27:5, 27:6
30:19, 33:9
36:19, 36:20
42:2, 56:1
60:14, 70:2
94:22, 94:25
95:19, 101:7
102:2, 104:3
112:19, 119:3
121:1
**domain** 10:15
**door** 25:25
**doors** 107:20
107:24
**download** 12:14
**downstairs**
113:2
**driven** 30:9
**due** 12:3
**duly** 7:3, 126:4
**duties** 9:24
11:25
**duty** 63:4, 73:3
94:25

**E**

**E-mail** 2:20
2:22, 2:24, 3:5
3:7, 3:9, 3:11
3:13, 3:15, 3:18
3:20, 3:22, 3:24
4:5, 4:7, 4:11
4:13, 4:16, 18:3
43:10, 44:6
44:9, 44:21
45:1, 47:3
58:12, 62:7
62:9, 68:10
76:11, 77:10
77:19, 82:13
83:9, 83:19
85:11, 89:5

90:14, 90:19
90:20, 93:14
94:2, 94:3
96:16, 97:16
100:13, 102:17
103:5, 106:13
114:24, 115:10
116:21, 117:13
119:5
**E-mails** 58:12
67:11, 85:18
**earlier** 73:15
100:14, 119:21
119:23
**early** 44:19
**early-ish** 39:11
**Eastwood** 93:22
**efficiency** 71:9
**either** 11:2
11:19, 12:15
32:14, 35:4
50:19, 52:22
59:19, 120:11
**else's** 43:20
**embarrass**
28:13
**employed** 7:25
8:8
**employee** 50:24
54:24, 62:10
84:19, 123:13
**employees**
19:19
**encourage**
66:16, 84:10
**encouraged**
37:8, 52:19
**ended** 105:6
**enforcement**
120:6
**engender** 32:20
**ensued** 110:2
**ensuring** 107:19
**enter** 51:3
51:19, 52:14
122:12, 122:14

**entered** 94:25
127:7
**enters** 31:9
**entire** 14:23
97:3, 109:6
115:18, 127:5
**entirely** 112:10
**EOIR** 9:11, 19:4
50:5, 63:25
89:7, 90:7
108:18, 109:15
**EOIR-B-000035**
99:14
**EOIR-B-000046**
91:14
**EOIR-B-000048**
68:7, 77:18
**EOIR-C-000038**
96:12
**EOIR-D-000029**
107:4
**EOIR-D-000054**
106:9
**EOIR-D-000058**
91:6
**EOIR-E-000131**
77:23
**EOIR-O-000059**
98:24
**EOIR-REQ-20...**
117:7, 118:20
**EOIR-Z-000098**
114:24
**episode** 43:1
90:15, 90:18
**ERIC** 1:7, 125:7
**Errata** 126:21
126:25, 127:1
127:9
**establish** 63:25
**et** 1:8, 29:6
125:8
**ethical** 74:16
74:17, 74:18
75:25
**ethically** 75:9

Deposition of            Gary W. Smith      August 20, 2014

ethics 17:6
evaluated 19:17
  19:18, 19:20
evaluating 19:9
evenly 27:15
  30:21
event 87:13
events 49:12
  55:2, 55:11
  102:11, 102:19
  109:4
evidence 86:12
  123:10
ex 113:24
exact 75:12
exactly 14:5
  21:21, 76:7
  107:12
examination 2:4
  2:5, 7:5, 73:16
  121:15
examined 7:3
example 15:21
  18:9, 18:11
  23:15, 26:25
  40:18, 101:13
  101:21, 112:19
  122:2
exception 79:14
  118:25
exchange 49:3
exclude 84:18
excluded 22:24
excuse 51:24
  80:4, 83:20
  93:13, 96:21
Executive 8:11
  9:6, 14:18
  20:15, 20:19
  66:12
exercise 48:17
exhibit 2:11
  2:13, 2:16, 2:17
  2:19, 2:20, 2:22
  2:24, 3:2, 3:4
  3:5, 3:7, 3:9

3:11, 3:13, 3:15
3:18, 3:20, 3:22
3:24, 4:2, 4:4
4:5, 4:7, 4:9
4:11, 4:13, 4:16
56:16, 56:20
63:15, 64:20
64:23, 66:6
67:3, 67:7, 67:8
67:14, 68:3
68:7, 68:11
68:16, 68:19
68:21, 68:24
70:7, 71:4
77:10, 77:18
77:22, 78:8
78:9, 78:11
78:14, 80:6
80:10, 83:14
83:18, 88:24
89:5, 89:11
89:15, 90:10
90:14, 90:21
91:11, 92:19
93:24, 96:6
96:9, 98:25
99:7, 100:18
102:17, 105:18
105:22, 106:6
106:16, 106:21
107:3, 110:3
110:6, 110:6
110:16, 114:11
114:14, 114:16
116:15, 116:18
116:20, 117:9
117:10, 118:18
120:9
exhibits 4:20
71:11, 76:19
existed 78:23
existence 78:25
exited 87:5
expect 19:5
34:8
expected 21:1

Expires 126:18
explain 21:14
  69:11
explained 51:1
explanation
  104:25
explode 121:22
expression 9:2
  65:23
extended 31:25
extent 16:1
  30:9, 32:18
  52:18, 75:7
  98:10, 108:9
  108:14
extract 18:5
eye 86:22

**F**

facially 73:23
facilities 35:5
  36:12, 107:25
facility 35:21
  38:17, 109:7
fact 17:11, 21:3
  43:23, 81:14
  86:13, 92:8
  93:1
facts 16:2, 62:19
  103:22
factual 22:25
failed 75:10
fair 21:1, 44:1
  46:17, 52:6
  52:23, 53:20
  83:1, 102:6
  102:7
fairly 27:10
  54:22
fairness 32:1
faith 75:18
falls 8:14, 8:19
  9:3, 9:5, 9:7
  120:5
familiar 11:1

11:11, 30:2
119:15
family 9:13
84:11
far 22:2, 45:6
51:22, 53:21
82:23, 107:22
fashion 18:16
fault 52:17
Feb 2:25
February 8:10
federal 1:17
2:13, 4:17
20:13, 24:6
30:4, 45:20
50:9, 56:16
56:18, 60:23
91:18, 92:7
92:20, 106:25
108:5, 108:6
113:7, 117:14
120:15, 120:24
feel 7:13
feeling 121:9
Feemster
106:19, 106:24
Feemster's
106:23
feet 109:10
fell 97:18
field 66:23
66:23, 102:9
figure 91:17
file 1:5, 80:25
81:8, 125:5
filed 60:11
files 29:23
financial 124:15
financially
123:13
find 17:23
41:24, 53:9
72:2, 96:4, 97:8
finding 113:14
fine 33:3, 76:14
fingertips 117:5

finish 7:17, 7:18
33:4, 120:20
finished 8:2
22:6, 122:18
first 2:14, 7:3
13:20, 15:7
19:16, 20:15
32:10, 37:23
39:20, 49:13
56:17, 64:19
66:9, 71:14
71:16, 71:17
71:23, 77:14
82:23, 83:25
85:6, 109:5
109:8, 114:21
five 30:18, 30:22
57:5, 79:13
109:7, 111:5
flipped 97:20
floor 85:6, 109:5
109:8
focusing 11:7
FOIA 19:6, 26:1
26:8, 26:14
follow 21:2
61:8
follow-up 59:7
121:13
followed 47:4
47:16
following 45:19
96:24, 124:7
127:7
follows 7:4, 71:1
foregoing 123:6
126:4
form 22:12
26:7, 28:11
30:11, 32:22
38:18, 57:15
76:24, 89:19
92:11, 125:21
formal 110:7
former 35:10
Fort 93:11

Deposition of                Gary W. Smith        August 20, 2014

**found** 45:3
63:10
**Foundation**
26:8, 85:14
**four** 9:20, 20:24
109:13
**FPS** 60:22, 61:4
61:12, 61:17
107:14, 108:17
108:21, 117:23
117:25, 118:2
118:4, 119:16
119:25, 120:3
**frame** 9:18, 14:8
15:10, 37:2
66:20
**Francisco** 8:13
**free** 7:13
**Freedom** 18:17
18:22, 18:25
19:3, 24:23
25:6
**friend** 114:9
**front** 116:7
**full** 7:7, 7:22
84:14
**fully** 31:13
68:12, 101:19
**FULTON** 123:4
**function** 102:5
**funds** 111:13
**further** 92:19
123:12

**G**

**gang** 122:7
**Gary** 1:13, 7:2
7:8, 124:5
126:4, 126:9
127:2, 128:1
128:25
**gauge** 16:12
**GC** 115:2
**gears** 20:8, 32:4
**general** 1:7

10:20, 12:11
14:20, 14:22
16:24, 58:6
58:13, 58:17
58:18, 60:19
63:21, 65:5
66:1, 102:4
103:14, 115:15
115:16, 117:1
125:7
**generally** 9:15
15:5, 19:13
20:10, 31:14
82:7
**Georgia** 1:1
1:21, 5:8, 6:6
6:9, 8:6, 123:3
124:3, 124:7
124:8, 125:1
**getting** 26:8
45:6, 52:16
95:13, 100:22
**give** 7:22, 21:3
62:16, 62:17
62:18, 69:5
69:19, 70:21
87:4, 101:19
112:19
**given** 16:2, 16:3
19:10, 25:23
79:2, 113:12
123:10, 124:15
**gives** 87:3
121:9
**giving** 115:16
**Glen** 116:21
117:13, 117:18
**go** 11:6, 11:25
12:20, 12:20
12:21, 13:2
17:12, 18:14
22:18, 26:14
30:14, 31:21
37:6, 39:9
40:20, 65:25
68:2, 69:17

71:8, 71:9
76:13, 82:15
85:4, 85:6, 86:5
91:23, 97:6
103:11, 104:6
105:14, 107:20
111:14, 112:4
112:24, 121:3
**goes** 89:23
118:8
**going** 13:1
14:14, 30:8
30:9, 31:10
31:23, 31:25
35:4, 36:20
43:12, 67:7
70:1, 71:5
72:23, 73:5
74:7, 77:3, 78:4
78:7, 83:8
84:21, 104:4
106:8, 112:16
117:5, 117:8
118:15, 121:22
**good** 11:10
43:19, 64:17
75:17, 102:25
**gotten** 21:11
120:22
**governed** 16:14
**government**
11:19, 93:10
119:11, 120:15
**governs** 24:4
**graduate** 8:1
**Gray** 119:3
**greater** 36:7
**group** 14:23
58:1, 59:1
92:20
**guards** 116:6
116:11
**guess** 34:6, 36:6
37:25, 43:14
58:8, 93:15
100:8, 114:7

**guide** 2:17, 63:4
65:1

**H**

**habitually** 95:10
**half** 20:18
**hall** 50:5, 65:25
**hallways** 86:24
**hand** 10:23
68:6, 78:7, 80:9
83:17, 89:2
89:14, 90:13
96:8, 99:9
105:21
**handed** 107:3
**handing** 77:9
98:23
**handle** 15:2
**handled** 19:4
63:1, 106:2
**handling** 30:10
107:16
**hang** 69:10
75:23
**happen** 7:21
113:25, 121:24
**happened** 45:19
46:9, 46:12
49:4, 49:22
51:16, 53:8
88:16, 103:3
116:14
**hard** 30:21
**Hartford** 100:3
100:4
**head** 28:22
59:10, 118:21
**headquarters**
8:19, 9:5
**heard** 28:4
34:10, 34:14
39:15, 44:3
46:25, 106:24
**hearing** 11:5
15:12, 15:17

22:6, 25:9
25:14, 32:3
32:10, 33:22
35:22, 36:4
36:5, 40:1, 40:4
40:24, 47:23
47:24, 48:5
48:6, 49:1, 51:3
51:10, 51:19
56:7, 63:8
80:25, 81:19
81:23, 84:25
87:6, 87:7
94:23, 112:20
**hearings** 15:13
15:15, 20:22
23:25, 24:14
29:15, 29:24
34:2, 34:9
34:18, 34:23
35:24, 36:1
36:3, 36:21
36:24, 37:4
38:2, 38:25
39:8, 84:9
84:12, 85:23
86:10, 90:9
91:19, 93:18
94:20, 95:1
110:17, 110:19
111:1, 111:2
111:4, 111:6
111:19, 111:23
112:2, 121:5
**heart** 82:15
**heavily** 89:5
96:5, 100:13
**hefty** 20:13
**help** 55:24, 70:1
75:5, 102:1
**helped** 27:17
**hereof** 125:17
126:6
**hereto** 6:20
**hesitance** 104:4
**Hey** 75:9, 76:2

Deposition of              Gary W. Smith        August 20, 2014

hiatus 14:11
high 9:16
higher 14:15
Highland 5:6
highly 66:11
82:16
history 43:1
HOLDER 1:7
125:7
HOLLIS 5:12
23:3, 28:5
30:11, 30:15
32:22, 32:25
33:7, 33:12
38:18, 40:11
67:16, 67:19
67:25, 68:17
70:4, 70:18
71:5, 71:17
71:21, 72:7
72:10, 72:23
73:11, 74:6
74:10, 74:22
76:22, 77:7
82:1, 82:22
83:3, 85:14
86:15, 89:19
90:21, 90:23
91:3, 91:20
92:11, 93:19
94:11, 95:7
98:1, 98:7
98:18, 98:20
99:3, 99:13
99:15, 104:17
108:11, 109:25
112:17, 113:17
115:8, 115:23
117:24, 118:19
120:17, 121:13
121:16, 122:18
Hollis...................
2:5
Homeland
20:17, 35:13
honestly 121:21

housed 9:2
huge 22:3
103:16
HUGHES 6:3
22:12, 26:7
32:6, 57:15
68:20, 69:4
69:17, 69:21
70:9, 70:12
70:21, 72:16
72:20, 74:15
75:24, 78:11
90:20, 91:1
94:13, 96:10
96:13, 99:4
100:20, 100:22
117:16, 117:18
117:21
human 10:6
hunch 119:24
hundred 30:18
109:10
hungry 100:22

**I**

ICE 2:25
idea 102:25
identification
56:16, 56:21
63:16, 64:21
66:7, 67:4, 68:4
70:8, 78:10
80:7, 83:7
83:15, 88:25
89:12, 90:11
91:12, 93:25
96:7, 99:8
100:19, 105:19
106:7, 106:17
110:4, 114:12
116:16, 117:11
identified 71:14
102:8
identify 28:11
57:6, 57:22

59:6, 63:18
64:23, 77:4
80:10, 81:18
96:10, 105:22
118:13
identity 96:1
ignore 60:18
immigration
2:17, 3:17, 5:16
8:12, 8:12, 8:15
8:18, 8:22, 9:6
9:17, 9:20, 9:21
9:23, 9:24, 10:1
10:3, 10:17
10:23, 10:24
10:25, 11:9
11:15, 11:17
11:17, 11:22
12:1, 12:5, 12:8
12:9, 12:17
12:22, 12:25
13:14, 13:14
13:18, 13:19
13:23, 13:24
14:1, 14:3, 14:4
14:7, 14:9
14:10, 14:13
14:18, 15:2
16:19, 17:6
17:20, 19:8
19:15, 19:18
20:11, 20:15
20:19, 21:4
21:16, 21:18
21:20, 21:23
22:5, 31:4
31:13, 31:21
32:16, 34:16
34:19, 36:20
36:22, 37:5
37:12, 38:1
39:9, 46:10
55:14, 56:11
59:9, 60:23
63:21, 63:22
65:1, 65:7, 65:9

66:12, 66:23
66:23, 85:4
93:13, 100:4
101:4, 101:12
102:1, 113:11
116:24, 120:6
121:18, 121:19
122:2, 122:5
122:8, 122:11
imply 73:16
75:3
important 7:16
7:17, 71:22
109:4, 112:15
114:5
impression 49:3
improperly
72:14
improve 63:21
Improved 64:2
improvement
22:3
in-court 15:9
15:16, 21:8
inadvertent
71:15, 73:19
76:9, 98:17
inadvertently
69:7, 69:22
71:11, 71:18
72:4, 73:9
76:21, 77:1
86:3, 99:1, 99:2
inappropriate
43:18
incidence 39:14
incidences
96:15
incident 16:13
41:12, 45:14
45:14, 46:8
46:17, 47:11
78:20, 80:17
89:17, 89:18
97:12, 100:15
102:22, 107:8

incidents 60:17
85:20, 100:10
include 48:2
59:15
included 10:2
18:6, 44:7
61:23
includes 83:18
117:13
including 41:8
45:6, 95:12
incorrect
115:21, 116:2
incorrectly 72:8
indicate 89:16
98:24
indicated 49:19
53:5, 54:7
86:12, 88:7
88:17, 93:21
96:20, 127:8
indicates 81:10
94:7, 99:17
indicating 92:21
103:22
indication 84:16
individual 22:19
31:3, 31:20
59:6, 80:25
108:9
individuals
37:13, 61:12
informal 113:15
information
15:20, 18:18
18:22, 18:25
19:4, 22:20
24:20, 24:24
25:6, 25:20
41:22, 44:25
45:20, 60:10
63:5, 63:9
67:19, 75:21
79:9, 82:2, 87:4
87:11, 100:12
100:17, 103:6

APG USA INC.

Deposition of                    Gary W. Smith        August 20, 2014

| | | | |
|---|---|---|---|
| 106:1, 120:21 | 17:21 | **Jacqueline** 1:3 | 91:19, 92:21 |
| **informed** 51:11 | **investigated** | 6:13, 32:11 | 93:15, 93:19 |
| 51:14 | 16:22, 105:3 | 34:10, 125:3 | 94:7, 97:13 |
| **initially** 41:24 | **investigation** | **January** 10:17 | 97:17, 97:20 |
| **initiate** 19:10 | 2:18, 15:25 | 67:18, 77:15 | 99:11, 101:4 |
| **inner** 50:17 | 61:23, 91:16 | 77:19, 78:1 | 101:13, 101:17 |
| 81:5, 88:20 | 92:7 | **jobs** 10:10 | 102:11, 102:13 |
| 107:23 | **Investigations** | **John** 58:15 | 102:18, 102:22 |
| **input** 120:23 | 65:1 | 58:22, 59:18 | 103:6, 103:10 |
| **inquired** 43:5 | **invited** 105:15 | 59:19 | 103:21, 104:1 |
| **inquiry** 12:24 | **involved** 15:18 | **Jones** 23:16 | 104:1, 104:2 |
| **inspection** 25:5 | 16:10, 16:11 | **Journalist** 3:10 | 104:9, 104:15 |
| **Inspector** 16:24 | 16:15, 16:24 | 4:12 | 105:6, 105:23 |
| 65:4, 66:1 | 18:4, 25:20 | **journalists** 37:2 | 106:14, 110:17 |
| **instance** 31:23 | 33:15, 35:7 | **JR** 1:7, 125:7 | 110:18, 110:23 |
| **instances** 75:14 | 37:11, 40:16 | **judge** 3:6, 3:21 | 111:16, 111:22 |
| **instructed** 79:3 | 41:11, 42:8 | 4:6, 8:9, 8:12 | 112:3, 112:7 |
| **instructing** | 45:4, 48:5 | 8:15, 8:18, 9:17 | 112:16, 113:6 |
| 67:23 | 56:12, 59:13 | 9:24, 10:23 | 113:21, 114:24 |
| **instructions** | 65:18, 67:10 | 11:1, 11:9 | 115:6, 115:12 |
| 52:22, 81:4 | 93:10, 94:21 | 11:15, 11:24 | 115:13, 119:3 |
| **integrating** | **issue** 22:25 | 12:8, 12:10 | 120:11, 121:17 |
| 109:25 | 23:17, 30:5 | 12:17, 12:20 | 121:22, 122:2 |
| **intercede** 12:2 | 31:24, 70:5 | 12:22, 12:23 | 122:5, 122:8 |
| **interest** 66:17 | 72:16, 110:14 | 12:25, 13:14 | 122:11, 122:14 |
| 71:9, 95:4 | 113:22, 118:4 | 13:14, 13:17 | **judge's** 19:10 |
| **interested** 27:25 | **issued** 56:3 | 13:18, 13:19 | 43:16, 49:18 |
| 35:4, 123:14 | 110:10 | 13:23, 13:24 | **judges** 2:17 |
| **interface** 33:19 | **issues** 42:8 | 14:1, 14:2, 14:3 | 9:23, 10:4 |
| 65:20, 66:4 | 42:11, 82:10 | 14:4, 14:6, 14:7 | 10:18, 11:10 |
| 103:15, 103:18 | **issuing** 53:10 | 14:9, 14:10 | 11:16, 11:17 |
| **interfere** 111:15 | 56:6, 79:4 | 14:13, 15:2 | 11:18, 12:5 |
| **interim** 19:25 | | 15:20, 16:19 | 12:19, 15:3 |
| **interns** 10:5 | **J** | 17:6, 17:20 | 19:15, 19:18 |
| **interpret** 52:17 | | 18:10, 18:13 | 19:21, 21:1 |
| **interrogatories** | **Jackie** 3:16 | 19:9, 20:3 | 24:13, 24:21 |
| 2:15, 56:18 | 3:23, 3:25 | 20:23, 21:4 | 27:11, 30:19 |
| 56:24 | 92:22 | 22:5, 23:10 | 30:22, 31:20 |
| **interrogatory** | **Jackson** 50:16 | 23:12, 23:15 | 34:18, 34:21 |
| 57:5, 59:5 | 52:2, 52:5, 52:9 | 24:9, 24:12 | 35:1, 65:1 |
| **interrupt** 80:4 | 53:12, 53:19 | 26:23, 27:1 | 94:24, 95:11 |
| **interrupted** | 53:23, 54:1 | 27:2, 28:4 | 101:9, 101:21 |
| 41:16, 43:10 | 54:1, 55:4, 62:6 | 28:15, 29:5 | 101:25, 102:2 |
| **interruption** | 62:23, 79:14 | 29:6, 29:20 | 109:7, 112:2 |
| 43:23 | 79:15, 84:23 | 30:10, 31:3 | **judicial** 16:15 |
| **investigate** | 85:2, 85:2, 85:8 | 31:4, 31:13 | 16:15, 17:15 |

Deposition of          Gary W. Smith          August 20, 2014

113:13, 124:7
**July** 19:16
  19:21
**June** 54:23
  56:10, 83:19
  90:14
**junior** 54:25
**jurisdiction**
  13:5, 126:15
**justice** 5:15, 6:5
  14:24, 17:2
  18:13, 66:1
  103:17
**juvenile** 27:6
**juveniles** 101:22

**K**

**keep** 18:1, 18:4
  30:24, 86:22
**keeps** 114:9
**Keller** 12:9
  12:20, 12:23
  17:10, 20:3
  47:2, 47:5, 47:6
  47:15, 55:12
  56:12, 57:25
  58:3, 58:21
  61:24, 65:19
  82:14, 83:9
  83:19, 96:16
  97:17, 97:20
  100:1, 103:10
  104:1, 104:1
  104:2, 110:17
**Keller's** 105:24
**kept** 22:11
**kick** 103:25
  104:1, 104:2
**kind** 16:12
  16:17, 18:15
  32:21, 46:2
  52:10, 52:17
  64:19, 92:14
  101:24, 109:17
  118:11

**kinds** 86:24
**knew** 27:22
  27:23, 35:23
  38:24, 38:24
  39:1, 54:7
  66:22, 79:12
  84:7, 84:17
  105:16, 122:15
**know** 7:16, 10:6
  11:9, 11:23
  18:5, 18:7
  18:24, 19:6
  20:6, 21:25
  22:2, 22:7
  22:13, 22:16
  22:17, 22:19
  22:22, 23:14
  23:17, 25:18
  25:22, 27:22
  28:3, 28:6
  29:12, 29:22
  29:25, 30:3
  33:19, 33:22
  34:3, 34:6, 34:7
  34:7, 36:17
  37:7, 37:8
  40:14, 41:9
  41:18, 41:23
  42:10, 44:18
  48:23, 51:2
  51:8, 54:4, 54:5
  56:1, 56:9
  61:16, 61:18
  61:19, 63:2
  65:10, 66:3
  66:14, 66:20
  68:22, 69:3
  69:9, 74:24
  75:9, 78:23
  81:3, 81:6
  81:22, 81:24
  82:12, 82:22
  84:12, 84:23
  85:19, 85:22
  86:19, 86:20
  86:21, 86:22

87:1, 87:1, 88:5
  90:4, 90:8, 92:3
  92:12, 93:17
  94:15, 96:1
  96:3, 97:3, 98:5
  100:21, 104:8
  105:16, 106:5
  106:14, 106:19
  108:14, 111:5
  112:1, 113:1
  113:10, 113:24
  114:25, 119:19
  120:10, 121:20
  121:21, 121:23
**knowing** 95:5
**knowledge**
  26:13, 32:18
  85:16
**known** 61:16
  79:12, 79:24
**knows** 7:20
**Koehl** 1:25
  123:20, 124:20
**Komis** 100:1

**L**

**label** 91:5
**labeled** 77:18
**lack** 9:1, 65:22
**Lackey** 54:19
  62:8
**language** 52:7
**large** 109:14
**late** 8:13, 44:19
**law** 5:4, 5:5
  5:14, 6:4, 10:4
  11:8, 19:6
  36:22, 37:5
  37:12, 66:23
  84:10, 112:8
  124:9
**lawsuit** 22:21
  60:11
**lawyer** 57:17
  73:22, 121:7

**lawyers** 37:9
**layout** 109:3
**lead** 52:2, 53:12
**leading** 23:4
  115:25
**learn** 48:7, 61:3
  61:6, 61:10
  78:25, 92:6
**learned** 50:19
  51:17, 71:14
  71:18, 71:20
  118:1
**learning** 35:3
**leave** 22:24
  40:24, 41:5
  41:7, 49:6
  50:12, 52:1
  52:5, 52:20
  53:17, 80:21
  88:4, 92:22
**leaving** 14:12
**left** 80:24, 81:3
  88:23, 102:9
**legal** 31:6, 31:8
  38:22, 44:8
  90:5, 95:17
  108:15, 115:4
**legislative** 32:15
  33:18, 36:15
  92:13, 92:15
  93:16
**legitimate** 95:4
**letter** 4:9, 12:16
  118:5
**letters** 18:4
  18:4
**level** 9:16, 85:12
**Liberty** 5:17
**limit** 33:2, 84:13
**limitations**
  20:23
**limited** 16:7
  111:13
**Line** 127:12
  127:16, 127:20
  128:3, 128:7

128:11, 128:15
  128:19
**list** 61:21
**listen** 15:12
  15:15, 15:17
  41:24, 111:3
**listened** 111:2
**literally** 84:14
  95:18
**litigation** 5:16
  79:1, 86:5
  124:15
**little** 9:25, 11:5
  13:2, 14:11
  20:8, 21:14
  27:3, 27:4, 32:4
  38:12, 54:11
  60:25, 75:20
**live** 9:9, 9:10
  111:8
**LLC** 5:5, 124:9
**load** 10:9, 31:1
**located** 94:24
**locking** 108:25
**locks** 107:22
**lodged** 18:12
  47:10, 54:13
  78:20
**log** 75:5
**logical** 88:19
**long** 11:23, 13:8
  39:24, 45:19
  54:15, 60:8
  61:24, 62:21
  83:20, 91:9
  91:9, 95:12
  104:7, 107:7
  120:11, 121:6
  121:7
**longer** 22:14
  100:20
**look** 15:17
  15:19, 15:23
  17:17, 17:22
  20:12, 22:21
  26:21, 27:4

Deposition of               Gary W. Smith          August 20, 2014

27:8, 69:6
70:22, 73:7
82:21, 85:24
98:16, 118:11
**look-ins** 111:8
**looked** 45:17
88:8
**looking** 15:24
29:12, 64:4
67:13, 73:3
105:3
**looks** 73:22
75:17, 107:11
107:12
**loop** 41:22
99:11, 115:6
115:10
**lot** 11:7, 24:13
66:24, 110:14
120:4
**low** 109:17
**Luckey** 50:15
50:23, 62:9
62:10, 62:21
79:14, 83:20
83:25, 84:17
87:3
**Luckey's** 83:23
**Lucky** 50:19

### M

**magazine** 66:11
**mailbox** 12:15
**main** 103:17
**major** 29:15
**making** 10:9
24:14, 27:14
57:21
**manageable**
30:25
**management**
19:19, 24:20
**managing** 26:18
**manner** 110:20
**Marion** 50:16

83:21, 94:3
107:7
**mark** 56:15
70:2, 117:6
**marked** 56:20
63:15, 64:20
66:6, 67:3, 67:7
68:3, 68:6, 70:7
78:8, 78:9, 80:6
80:9, 83:14
83:18, 88:24
89:2, 89:11
89:14, 90:10
90:13, 91:11
93:24, 96:6
96:9, 99:7
99:10, 100:18
102:17, 105:18
105:21, 106:6
106:16, 110:3
114:11, 116:15
117:8, 117:10
**marking** 112:12
**Marsi** 1:25
123:20, 124:20
**MaryBeth** 12:9
17:9, 96:16
**Maryland** 22:18
22:19
**master** 29:15
29:19, 29:21
30:17, 30:23
30:24, 31:5
112:20
**masters** 8:3
**material** 82:17
**materials** 64:2
**matter** 10:20
23:22, 26:3
30:9, 30:10
47:6, 74:20
81:18, 82:15
104:14, 106:13
110:15, 112:8
112:9, 125:15
126:5, 127:6

**matters** 42:3
66:17
**McGoings** 14:9
**mean** 22:12
34:8, 39:19
40:18, 41:19
43:3, 70:12
71:25, 75:25
80:4, 85:12
85:18, 89:25
91:9, 91:25
102:7, 104:12
108:23, 109:3
111:9, 121:1
**means** 28:6
121:4
**meant** 54:24
101:1
**mechanisms**
64:6
**medical** 31:24
**meeting** 57:24
58:1, 58:3
58:10, 58:21
59:1, 59:3
99:18, 99:19
99:25, 100:6
**meetings** 57:6
57:22, 58:4
58:20, 58:24
**MegaCenter** 3:4
53:1, 53:2, 88:8
**member** 18:11
26:13, 27:25
28:2, 33:15
33:17, 35:10
35:12, 38:3
59:3, 85:22
89:23, 122:12
**members** 33:20
33:24, 36:11
84:10, 84:11
90:9, 96:1
122:7
**memo** 119:5
**memorandum**

2:16, 63:20
**mentioned**
10:12, 21:6
37:18, 54:13
55:10, 58:8
73:15, 84:10
98:13, 101:3
103:9, 103:10
119:20, 119:22
**message** 35:6
60:15, 60:25
95:3, 97:20
**Michael** 14:9
**middle** 40:1
41:15, 43:20
**mine** 104:6
**minute** 69:6
69:18, 70:21
100:10
**minutes** 23:19
111:14, 112:6
**mischaracterize**
92:1
**mischaracterizes**
91:21, 115:9
**miscommunica...**
53:7
**misconduct**
16:15, 16:16
16:25, 17:15
43:7
**mistake** 73:5
76:5
**Monday** 89:8
89:9
**monitored**
36:16, 46:22
**monitoring**
45:16, 46:6
46:18, 46:19
**months** 8:2
9:20, 103:2
**Mooney** 100:1
**morning** 89:16
90:4, 91:17
92:9, 93:15

96:25, 118:2
118:5
**motion** 72:24
72:25
**motivation** 92:4
**Motor** 109:24
**move** 9:11
77:17, 83:5
**moved** 8:13
9:13, 38:23
**movement** 92:9
**movements**
86:14
**multiple** 103:16

### N

**name** 7:7, 7:9
23:23, 35:9
37:3, 56:8
58:13, 106:23
106:24, 127:8
**names** 14:14
18:19, 37:1
37:16, 62:2
**Narrative**
113:18
**Nation** 2:19
66:11
**nature** 41:3
42:10, 59:23
60:2, 63:11
**Neal** 13:22
116:21, 116:22
116:23
**near** 104:6
**necessary** 16:1
113:14
**need** 26:13, 32:6
40:19, 69:17
69:23, 73:6
73:9, 83:5
95:25, 112:23
113:24, 114:3
**needed** 12:24
46:13, 46:16

Deposition of          Gary W. Smith          August 20, 2014

47:20, 55:19
55:25, 65:25
80:21, 84:1
88:4, 90:7
115:14
**needs** 89:24
95:24
**neutral** 74:13
**never** 7:20, 7:21
18:10, 93:1
106:24, 116:19
118:14, 119:1
119:13, 121:21
**new** 30:18, 31:6
37:9, 101:9
**nods** 28:22
59:10, 118:21
**non-detained**
27:7
**nonredacted**
68:16, 71:3
82:20
**North** 5:6
**NORTHERN**
1:1, 6:6, 125:1
**notarized**
126:22, 126:24
**Notary** 126:18
**note** 39:24
81:17, 81:18
102:9, 118:1
118:24, 119:5
**noted** 26:10
126:25
**notice** 106:23
**noticed** 71:24
**notification**
38:11, 39:6
44:6
**notified** 41:13
41:17, 41:25
49:6, 50:21
**notify** 107:24
108:17
**number** 11:10
15:2, 17:16

28:12, 29:20
84:13, 92:8
96:11, 99:13
119:9, 120:7
**numbers** 18:19
**NW** 5:18

## O

**O'Leary** 14:2
**O.C.G.A** 124:11
**object** 32:25
33:1, 33:6, 71:5
**objecting** 33:3
33:9
**objection** 22:12
23:3, 26:7, 26:9
28:5, 30:11
32:22, 38:18
40:11, 57:12
57:14, 57:15
67:16, 67:19
82:1, 85:14
86:15, 89:19
91:20, 92:11
94:11, 95:7
98:7, 104:17
108:11, 109:25
112:17, 113:17
115:8, 115:23
120:17
**obligation** 74:17
74:18
**obligations** 9:3
**observe** 34:1
34:9, 34:17
36:24, 37:7
38:2, 38:25
39:7, 48:25
51:9, 84:9
84:12, 85:23
86:10, 121:5
**observing** 33:22
87:1, 91:19
93:18
**obtain** 80:25

**obviously** 17:24
30:6
**occasion** 32:13
35:3, 41:11
60:14, 101:4
105:5
**occasional**
58:20
**occasionally**
58:6
**occasions** 22:22
**occur** 103:1
**occurred** 44:10
44:11, 44:14
45:4, 45:5, 45:7
45:21, 45:22
47:18, 47:21
49:7, 60:17
62:13, 62:14
62:18, 80:19
89:17
**OCGA** 6:17
**October** 8:13
8:24
**odd** 86:11, 93:6
**offenders** 122:4
**office** 5:16, 8:11
9:6, 11:15
14:18, 16:23
16:24, 17:12
20:15, 20:19
24:24, 26:17
32:14, 33:18
33:21, 36:15
37:4, 37:12
58:7, 65:2, 65:4
65:11, 65:15
65:21, 66:1
66:4, 66:12
66:16, 93:16
103:14, 103:17
104:5, 117:1
**officer** 19:4
50:16, 51:18
51:23, 51:25
52:2, 52:4, 55:4

62:6, 62:23
79:2, 79:15
84:23, 85:2
96:20
**officers** 52:19
53:2, 53:5, 55:7
88:3
**offices** 16:22
103:15, 124:9
**official** 1:8
45:24, 113:5
119:11, 125:8
**officials** 50:10
81:4, 89:7
91:18, 92:7
92:20
**oftentimes**
62:15
**Oh** 9:5, 64:6
90:22
**OIG** 17:1
103:12, 103:23
104:14, 105:7
105:10, 105:15
**okay** 9:19, 33:12
57:19, 69:6
76:6, 83:1, 99:3
107:13, 115:12
121:11
**old** 22:7
**older** 22:11
**on-bench** 64:2
**one-page** 91:4
**ones** 69:20
**ongoing** 122:10
**onsite** 34:21
35:1, 94:24
**open** 24:25, 31:7
63:8, 97:8
107:20, 113:9
**opened** 10:16
34:17
**operator** 53:2
53:2
**opinion** 79:5
79:5, 102:25

110:11
**opportunity**
43:22, 52:25
62:17
**opposed** 104:23
**opposing** 113:23
**OPR** 2:18, 17:1
65:11, 103:11
103:23, 104:14
105:7, 105:11
105:15
**orally** 102:24
**order** 60:22
61:4, 72:25
113:8
**ordered** 53:6
73:6
**ordinarily** 84:8
97:7, 111:19
**organization**
24:25, 36:2
103:16
**organizations**
120:5
**organized** 18:16
**organizes** 106:1
**original** 4:20
4:20, 127:10
**ought** 75:19
103:23
**outcome** 123:14
**outlined** 64:1
**outside** 36:14
50:10, 109:11
**overly** 35:25
57:12, 57:18
**overseeing** 20:9

## P

**p.m** 100:23
100:23, 122:19
**page** 2:3, 2:11
3:2, 4:2, 57:2
57:4, 59:5
61:20, 63:23

Deposition of                Gary W. Smith        August 20, 2014

67:8, 77:12
77:15, 78:14
78:14, 91:3
92:18, 92:24
93:20, 93:21
98:2, 110:16
114:20, 114:21
114:23, 125:17
126:5, 127:12
127:16, 127:20
128:3, 128:7
128:11, 128:15
128:19
**paragraph** 57:5
61:21, 64:1
64:4, 64:13
110:16
**paraphrasing**
48:24
**part** 17:3, 20:14
20:16, 27:8
34:12, 61:22
74:3, 88:9
119:5, 119:10
**parte** 113:24
**partial** 115:3
**partially** 68:11
**participated**
37:19
**particular** 15:3
16:2, 18:7
20:11, 26:24
27:13, 28:1
28:1, 28:4, 30:5
30:7, 30:8
31:12, 32:24
33:25, 42:1
42:25, 48:17
53:24, 67:7
68:1, 72:1, 84:8
87:5, 103:19
106:2, 113:8
**particularly**
101:9, 102:8
112:15
**parties** 42:19

112:3, 112:11
112:22, 124:14
125:24
**party** 59:3
74:14, 90:3
123:13, 124:12
124:15
**passing** 95:3
**PATRICIA**
5:13
**patrol** 120:7
**pejorative** 41:20
**Pelletier** 29:6
**pending** 26:23
**people** 10:2
10:9, 10:10
24:20, 24:24
33:24, 34:1
34:8, 35:25
36:3, 36:18
36:19, 38:25
41:7, 48:25
50:14, 51:12
51:15, 51:17
51:22, 52:21
53:16, 55:9
61:22, 62:17
63:7, 66:24
79:12, 79:17
84:13, 84:14
86:13, 86:19
86:23, 88:14
88:15, 94:6
97:8, 103:16
107:20, 108:24
109:1, 121:3
121:7
**performance**
19:10, 19:14
**performing** 9:2
**period** 14:11
19:22, 31:25
36:13, 97:19
**periodically**
45:10, 111:3
**permanent**

114:9
**permission**
89:24, 90:7
**person** 11:19
12:12, 15:21
17:25, 25:21
27:5, 27:13
32:16, 48:17
49:1, 53:13
55:24, 57:25
58:4, 58:5, 63:4
66:4, 87:18
103:22, 105:17
109:18, 122:14
**person's** 23:23
43:22
**personal** 25:20
**personally**
113:25, 126:4
**personnel** 51:8
86:18, 88:18
108:8, 108:16
109:15, 122:13
122:15
**persons** 122:1
**perspective** 20:9
26:12, 86:11
107:14
**pertain** 40:15
**phone** 62:16
**physical** 109:3
**physically** 9:8
28:18
**pick** 37:17
**piece** 87:11
103:5
**piecemeal** 71:10
**Piecing** 50:13
**Pike** 9:7
**piloted** 21:17
**place** 15:10
18:13, 20:5
21:12, 64:10
97:8, 125:16
126:5
**places** 9:3

**plaintiff** 1:4, 5:2
7:10, 22:23
32:11, 56:25
57:7, 58:5
58:21, 58:25
60:23, 66:10
84:1, 84:24
84:24, 85:10
86:4, 89:8, 94:9
97:17, 98:22
102:20, 104:16
115:17, 125:4
**plaintiff's** 2:14
56:17, 56:20
59:8, 63:15
63:18, 64:20
66:6, 67:3, 68:3
70:7, 78:9, 80:6
83:11, 83:14
86:14, 88:24
89:11, 90:10
91:11, 91:14
92:9, 93:24
96:6, 99:7
100:18, 105:18
106:6, 106:16
110:3, 114:11
116:15, 117:10
**plan** 15:24
**planning** 94:16
**plastic** 109:20
**pleadings** 49:19
122:11
**please** 7:7, 7:13
12:7, 57:5
63:19, 64:24
67:22, 80:11
81:17, 81:18
105:22, 118:1
**plenty** 109:2
**point** 11:23
17:13, 23:20
32:18, 41:6
41:8, 45:16
47:2, 56:3
58:17, 59:18

74:10, 79:13
87:17, 87:18
87:21, 94:25
100:12, 100:17
105:3, 118:23
119:4
**points** 105:13
**pole** 109:18
**policy** 20:1
20:10, 24:4
120:23
**poor** 64:6
**portion** 17:9
68:16, 68:17
68:20, 68:23
71:3, 73:18
**portions** 76:18
**position** 14:15
17:24, 76:16
76:17, 76:22
80:1, 118:6
**positions** 79:17
**possibly** 12:21
37:19, 58:11
58:21
**posted** 28:14
29:8
**postponed** 32:3
**potentially**
71:18
**preceding**
125:15
**prefaced** 60:25
**preference**
114:7, 121:4
**prehearing**
112:11
**prejudicial**
82:18
**prepare** 106:4
**prepared**
105:23
**presence** 59:8
**present** 6:12
6:19, 23:10
26:14, 43:22

Deposition of            Gary W. Smith        August 20, 2014

72:17
**press** 33:17
  33:19, 33:20
  33:24, 35:11
  36:11
**presumptively**
  26:4, 79:20
**pretty** 11:1
  11:2, 20:13
  24:17, 27:24
**previous** 44:11
**previously**
  107:10
**primarily** 9:3
  27:18
**primary** 115:13
**prior** 79:4
**Privacy** 82:3
**private** 48:10
  48:25, 49:2
  82:2
**privilege** 71:6
  71:7, 73:17
  73:24, 74:4
  75:4, 75:5
  75:19, 77:1
  86:2
**privileged** 67:20
  72:6, 74:2
  74:12, 82:16
  86:1, 86:5, 86:8
  97:21, 106:12
  120:21
**pro** 48:11, 48:16
  63:3, 87:20
  93:8
**probably** 7:21
  26:13, 27:2
  32:1, 43:19
  65:9, 69:17
  71:13, 82:24
  84:20, 85:7
  108:2, 112:21
  117:3, 120:22
**problem** 70:15
  107:25, 108:16

**procedural**
  20:20
**procedure**
  12:13, 47:16
  115:16
**procedures**
  63:25
**proceeding** 41:3
  41:16, 43:5
  43:12, 43:20
  44:13, 48:10
  50:20, 51:2
  51:9, 51:20
  52:15, 53:14
  53:15, 53:24
  54:7, 121:20
  121:21, 122:10
  123:11
**proceedings**
  20:11, 20:24
  23:9, 23:10
  23:12, 23:25
  32:17, 33:16
  34:11, 37:14
  37:20, 38:8
  38:10, 40:16
  43:10, 43:17
  49:6, 53:22
  87:20, 90:7
  93:16, 94:10
  95:6, 97:14
  110:24, 111:15
  111:17, 113:12
  121:2
**process** 12:2
  12:3, 13:1, 15:6
  16:8, 16:19
  18:1, 20:2, 20:4
  20:5, 46:2
  67:21, 71:6
  73:1, 74:4, 86:2
  98:8, 103:20
**procured** 81:8
**produced** 18:15
  71:12, 73:4
  73:9, 76:25

86:3, 86:4, 99:1
**product** 74:2
**production** 72:2
  82:3
**Professional**
  16:23, 65:2
  65:15
**professionalism**
  12:10, 16:20
  17:7, 17:8
  55:14, 65:8
  65:17
**professor** 34:11
  37:6, 39:25
  43:13, 47:3
  49:22, 50:21
  50:25, 51:8
  66:21, 87:14
  96:19, 96:21
  97:3, 110:7
**professors**
  36:23, 37:2
  37:11
**program** 8:2
  12:12, 17:11
  21:17
**prohibited**
  124:11
**promulgate**
  64:17
**promulgated**
  56:24, 64:18
**proper** 82:13
  101:10
**properly** 10:10
  21:19, 72:15
  95:13, 95:14
  107:22, 121:3
  121:10
**protect** 21:4
  109:1
**protective** 4:17
  45:20, 72:25
  106:25, 108:5
  108:6, 117:14
**protocol** 82:13

**provide** 25:14
  59:24, 60:16
  62:14, 124:9
  124:12
**provided** 25:12
  45:17, 50:14
  59:24, 60:1
  60:3, 60:3, 60:4
  60:5, 79:10
  79:11, 80:13
  96:22
**providing** 63:5
  100:16, 104:20
**provision** 24:7
  83:8
**PS** 81:17
**public** 18:12
  18:25, 20:11
  20:22, 21:5
  25:5, 25:17
  26:13, 27:25
  28:2, 32:15
  33:15, 33:18
  33:20, 33:21
  34:9, 35:11
  35:12, 36:15
  38:3, 40:25
  48:14, 53:23
  66:16, 84:9
  84:10, 85:23
  89:24, 90:9
  92:13, 92:15
  93:17, 96:1
  112:14, 113:9
  113:16, 121:5
  122:12, 122:17
  126:18
**published** 66:21
**pull** 27:24
**Pullen** 14:6
**purpose** 70:1
  101:7
**purposes** 63:25
  83:7
**Pursuant** 6:17
  124:6

**push** 24:10
  24:14
**put** 18:17, 18:22
  25:25, 28:10
  88:1, 88:2
  109:16
**puts** 18:18
  18:19

**Q**

**qualify** 100:10
**quality** 19:11
  64:7
**question** 7:12
  7:18, 28:6, 28:8
  30:12, 33:2
  33:6, 38:7, 38:9
  38:15, 38:20
  39:4, 40:13
  53:25, 54:9
  59:15, 65:11
  67:21, 72:7
  74:24, 79:24
  82:23, 82:24
  86:16, 94:19
  95:9, 98:9
  98:10, 104:13
  104:18, 108:13
  113:7, 116:1
**questioned**
  43:15
**questioning**
  43:16, 76:3
  104:5
**questions** 7:11
  49:18, 78:5
  121:14, 123:8
**quick** 32:7
**quickly** 27:24
**quite** 89:21
**quote** 52:6

**R**

**ranting** 51:25

Deposition of          Gary W. Smith          August 20, 2014

52:6, 52:7
**rate** 124:14
**rational** 42:2
**raving** 52:8
**Ray** 68:10, 69:1
94:3
**read** 15:7, 47:17
47:18, 51:5
66:14, 66:15
66:17, 67:1
67:13, 70:25
125:24, 127:5
127:6
**reading** 11:2
11:6, 66:18
**ready** 23:16
23:21, 118:4
**really** 16:8, 18:7
19:4, 20:16
22:8, 36:14
37:24, 66:15
89:20, 101:18
102:1, 114:3
**realm** 11:24
63:13
**reams** 66:25
**reappraised**
19:23
**reason** 11:24
31:15, 31:16
63:13, 95:21
121:1, 122:13
127:14, 127:18
127:22, 128:5
128:9, 128:13
128:17, 128:21
**reasons** 86:23
127:8
**reassign** 32:1
**recall** 32:10
35:6, 35:22
36:18, 37:1
37:12, 42:8
48:4, 53:4
54:21, 55:23
56:7, 58:2

58:24, 59:2
60:14, 60:15
60:22, 62:12
64:10, 65:12
66:18, 67:14
68:15, 71:2
90:2, 91:8, 94:5
96:15, 96:18
99:19, 99:21
99:23, 99:25
102:22, 103:6
104:3, 105:8
105:9, 105:12
106:12, 107:6
110:21, 111:24
114:14, 115:17
119:22
**recalled** 80:19
**receive** 80:15
92:2, 93:23
95:2, 102:21
**received** 21:8
44:6, 44:21
47:8, 47:22
52:22, 54:23
62:7, 65:4
65:13, 100:12
103:8, 106:20
106:22, 119:23
**receiving** 44:25
47:13, 91:8
103:6, 107:6
114:14
**reception** 87:24
**Recess** 32:8
70:24, 100:23
**recollection**
35:16, 42:9
42:17, 44:17
46:14, 49:11
55:1, 60:12
103:7
**recommend**
98:15, 104:12
104:13, 105:2
**record** 7:7

14:23, 23:13
23:22, 24:14
25:16, 40:5
40:18, 40:21
47:9, 47:23
47:24, 49:16
69:13, 69:18
69:25, 70:25
71:22, 77:5
77:9, 77:14
79:16, 80:11
81:11, 83:18
88:9, 91:23
98:22, 103:2
106:9, 107:2
110:2, 110:17
110:18, 110:19
110:19, 111:6
112:2, 112:4
112:9, 112:24
113:5, 114:2
114:4, 114:6
114:8, 114:9
114:10, 116:20
116:22, 117:6
117:12, 123:10
127:8
**recorded** 15:13
22:7, 23:1, 23:9
23:11, 23:13
23:24, 24:1
24:2, 24:4, 24:5
24:16, 111:20
111:23, 112:1
**recorders** 22:4
**recording** 15:11
15:14, 23:12
23:20, 23:21
24:12, 24:17
25:9, 25:11
26:15, 40:6
48:1, 48:1, 48:2
48:2, 48:4, 48:8
111:17, 111:22
112:10, 112:22
**recordings** 21:7

22:10, 22:17
25:5, 111:4
**records** 18:1
18:15, 18:21
18:24, 24:25
26:21, 110:24
111:1, 111:3
**recounted** 44:10
**recounts** 90:15
**recuse** 31:15
**redact** 75:10
**redacted** 68:11
68:12, 68:21
68:23, 69:15
69:16, 70:17
72:9, 72:10
72:14, 72:15
73:13, 73:18
74:21, 74:25
75:1, 75:2
75:13, 76:7
76:19, 76:20
76:23, 76:24
82:2, 82:14
83:8, 89:6, 96:5
100:13, 117:16
117:21
**redacting** 73:20
**redaction** 67:10
**redactions**
71:24, 72:12
75:8
**reduce** 102:24
102:25
**reduced** 123:8
125:20
**refer** 12:22
24:25, 65:3
104:21
**reference** 64:2
**referenced**
120:9
**referral** 124:13
**referred** 15:8
15:16, 16:22
47:6, 96:16

103:23, 104:14
105:7, 120:2
120:2
**referring** 23:5
47:25, 58:14
59:1, 65:12
68:18, 75:14
98:1, 98:6
114:17
**reflect** 62:13
62:17, 89:6
**reflecting** 119:2
**reframe** 7:12
**regard** 25:8
43:4, 63:4, 63:6
63:6, 63:7
104:11
**regarding** 39:1
**Regents** 8:6
**regular** 63:25
**regularly** 11:13
55:15, 110:24
111:7
**regulation** 21:2
24:4, 25:4
**regulations**
20:13, 24:6
82:4, 84:6
124:6
**Reid** 100:1
**related** 35:20
48:9, 82:8
82:10, 119:25
**relating** 47:10
104:15, 111:22
119:11, 120:13
**relative** 48:7
123:12
**relatively** 87:12
**released** 19:7
**relief** 82:8
**remember** 14:5
21:21, 35:9
37:16, 40:7
40:9, 44:18
44:20, 45:9

APG USA INC.

Deposition of                Gary W. Smith        August 20, 2014

64:18, 90:2
106:15, 111:25
120:25
**removal** 42:7
101:14, 110:24
118:7
**remove** 79:3
**rendered** 59:11
115:2
**repeat** 74:22
89:20
**repeated** 46:21
**rephrase** 71:21
**report** 13:11
14:16, 14:17
14:19, 80:16
80:18, 87:12
91:8, 107:7
124:13
**reported** 13:4
13:8, 13:11
13:15, 14:21
49:12, 50:8
**reporter** 6:19
7:20, 71:1
113:4, 117:6
124:8, 124:13
125:20, 127:4
**reporters** 24:12
**reporting** 13:3
124:6, 124:10
124:12, 124:13
**reports** 26:22
27:23, 29:14
**represent** 7:10
**represented**
48:11
**request** 18:18
18:23, 19:1
25:6, 26:1
26:14, 38:15
42:22, 48:15
57:10, 97:5
99:18, 127:7
**requested**
125:19

**requests** 24:25
**require** 62:25
101:22
**required** 24:1
24:3, 55:12
**requirements**
101:14
**research** 59:7
**reserved** 115:18
122:20
**resource** 17:24
55:24
**resources** 10:6
**respect** 46:4
46:16, 55:21
59:13, 59:17
78:20, 95:23
104:9, 104:15
**respondent**
11:20, 25:8
25:15, 25:23
26:1, 26:3
42:23, 44:12
48:5, 48:10
48:11, 48:16
49:4, 49:8
49:10, 49:17
49:18, 63:11
80:22, 81:12
81:15, 87:19
93:7, 96:21
**respondent's**
25:15, 25:24
26:2, 26:4
40:16, 43:21
**respondents**
21:5, 32:2, 63:3
96:22, 112:20
**responding**
99:18
**response** 2:13
25:5, 44:25
47:13, 49:18
53:11, 54:10
56:17, 78:19
110:7

**responses** 56:23
**responsibilities**
9:16, 10:22
**responsibility**
11:14, 16:23
19:9, 27:14
65:2, 65:15
92:14
**responsible** 10:8
105:10, 107:19
108:7, 108:8
**rest** 32:6
**result** 16:5
52:22
**retired** 8:1, 8:7
8:10, 8:15, 9:11
14:6
**return** 50:1
51:16
**returned** 81:8
**returning**
126:22, 126:24
**reversed** 101:12
**review** 8:12, 9:6
14:18, 16:14
16:20, 17:20
20:15, 20:19
29:23, 52:25
66:13, 72:1
101:4, 101:10
101:23, 103:21
105:5
**reviewed** 47:22
79:16, 85:19
**reviewing** 11:11
15:6, 54:12
105:10, 111:3
**revisions** 110:10
**Richard** 1:17
**right** 13:9, 16:7
34:24, 46:9
48:20, 52:10
55:25, 57:10
57:10, 58:22
62:11, 65:13
70:10, 70:19

72:11, 87:13
88:7, 89:18
93:9, 93:14
99:15, 103:12
109:4, 109:9
109:11, 109:13
112:16, 113:9
113:11, 113:16
115:21, 115:22
117:19
**rights** 20:21
48:19, 63:5
87:20
**Robin** 99:17
**role** 11:1, 12:4
12:7, 19:8
26:17, 27:8
45:13, 65:6
65:10, 107:14
107:14
**roles** 19:19
**rolled** 21:19
**rollout** 21:22
**room** 32:7
51:19, 58:1
59:2, 104:7
109:12, 109:14
**rooms** 109:13
**roughly** 29:1
**row** 70:14, 97:3
97:11, 115:18
116:7
**Rule** 72:24
**rules** 20:21
33:10, 39:1
124:6
**run** 29:14, 74:19
**Russell** 1:17

**S**

**San** 8:12
**saw** 55:19
102:17
**saying** 52:18
60:16, 73:12

75:2, 75:11
76:15, 100:11
116:6
**sayings** 114:8
**says** 57:5, 57:12
79:2, 80:24
81:17, 83:25
85:19, 88:10
88:10, 106:14
**scene** 52:10
**schedule** 21:20
30:8
**scheduling**
112:5
**schematic** 16:18
**Schuster** 102:10
**scope** 53:19
54:2
**screen** 105:25
**se** 48:11, 48:16
63:3, 87:20
93:8
**sealing** 113:8
**Sease** 40:2
119:3, 120:12
**Sease's** 39:25
97:13
**seat** 116:7
**second** 20:14
21:6, 67:8
69:10, 73:20
75:23, 77:12
93:21, 98:2
**secret** 99:18
99:23
**secrets** 86:7
106:11
**section** 20:12
20:21, 21:3
85:7, 85:8
92:14
**secure** 109:2
**security** 20:17
35:13, 51:8
51:11, 51:15
51:21, 52:2

APG USA INC.

Deposition of                    Gary W. Smith       August 20, 2014

| | | | | |
|---|---|---|---|---|
| 52:18, 52:21 | **sending** 60:15 | **sic** 53:24, 54:20 | **software** 25:13 | 88:18, 117:25 |
| 53:5, 53:13 | **sense** 71:23 | **side** 102:18 | **somebody** 11:4 | **spoken** 88:3 |
| 53:16, 85:7 | **sensitivity** 42:18 | **sides** 23:16 | 19:3 | **spring** 1:19, 6:7 |
| 85:8, 88:3 | 113:22 | **sideways** 104:1 | **something's** | 8:25, 10:16 |
| 88:18, 108:16 | **sent** 39:24 | 104:2 | 74:12 | 108:1 |
| 108:17, 108:18 | 58:11, 61:2 | **sign** 125:24 | **sorry** 68:19 | **Square** 5:17 |
| 108:20, 108:20 | 61:3, 92:3 | **signature** 57:2 | 90:18, 99:14 | **squeeze** 97:6 |
| 108:22, 108:24 | 101:24 | 122:20, 128:24 | 110:18 | **stack** 70:16 |
| 108:24, 121:17 | **sentence** 93:20 | **signed** 126:22 | **sort** 15:25 | **staff** 10:4, 24:21 |
| 121:19, 121:24 | **separate** 64:19 | 126:24, 127:8 | 29:17, 42:19 | 27:13, 27:16 |
| **see** 9:15, 15:18 | **separated** | **simple** 87:12 | 65:23, 71:8 | 46:3, 50:19 |
| 15:19, 16:21 | 111:18 | **simply** 53:7 | 73:23, 81:17 | 97:2 |
| 18:11, 40:18 | **September** | **single** 4:4, 112:2 | 85:10, 113:15 | **standards** |
| 46:13, 57:8 | 123:15 | **singled** 33:25 | **sorts** 74:11 | 101:11 |
| 57:13, 59:9 | **sequence** 39:20 | **sir** 32:10, 64:8 | **sound** 41:19 | **start** 76:3, 101:2 |
| 61:25, 68:8 | 49:11, 80:20 | 68:8 | **space** 50:17 | **started** 17:11 |
| 68:10, 68:12 | **series** 20:20 | **sit** 32:2, 62:13 | 50:18, 81:5 | 19:14, 21:24 |
| 68:13, 73:12 | 96:15 | 72:21, 87:7 | 86:25, 88:20 | 23:15, 23:18 |
| 74:25, 75:2 | **served** 10:25 | 97:9 | 107:18, 107:23 | 29:23 |
| 75:7, 76:4 | **Service** 4:17 | **site** 100:4, 111:9 | 107:24 | **state** 7:7, 30:3 |
| 77:20, 77:23 | 45:20, 107:1 | **sitting** 44:20 | **spaces** 108:23 | 86:7, 106:11 |
| 81:1, 81:20 | 108:5, 108:6 | **situation** 12:18 | **speak** 45:8 | 123:3, 124:3 |
| 82:17, 83:21 | 117:15 | 98:5, 113:13 | 54:19, 55:6 | 126:2 |
| 84:3, 84:4 | **services** 124:10 | 113:20 | 55:10, 80:22 | **stated** 90:6 |
| 84:18, 87:9 | 124:12 | **six-hour** 22:6 | 104:6 | 123:7 |
| 91:23, 92:18 | **set** 19:20, 30:17 | **Skipping** 98:5 | **speaking** 17:5 | **statement** 6:18 |
| 92:24, 92:25 | 31:5, 31:8 | **slightly** 34:20 | 45:11 | 44:7, 45:7 |
| 93:3, 93:19 | 35:14, 125:16 | **small** 26:25 | **special** 101:22 | 45:18, 47:21 |
| 94:15, 97:22 | 126:5 | 97:1, 109:6 | **specific** 15:8 | 50:15, 51:6 |
| 97:23, 97:24 | **sets** 16:18, 20:21 | 109:12 | 18:21, 46:15 | 54:22, 55:1 |
| 98:16, 102:14 | 20:22, 20:24 | **smaller** 108:3 | 57:10, 63:4 | 62:14, 62:18 |
| 114:18, 115:4 | **seven** 9:25 | **Smith** 1:13, 4:10 | 102:5, 112:1 | 74:19, 75:17 |
| 117:17, 117:24 | 10:13 | 7:2, 7:8, 7:9 | **specifically** 34:8 | 83:23, 86:3 |
| 121:8 | **share** 90:23 | 18:13, 56:19 | 55:21, 55:23 | 87:15, 88:1 |
| **seeing** 90:2 | **she'd** 56:1 | 56:23, 63:18 | 66:18, 82:9 | 88:2, 96:23 |
| 90:3, 94:5 | **Sheet** 126:21 | 64:23, 65:25 | **specifics** 22:21 | 102:10, 102:14 |
| **seen** 16:18 | 126:25, 127:1 | 66:9, 67:6, 77:9 | **specify** 23:4 | **statements** |
| 78:16, 78:17 | 127:9 | 82:14, 83:17 | **speculation** | 50:13, 62:20 |
| 85:21, 85:22 | **shield** 25:4 | 89:2, 89:14 | 94:12, 95:8 | 79:11 |
| 89:25, 94:2 | **shoot** 90:22 | 93:20, 96:8 | 108:12 | **states** 1:1, 1:8 |
| 94:14, 107:9 | **shorthand** | 99:11, 121:17 | **spend** 8:21, 11:7 | 14:24, 57:17 |
| 116:18, 118:14 | 62:16 | 124:5, 126:4 | **spent** 24:13 | 64:25, 82:18 |
| 118:18, 118:23 | **shot** 105:25 | 126:9, 127:2 | 24:18 | 87:3, 98:23 |
| 119:1, 119:4 | **show** 67:6 | 128:1, 128:25 | **spoke** 54:14 | 119:10, 125:1 |
| 119:6, 119:14 | **showed** 46:19 | **Snow** 13:24 | 54:14, 55:3 | 125:8, 126:4 |
| **selected** 38:23 | **shows** 80:20 | **softened** 118:6 | 55:12, 87:24 | **stationed** 8:17 |

Deposition of                Gary W. Smith        August 20, 2014

| | | | | |
|---|---|---|---|---|
| **stay** 51:20 | 3:14 | 60:20 | **sworn** 7:3 | **task** 59:16 |
| 69:24, 69:25 | **Stewart** 2:21 | **suggestion** | 126:4, 126:13 | **tasked** 27:14 |
| **stayed** 31:12 | 10:14, 10:17 | 115:17 | **system** 15:9 | 59:6, 60:18 |
| **step** 14:15, 49:8 | 12:19, 34:16 | **Suite** 5:7, 6:8 | 15:14, 19:15 | **technical** 95:15 |
| 49:13, 87:16 | 34:19, 35:5 | **superior** 84:2 | 19:20, 21:12 | **technology** 22:5 |
| 87:22 | 35:21, 37:19 | 84:21, 86:21 | 22:18, 23:2 | **telephone** 12:16 |
| **Stevens** 1:3, 3:8 | 38:1, 39:19 | 113:2 | 24:22, 25:13 | 47:5, 53:18 |
| 3:16, 3:23, 3:25 | 39:20, 85:25 | **supervised** 8:22 | 26:14, 27:22 | **televideo** 91:19 |
| 4:9, 6:13, 22:23 | 93:11, 93:13 | 8:23, 9:19, 9:21 | 30:4, 30:4 | 93:18 |
| 32:11, 34:3 | 94:8, 96:19 | 10:1, 27:21 | 30:21, 121:8 | **televised** 34:23 |
| 34:10, 34:15 | 100:15, 115:13 | 46:10 | 121:9, 121:10 | 95:6 |
| 35:4, 35:17 | 115:14 | **supervising** | **systems** 95:13 | **tell** 15:5, 25:7 |
| 35:22, 36:17 | **stood** 30:1 | 10:2, 11:10 | | 26:22, 42:5 |
| 37:15, 37:18 | **stop** 7:22 | **supervision** | | 43:7, 45:5 |
| 37:22, 38:14 | **store** 22:20 | 102:4, 107:15 | **T** | 48:19, 48:21 |
| 39:15, 39:25 | **story** 102:19 | **supervisor** 10:7 | | 64:25, 69:14 |
| 40:23, 41:8 | **Street** 1:19, 5:18 | 38:22, 44:8 | **take** 12:3, 14:14 | 74:6, 74:7 |
| 43:8, 43:14 | 6:7, 108:2 | 50:25, 52:9 | 32:7, 36:23 | 79:20, 82:8 |
| 44:4, 44:16 | **Strike** 103:9 | 119:8, 119:9 | 43:4, 46:4 | 86:1, 86:8 |
| 46:4, 47:1, 47:3 | **String** 2:20 | **supervisory** | 46:16, 46:16 | 87:23, 94:16 |
| 47:10, 48:3 | 2:22, 2:24, 3:5 | 90:5 | 59:12, 75:12 | 111:1, 111:25 |
| 49:5, 49:13 | 3:7, 3:9, 3:13 | **suppose** 36:4 | 102:9, 118:11 | 114:4 |
| 49:23, 50:4 | 3:15, 3:20, 3:22 | 46:22, 47:14 | **taken** 7:14 | **telling** 104:22 |
| 50:8, 50:21 | 3:24, 4:5, 4:7 | **supposed** 22:13 | 113:4, 123:7 | 104:23 |
| 51:1, 51:8 | 4:11, 4:13, 4:16 | 24:5, 74:4, 74:7 | 125:15, 125:19 | **templates** 64:3 |
| 51:15, 51:24 | **student** 37:7 | 74:8, 86:4 | 126:5, 127:5 | **tenant** 85:5 |
| 52:5, 52:12 | 50:23, 54:23 | 111:23 | **talk** 7:20, 23:19 | 108:1, 108:2 |
| 52:19, 55:21 | 62:10, 84:19 | **sure** 7:22, 7:24 | 40:19, 54:21 | **tenants** 108:3 |
| 56:7, 56:8 | 109:16 | 10:9, 13:21 | 58:11, 62:15 | **tenure** 15:1 |
| 57:23, 58:9 | **students** 10:5 | 18:9, 18:17 | 98:20, 101:16 | **terms** 75:24 |
| 59:12, 59:13 | 36:24, 84:11 | 18:20, 18:22 | 112:9, 113:21 | **testified** 7:3 |
| 59:17, 61:5 | **study** 8:5 | 21:15, 21:18 | **talked** 45:2 | **testify** 115:23 |
| 66:21, 78:19 | **Stutman** 99:17 | 24:14, 27:10 | 45:9, 47:19 | **testifying** 85:15 |
| 79:3, 80:21 | 100:1 | 27:14, 35:14 | 47:20, 50:14 | 112:17 |
| 87:7, 87:14 | **subject** 106:13 | 69:19, 85:18 | 50:25, 53:12 | **testimony** 91:21 |
| 87:25, 89:18 | 106:15 | 91:22, 94:8 | 57:25, 62:5 | 91:22, 91:24 |
| 90:6, 90:15 | **submitted** 6:18 | 99:12, 101:10 | 62:6, 62:22 | 92:1 |
| 91:18, 93:17 | 19:1 | 103:4, 107:21 | 79:11, 80:13 | **Thank** 54:9 |
| 96:19, 96:21 | **SUBSCRIBED** | 114:3, 114:5 | 81:6, 87:19 | 96:13, 121:11 |
| 97:3, 100:2 | 126:13 | **surface** 115:1 | **talking** 7:19 | **thing** 10:11 |
| 110:8, 114:17 | **subsequent** 43:1 | **susceptible** | 29:16, 43:12 | 16:11, 17:17 |
| 115:18, 119:16 | **substance** 98:11 | 73:23 | 54:11, 54:21 | 18:8, 20:7, 30:1 |
| 120:1, 120:14 | **substantive** | **suspected** | 57:24, 58:1 | 31:2, 83:25 |
| 120:16, 120:24 | 11:16, 112:8 | 122:15 | 68:14, 96:22 | 97:12, 108:25 |
| 125:3 | **suggest** 104:13 | **SW** 1:19, 6:7 | 100:14, 112:11 | 111:18, 112:3 |
| **Stevens-April** | **suggesting** | **switch** 32:4 | 114:18, 114:20 | 113:11, 118:23 |
| | | | **tame** 74:20 | |

APG USA INC.

Deposition of            Gary W. Smith        August 20, 2014

| | | | | |
|---|---|---|---|---|
| 119:20 | 46:11, 46:12 | **top** 64:5, 77:14 | **turn** 20:18 | 77:3, 79:23 |
| **things** 11:12 | 46:12, 46:15 | 77:19, 77:25 | 114:23, 120:8 | 86:17, 88:22 |
| 27:18, 46:11 | 46:25, 50:7 | 78:1, 93:22 | **two** 8:4, 19:23 | 89:21, 93:4 |
| 48:20, 55:18 | 52:3, 54:25 | **totem** 109:18 | 24:18, 29:15 | 95:23, 101:13 |
| 58:7, 59:20 | 56:7, 58:15 | **touch** 29:25 | 75:2, 75:12 | 101:15, 101:17 |
| 60:2, 66:15 | 58:18, 66:20 | **tour** 2:21, 35:6 | 75:12, 76:6 | 101:19, 111:21 |
| 66:15, 71:19 | 67:1, 79:13 | 35:14, 35:17 | 91:2, 94:6 | **understanding** |
| 86:24, 92:16 | 95:14, 95:18 | 35:18, 35:20 | 94:21, 95:10 | 38:6, 39:3 |
| 100:25, 101:22 | 97:2, 105:12 | 35:21, 37:19 | 95:16, 118:6 | 40:23, 41:1 |
| 102:3, 103:1 | 105:16, 111:5 | **Tours** 2:25 | **two-page** 16:17 | 42:24, 43:13 |
| 107:23, 112:12 | 115:7, 118:24 | **track** 36:2, 56:1 | **two-thirds** | 50:3, 51:13 |
| 121:24 | 121:6, 121:7 | 97:15 | 114:21 | 63:24, 93:5 |
| **think** 18:19 | 125:16, 126:5 | **tracking** 17:18 | **two-year** 19:21 | 116:14 |
| 19:2, 35:12 | **timeline** 59:20 | 86:13, 92:8 | **type** 10:11 | **understood** 54:1 |
| 38:9, 39:6, 53:7 | 60:1, 60:16 | **traffic** 85:11 | 16:11, 17:17 | 54:2, 54:4, 54:6 |
| 54:6, 54:24 | 119:22, 120:20 | **trailed** 85:11 | 18:8, 20:7 | **unemployed** 8:4 |
| 58:8, 63:1, 72:4 | **times** 35:24 | **train** 41:16 | 25:22, 27:5 | **Unfortunately** |
| 72:8, 73:2 | 59:21, 84:15 | **trained** 10:10 | 30:1, 31:1, 31:2 | 24:11 |
| 74:16, 74:18 | 95:15 | 24:20, 24:21 | 36:5, 41:23 | **United** 1:1, 1:8 |
| 91:20, 99:10 | **timing** 43:19 | **training** 24:13 | 41:25, 42:5 | 14:24, 57:17 |
| 108:14, 113:19 | **title** 58:16 | 24:18, 37:9 | 42:14, 48:21 | 82:18, 98:23 |
| 119:13, 120:9 | 125:16, 126:5 | 101:8, 101:20 | 63:8, 105:13 | 125:1, 125:8 |
| 121:7, 121:8 | **today** 22:2 | 102:4 | 108:25, 112:13 | **university** 8:6 |
| **thinking** 33:15 | 23:16, 44:20 | **transcript** 3:4 | **types** 16:7 | 37:1 |
| **third** 77:22 | 62:2, 115:1 | 4:20, 18:6 | 23:25, 29:15 | **unredacted** 73:3 |
| 110:15 | **told** 32:15, 38:1 | 48:24, 88:8 | 30:19, 30:20 | 73:13, 74:19 |
| **Thomas** 14:6 | 39:24, 43:9 | 112:15, 123:6 | 46:11, 92:16 | 75:1, 75:3 |
| **thought** 41:16 | 45:6, 45:21 | 123:9, 125:25 | **typewriting** | 75:13 |
| 114:2 | 47:2, 47:20 | 126:5, 126:6 | 123:9 | **unusual** 32:19 |
| **thoughts** 17:23 | 49:7, 49:25 | 127:5, 127:10 | **typewritten** | 36:25, 37:10 |
| **threaten** 121:22 | 51:6, 51:18 | **transcripts** 53:1 | 125:20 | 97:5 |
| 121:23 | 52:1, 52:5 | **transpired** | **typical** 36:2 | **upstairs** 113:3 |
| **three** 21:17 | 52:13, 53:13 | 114:10 | | **USA** 124:9 |
| 70:14, 76:18 | 54:8, 59:23 | **travel** 111:13 | **U** | 124:12, 124:14 |
| 109:12 | 79:22, 79:25 | **triage** 65:23 | | **use** 18:9, 26:22 |
| **time** 8:21, 8:24 | 80:1, 84:1 | **tribunal** 113:4 | **ultimately** 64:17 | 27:23, 32:6 |
| 9:18, 9:19, 11:3 | 85:24, 87:6 | **tried** 30:24, 45:5 | **undated** 77:25 | 101:16 |
| 11:7, 13:19 | 87:14, 87:15 | **triggered** 34:4 | **understand** | **usual** 124:14 |
| 14:12, 15:10 | 87:16, 87:17 | 39:4 | 7:12, 24:22 | **usually** 28:11 |
| 16:6, 17:9 | 88:3, 88:12 | **true** 79:20 | 24:23, 25:3 | 29:4, 31:21 |
| 19:16, 24:13 | 88:15, 90:8 | 123:10, 126:6 | 26:9, 28:7 | 33:21, 109:16 |
| 31:10, 34:14 | 93:5, 102:23 | **truthful** 80:5 | 30:16, 40:14 | 109:18, 111:14 |
| 34:18, 34:21 | 102:24, 114:1 | **try** 15:23, 97:6 | 53:21, 57:17 | |
| 35:21, 36:13 | 115:20, 116:3 | **trying** 14:5 | 57:20, 72:19 | **V** |
| 37:2, 37:21 | 118:2, 118:3 | 96:4, 97:15 | 73:21, 75:5 | |
| 44:3, 45:25 | **Tom** 13:24 | **Tuesday** 89:8 | 75:15, 76:16 | **variations** 75:8 |

APG USA INC.

Deposition of            Gary W. Smith       August 20, 2014

**various** 37:4
48:19, 50:13
107:16
**Vehicles** 109:24
**verified** 56:23
**version** 82:20
107:6
**video** 35:1
94:10, 94:20
94:22, 95:1
95:13, 95:24
96:2
**view** 32:17
33:16, 43:17
72:9, 72:13
72:14, 73:7
79:19
**viewed** 66:11
**viewing** 34:11
**violent** 122:4
**Virginia** 8:14
8:20
**visit** 32:20
37:25, 100:4
111:9
**visiting** 33:16
36:12, 37:14
**visitor** 69:1
74:1, 97:4
**visitors** 2:25
92:16
**Visits** 2:23
**volunteers** 10:5
**vs** 1:5, 125:5
**vulnerable**
122:1

**W**

**waiting** 28:20
28:21, 28:24
50:5, 50:10
109:9
**walk** 111:12
**walked** 97:14
**walking** 25:24

**wall** 28:24
**want** 7:12, 27:2
28:13, 36:9
48:23, 48:25
100:9, 101:9
111:15, 112:4
113:21, 114:5
**wanted** 18:11
18:21, 25:8
35:14, 35:17
41:24, 48:13
49:19, 94:7
97:3, 97:10
**wants** 33:18
48:22, 122:12
**Washington**
5:19
**watch** 48:22
**watched** 85:13
**watchful** 86:22
**watching** 10:8
94:10, 95:6
96:2
**way** 12:23, 23:8
41:20, 46:8
49:9, 59:13
70:17, 72:18
74:11, 74:15
74:16, 75:25
76:5, 76:12
79:6, 88:16
94:20, 102:8
114:21
**we've** 62:3
86:23, 118:12
121:12
**website** 12:14
18:19
**week** 39:16
39:17, 118:3
118:4
**weekly** 29:2
29:3
**weeks** 8:4
**weight** 80:3
**went** 15:14

24:19, 28:13
37:25, 50:17
50:24, 52:12
71:13, 84:24
85:7, 87:23
88:20, 96:19
**willing** 83:3
**window** 50:22
109:15, 109:17
109:19
**withdraw** 33:4
**witness** 15:22
28:22, 59:10
70:13, 72:22
76:3, 77:4
85:15, 91:21
107:3, 112:18
115:24, 118:13
118:16, 118:21
**witnesses** 7:20
15:23, 21:5
42:19, 79:10
**words** 53:15
98:25
**work** 10:23
12:23, 27:15
54:12, 62:23
72:23, 74:2
74:11, 95:13
95:14, 109:18
121:6
**worked** 20:3
21:18, 24:22
59:16, 95:10
95:12
**working** 22:14
31:22, 61:9
95:17, 107:22
111:6, 121:10
**workload** 27:3
27:11
**works** 121:9
**worried** 22:8
**write** 120:10
**writing** 66:22
66:24, 102:24

103:1
**written** 6:18
20:1, 56:3, 56:6
80:12, 80:15
80:16, 80:18
103:5, 115:12
120:14
**wrong** 21:12
115:21
**wrote** 78:19
116:5

**Y**

**yeah** 70:6, 70:20
71:17, 74:9
84:19, 88:10
90:24, 91:4
99:1, 109:16
**year** 8:13, 10:19
**years** 8:10
19:24, 79:13
79:24, 103:1
111:5
**yesterday** 25:10
**you-all** 76:17

**0**

**00005** 117:7
118:20

**1**

**1** 2:13, 56:16
56:20, 83:19
110:16
**1/27/10** 2:20
2:22, 2:24
**1:11** 122:19
**1:12-CV-1352-...**
1:6, 125:6
**10** 3:7, 61:21
64:13, 83:14
83:18
**10:15** 32:8

**10:25** 32:8
**100** 3:24
**1000** 20:20
**1003.27** 20:21
**105** 4:4
**106** 4:5, 4:7
**11** 3:9, 9:20
10:12, 46:10
83:9, 88:24
89:3
**11:22** 70:24
**11:47** 70:24
**110** 4:9
**114** 4:11
**116** 4:13
**117** 4:16
**11th** 47:7
**12** 3:11, 61:20
89:11, 89:15
116:6
**12:30** 100:23
**12:38** 100:23
**12th** 47:22
85:24, 89:8
96:18, 116:8
**13** 3:13, 9:21
10:12, 90:10
90:14
**13th** 89:8, 96:25
114:17, 114:25
**14** 3:15, 91:11
91:14, 92:19
**14th** 39:23
97:13, 119:4
**15** 3:18, 93:24
94:2, 112:6
**15-14-37** 6:17
124:11
**16** 3:20, 96:6
96:9, 98:25
**17** 3:22, 99:7
99:10
**18** 3:24, 8:12
100:18
**19** 3:14, 4:4
102:12, 105:18

Deposition of          Gary W. Smith        August 20, 2014

| | | | |
|---|---|---|---|
| 105:22 | **2014** 1:14 | **4/13/10** 4:11 | **7** |
| **1970s** 22:4 | 123:15, 126:14 | **4/19/10** 3:9, 3:12 | |
| **19th** 44:11 | 127:3 | 3:13, 3:15, 3:19 | **7** 2:24, 59:5 |
| 44:16, 45:15 | **202** 5:20 | **4/21/10** 4:13 | 64:4, 70:3, 70:7 |
| 46:24, 47:11 | **20th** 44:5, 44:21 | **4/27/10** 3:20 | 77:22 |
| 55:11, 78:20 | 44:23, 45:12 | 3:22 | **70** 2:24 |
| 89:9, 89:17 | 45:14, 46:25 | **4/28/10** 3:24 | **74-5** 78:15, 88:9 |
| 90:5, 90:15 | 55:11 | **404** 5:9, 6:10 | **75** 1:19, 6:7 |
| 91:17, 92:9 | **21** 4:7, 106:16 | **450** 5:18 | **78** 3:4 |
| 97:18, 102:19 | 106:21, 107:3 | **47** 93:20 | |
| 107:8 | 116:20 | | **8** |
| **1st** 19:16, 19:21 | **22** 4:9, 110:3 | **5** | |
| 54:23 | 110:6, 110:6 | | **8** 3:4, 20:12 |
| | 110:16 | **5** 2:20, 51:3 | 24:6, 57:4, 78:8 |
| **2** | **23** 4:11, 114:11 | 52:14, 53:24 | 78:9, 78:11 |
| | 114:14, 114:16 | 67:3, 67:7, 67:9 | 78:14 |
| **2** 2:16, 63:15 | **24** 4:13, 116:15 | 67:14, 68:11 | **8.B** 124:6 |
| 63:18, 78:14 | 116:18, 116:20 | 77:10, 109:4 | **8/9/06** 2:16 |
| **20** 1:14, 4:5 | **25** 4:16, 112:20 | 109:10 | **8:30** 31:7 |
| 30:23, 106:6 | 117:9, 117:10 | **5,000** 27:1 | **80** 3:5 |
| 106:8, 106:9 | 118:18, 119:6 | **5/11/10** 4:16 | **810004327** 4:8 |
| 127:3 | 120:9 | **5/12/10** 3:5 | **83** 3:7 |
| **20001** 5:19 | **27** 77:15, 77:19 | **500** 27:2 | **88** 3:9 |
| **2005** 8:11, 8:24 | 96:17 | **548-0400** 5:9 | **89** 3:11 |
| **2006** 12:11 | **27th** 78:1, 110:8 | **56** 2:13 | |
| 63:20 | **2nd** 90:14 | **581-6133** 6:10 | **9** |
| **2008** 9:17, 13:17 | | **59** 21:16, 21:23 | |
| 14:8 | **3** | **5th** 5:18, 123:15 | **9** 3:5, 80:6 |
| **2009** 15:10 | | | 80:10 |
| 19:16, 19:21 | **3** 2:17, 63:23 | **6** | **9/5/14** 124:20 |
| 21:13, 32:12 | 64:20, 64:23 | | **9:40** 1:15 |
| 34:5, 34:13 | 78:14, 78:14 | **6** 2:22, 64:1 | **90** 3:13 |
| 66:20 | 78:14 | 68:3, 68:7 | **91** 3:15 |
| **2009-2010** 37:2 | **30** 8:10, 112:20 | 68:19, 68:24 | **93** 3:18 |
| **2010** 3:14, 10:18 | **30303** 6:9 | 77:18 | **96** 3:20 |
| 15:10, 21:13 | **30307** 5:8 | **6/1/10** 3:7, 4:5 | **99** 3:22 |
| 21:23, 34:17 | **305-0899** 5:20 | 4:7 | |
| 39:12, 67:18 | **309** 5:6 | **6/3/10** 4:10 | |
| 77:15, 77:19 | **31st** 8:15 | **600** 6:8 | |
| 83:19, 89:9 | **37** 72:24 | **63** 2:16 | |
| 92:10, 96:17 | **38** 98:2 | **64** 2:17 | |
| 100:2, 116:21 | **3rd** 47:5, 56:10 | **66** 2:19 | |
| **2011** 8:25, 10:16 | | **67** 2:20 | |
| 13:17 | **4** | **68** 2:22 | |
| **2012** 8:1, 8:16 | | | |
| 9:17 | **4** 2:19, 66:6 | | |

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

JACQUELINE STEVENS,

     Plaintiff,

VS.

ERIC HOLDER, JR., Attorney General of the United States, in his official capacity, et al.,

     Defendants.

CIVIL ACTION FILE NO.:
1:12-CV-1352-0DE

## FEDERAL DEFENDANTS' RESPONSE TO PLAINTIFF'S FIRST CONTINUING INTERROGATORIES TO FEDERAL DEFENDANT SMITH

Pursuant to Federal Rule of Civil Procedure 26 and 33, Federal Defendant Smith hereby responds and objects to Plaintiff's first continuing interrogatories.

## GENERAL OBJECTIONS


PLAINTIFF'S EXHIBIT
PENGAD 800-631-6989

Defendant asserts and incorporates by reference the following general objections and qualifications to Plaintiff's requests as though they were set forth in full in each response:

1. Defendant objects that the interrogatories are overly broad and outside the scope of this litigation to the extent they seek information with respect to events, communications, and/or circumstances occurring outside the relevant time period.

2. Defendant objects that the interrogatories are vague, overly broad and unduly burdensome to the extent they contemplate *Bivens* claims-related by seeking information "concerning any of the facts or circumstances referred to in the Amended Complaint" which have been dismissed by this Court.

3. Defendant objects to the extent that Plaintiff seeks information protected from disclosure by attorney-client privilege, attorney work product doctrine, deliberative process privilege, law enforcement/investigatory files privilege, self-critical analysis privilege, and other applicable privileges. Defendants also object under the Privacy Act, 5 U.S.C. §552a, the Freedom of Information Act, 5 U.S.C. §552, the Inspector General Act of 1978, 5 U.S.C.

App. 3 §7(b) and other state or federal statutes and privacy regulations, or other regulations preventing disclosure of specific alien information (such as, but not limited to:  8 U.S.C. §§1160(b)(5),(6),  1186A(c)(4),  1202(f),  1254a(c)(6), 1255a(c)(4)(5),  1304(b) and 1367(a)(2)(b),(c),(d), 22 U.S.C. §7105(c)(1)(C), 8 C.F.R. §§208.6,  210.2(e),214.14(e),  216.5(e)(3)(iii),  216.5(e)(3)(viii),  236.6, 244.16, 245a.2(t), 245a.21, 1003.46, 1208.6.

This response is made without waiver of, and with express reservation of all questions as to competency, relevancy, materiality, and admissibility of the responses to requests as evidence for any purpose in any further proceedings in this action (including the trial of this action) or in any other action.

Discovery has not concluded in this litigation.  Accordingly, Defendant's responses to Plaintiff's requests are based upon the information available at this stage of the litigation.  Defendant reserves the right to rely upon any facts, documents, or other evidence which may develop or come to its attention subsequent to this response.

Likewise, Defendant's objections to Plaintiff's requests are based upon the information presently known by the Government, and are made without

prejudice to the Government's right to assert additional objections in the event that additional grounds for objections should be discovered by the Government subsequent to this response.

The general objections and qualifications set forth above apply to each request. For convenience, they are not repeated after each discovery request, but rather are set forth here and are incorporated into each response. The assertion of the same, similar, or additional objections or the provision of partial answers in the individual responses to these requests does not waive or modify any of the Defendant's general objections.

Without waiving the above objections, Defendant will provide responses to only relevant non-privileged matters based on information currently available to Defendant, subject only to the requirements for supplementation of responses contained in Fed. R. Civ. P. 26(e).

### __INTERROGATORIES__

1.

Please identify, as defined herein, all persons who provided information on which you relied in responding to any of these Interrogatories, and, for each such person, state the relationship between that person and any of the